**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

..........................................................................

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:21-CR-208 (APM) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **MOTION TO REVOKE OR** |
| | : | **AMEND MAGISTRATE'S ORDER** |
| | : | **OF PRE-TRIAL DETENTION** |
| THOMAS WEBSTER, | : | |
| | : | |
| Defendant. | : | |

..........................................................................

Defendant Thomas Webster (hereinafter "Webster"), by and through his attorneys, Dupee & Monroe, P.C., submits his Motion to Revoke or Amend Magistrate Andrew E. Krause's Order of Pre-Trial Detention dated February 23, 2021 pursuant to 18 U.S.C. §3145(b) and in support thereof, states as follows:

## I. INTRODUCTION

1.     Defendant was indicted on March 12, 2021 upon charges of: Assaulting, Resisting, or Impeding Certain Officers Using A Dangerous Weapon 18 U.S.C. §111(a)(1) & (b); Civil Disorder 18 U.S.C. §231(a)(3); Entering And Remaining In A Restricted Building Or Grounds With A Deadly Or Dangerous Weapon 18 U.S.C. §1752(a)(1) & (b)((1)(A); Disorderly and Destructive Conduct In A Restricted Building Or Grounds With A Deadly Or Dangerous Weapon; 18 U.S.C. §1752(a)(2) & (b)(1)(A); Engaging In Physical Violence 18 U.S.C. §1752(a)(4) & (b)(1)(A); Disorderly Conduct Within The Capitol Grounds Or Buildings 40 U.S.C. §5104(e)(2)(D); and Active Physical Violence Within The Capitol Grounds Or Buildings 40 U.S.C. §5104(e)(2)(F).

## II. FACTS

2.      A Detention Hearing was held before Magistrate Andrew E. Krause on February 23

2021. (Exhibit "A")  At hearing, Magistrate Krause denied defendant's request for pretrial release.

Webster now moves pursuant to 18 U.S.C. §3145(b) for his pre-trial release.  Although the D.C.

Circuit has yet to opine on the question, *See, United States v. Munchel,* 991 F.3d 127, 1280 (D.C.

Cir. 2021), substantial precedent supports the view that Magistrate Krause's February 23rd Detention

Order is subject to *de novo* review.  *See, United States v. DeGrave,* 2021 WL 1940536 at *7 (D.D.C.

May 14, 2021); *United States v. Caldwell,* 2021 WL 2036667 at *5 (D.D.C. May 21, 2021); *United

States v. Owens,* 2021 WL 2188144 at *5 (D.D.C. May 28, 2021); *United States v. Glasgow*, 2021

WL 2403136 at *5 ( D.D.C. June 11, 2021).

3.      Webster is 55 years old having been born in Brooklyn, New York on March 25, 1966.

Defendant lived in a stable and loving home in Florida, New York with his wife and three children.

Defendant and his wife Michelle Webster were married on July 16, 1999.  The Websters are devoted

Catholics and are active parishioners of the Church of St. Johns The Evangelist in Goshen, New

York.  Defendant was raised with his two siblings by his supportive parents John and Yvonne

Webster in Suffern, New York.  Defendants' parents are alive and remain residents of Rockland

County, New York.  Defendant Webster graduated from Suffern High School in 1984 and following

a short stint at the Rockland County Community College enlisted in the United States Marine Corps

on November 1, 1985.

4.      While in the service of our country, Webster received a meritorious promotion to

Private First Class on January 2, 1986; was promoted to Lance Corporal on September 1, 1986; and

was ultimately promoted to the rank of Corporal on September 1, 1988.  (Exhibit "B").  As a Lance

Corporal, defendant received a Letter of Appreciation (Exhibit " B ") from his Commanding Officer reciting his outstanding conduct as a Marine for the time period between August 18, 1986 to February 23, 1987.  Defendant also received a Certificate of Good Conduct from the United States Marine Corps for the period of November 1, 1985 to October 31, 1988 on November 1, 1988. (Exhibit "B ")  As a Marine, defendant also received the Sea Service Deployment Ribbon; Good Conduct Medal; Meritorious Unit Recommendation; and Rifle Expert Badge.  Webster was Honorably Discharged from the United States Marine Corps on October 31, 1989.  (Exhibit " B")

5.      Following Webster's exemplary service with the United States Marine Corps, defendant applied to and was accepted by the New York City Police Department's (hereinafter N.Y.P.D.) Academy on April 30, 1991.  (Exhibit "C") Webster's law enforcement career started at the New York City Housing Police Department - - which was subsequently merged with the N.Y.P.D.  Defendant was tasked with the responsibility of policing some of the City's most dangerous low-income housing projects.  As a patrolman, Webster confronted violent/hostile citizens on almost a daily basis.  As evidenced by the attached records, Webster consistently demonstrated a high degree of professionalism and restraint in his dealings with the public.  At no time during the course of Webster's twenty year career with the N.Y.P.D. did he ever have to resort to using his firearm.  As in the Marine Corps, defendant received high marks from his superiors for his integrity and good conduct.  Since retiring from the N.Y.P.D. in 2011, defendant has remained self employed as a landscaper under the name Semper Fi Landscaping.

6.      Webster's high moral character is exemplified by a private letter to then Mayor Rudolph Giuliani on May 15, 1997 stating:

Dear Mayor:

I am a Resident Patrol Supervisor at Gun Hill Houses located in the

North Bronx. I am writing to let you know what a great job the
Residents at Gun Hill think your officers are doing.

Police Officer Webster and Police Officer Morales have demonstrated
to us that they are concerned about the quality of life in our community.
They are always courteous and ready to respond to any situation.

Just as we speak out when we think there is a problem in our community
with the police officers, we are writing to give Police Officer Webster and
Police Officer Morales the praise they so richly deserve. (Exhibit "D")

7.      With the exception of having accidentally misplaced his police identification card,

Webster was never disciplined as a police officer. Only one substantiated complaint for excessive

force was filed against the defendant during his twenty years of service. As a product of Webster's

high performance ratings, he was assigned as a Firearm Instructor at the KNAPWEED's Academy

and subsequently reassigned to Mayor Bloomberg's private security detail. In this role, Webster

served in both uniform and non-uniform capacity and was responsible for guarding the Mayor and

high ranking city public officials both within the City of New York and abroad.

8.      As previously stated by Webster (Exhibit "E") and verified by the Federal Bureau of

Investigation, (Exhibit "F") defendant has no prior arrests; no social media presence; is not a member

of political organizations; and presents no present or future threat to the United States of America

or its citizens. (Exhibit "F" at pgs. 4-6)

9.      Webster traveled from his Florida, New York home to Washington D.C. during the

early morning hours of January 4, 2021. Defendant checked into the Lombardy Hotel located on

N.R. Pennsylvania Avenue in Washington D.C. on January 5, 2021. Webster traveled alone and had

no plans of meeting anyone/group during his stay in D.C. On the evening of January 5th, defendant

attended the "Freedom Rally" and listened to speeches given by former National Security Advisor

Michael Flynn, and long time advisor to Former President Trump Roger Stone. However misguided,

Webster attended the January 5th rally at Freedom Plaza to protest the results of the 2020 presidential election. Webster attended the January 5th rally alone and did not participate in any form of criminal activity.

10.     On Wednesday January 6, 2021,  Webster attended the rally held at the Ellipse in Washington D.C. where many speakers, including the then - President of the United States, Donald J. Trump, and the President's former private counsel Rudolph Giulani exhorted attendees to march to the Capitol to protest the Certification of the Electoral College Vote count for the 2020 Presidential election.   Again, Webster attended the January 6th rally alone and was generally unfamiliar with the area having not visited Washington D.C. in more than twenty years prior to January 6th.  Webster remained at the rally held at the Ellipse until the end of most of the speeches before walking down Pennsylvania Avenue towards the Capitol to exercise his First Amendment right to protest.  The temperature outside in Washington D.C. on January 6th at approximately 1:00 P.M. was 43 degrees.  Defendant was dressed appropriately for the weather conditions wearing a brightly colored black/white/red winter jacket, blue jeans, brown leather gloves, and work boots. Defendant also wore his bullet proof vest originally issued to him by the N.Y.P.D.  under his winter jacket.  Given the political climate, defendant was concerned for his personal safety in the event he was to encounter counter-protestors or members of left-wing organizations such as Antifa.  As a precautionary measure, defendant left his service revolver -- that he customarily carries - - in his hotel room.  After some quiet reflection, Webster also decided to bring a Marine Corps Flag attached to a lightweight half inch hollow aluminum five foot flagpole. The flagpole consists of two sections measuring two and half feet in length each weighing .425 pounds or .68 ounces. (*e.g.* Exhibit "G") Defendant had never attended a protest or political rally prior to January 5th.  Defendant had no intention of disrupting the Congressional proceedings or engaging in any type of assaultive behavior

with any counter protestor or member of law enforcement.

11.     A joint session of the United States Congress convened on January 6th to certify the 2020 Presidential Election which had taken place on November 3, 2020. The joint session began at approximately 1:00 P.M., with then - Vice President Michael R. Pence presiding. By 1:30 P.M. the United States House of Representatives and the United Stats Senate adjourned to separate chambers within the Capitol to resolve an objection raised in the joint session. Shortly after 2:00 P.M., a crowd of protestors were reported to have forcibly entered into the Capitol Building causing members of the Senate and House of Representatives to evacuate the chambers of the Capitol and suspend the certification process of the Presidential Election results. According to the Government's body cam video (Exhibit "H") Webster first appears at the police line in the presence of Officer N. R. at 2:28 P.M. after the Capitol Building had been breached. *See also,* Government's Statement of Facts dated February 19, 2021. (Exhibit "I") Webster ascended the base of the west front of the Capitol's exterior stairs where he confronted Officer N.R. at the bike rack barricade line. As confirmed by subsequent FBI investigations (Exhibit "F"), Mr. Webster never entered the Capitol Building or caused any property damage. For the ten minutes prior to encountering the defendant, Officer N.R. can be seen reaching over the metal barrier and pushing a female protester holding a flag to the ground on two separate occasions. (Exhibit "H" at 14:18:08 and 14:18:22) Notwithstanding what was occurring behind this police line - - (i.e., the breach of the Capitol) - - the protestors assembled in front of Officer N.R. were by and large peaceful. It was only after tear gas and pepper spray were deployed by police upon this group of peaceful protestors that the crowds changed. (Exhibit "H" at 14:18:18)

12.     Officer N.R. was equipped with a helmet, shield, gas mask and a full complement of body armor. (Exhibit "H") Officer N.R. loses his right glove in his initial altercation with a female

protestor. (Exhibit "H" at 14:18:11) The remaining glove on Officer N.R.'s left hand was identified as a "tactical glove" manufactured by a company known as Mechanix Wear.

13.     The pepper spray and tear gas deployed by police at this police line caused the protestors to dissipate and fall back towards the street.  The remaining protestors - - who did not attend the protest with a mask or face shield - - are observed suffering the effects of being gassed and pepper sprayed by the police.  By 14:23:21 the Government's body cam video shows that as the gas and pepper spray dissipates,  the protestors reassemble in front of Officer N.R. The body cam video also establishes that many of the protestors - - including Webster - - are outside the Capitol holding a variety of flags attached to flagpoles.

14.     Showing little regard for the peaceful protestors present, Officer N.R. can be seen reaching over the metal barrier and pushing a peaceful male protestor wearing a maroon sweatshirt who was blinded by pepper spray. (Exhibit "H" at 14:20:45 by 14:23:06) Officer N.R. can also be observed mocking several protestors who were complaining about this Officer's excessive use of force.

15.     Late to the protest, Webster observed the retreating protestors gassed and/or pepper sprayed by the police as he made his way up to the base of the front of the Capitol's stairs.  Angered by the police use of force, Webster is first seen emerging from the crowd of protestors holding his flagpole with an attached Marine Corps flag in his right hand behind him - - away from the police. Upset by the retreating protestors Webster is heard angrily referring to the police officers as "commie motherfuckers".  As a former U.S. Marine and a member of law enforcement, defendant's moral instinct was to protect the innocent.  As Webster continues to hold his flagpole and attached flag in his right hand - - in a position furthest away from the police - - the Government video goes on to depict Webster objecting to the Officers "attacking Americans".  (Exhibit " H " at 14:28:26)  In

keeping with tactics Officer N.R. used against other protestors, the video depict this officer reaching beyond the metal barrier and pushing Webster on the chest with his left glove hand. (Exhibit "H" at 14:28:29) In response, Webster switches the flagpole from his right to his left hand while still keeping the flagpole behind his body and in position furthest away from the police. Webster arrived at the Capitol with his Marine Corps flag to express his patriotism, not to use a weapon or device to intimidate law enforcement.

16.     It is at this point (Exhibit "H" at 14:28:28), that Officer N.R. again reaches over the metal barricade and punches Webster on the left side of his face with his left hand that is covered with a black tactical glove. Up until this point in time, Webster had not made any attempt to cross the police barricade or engage in a physical altercation with any member of law enforcement. Provoked by Officer N.R.'s use of force, Webster is observed on the Government's video pushing the metal police barrier with his right hand. (Exhibit "H" at 14:28:36) Webster also responds to being punched by telling the Officers "fuck you". From the video, Webster can also be heard saying after being punched "come on, take your shit off. Take your shit off." By 14:28:38, the Government's body cam video shows the officers' attempt to take the flagpole and flag from Webster. Officer N.R. and an unidentified Officer to his immediate right, grab the top part of the flagpole/flag causing the pole to separate, leaving Webster with only the bottom half of the pole. (Exhibit "H" at 14:28:39) With only the bottom of the pole in his hand, Webster is seen drawing the pole over his head and striking the top of the metal police barrier. (Exhibit "H" at 14:28:40) During the initial brief exchange between Webster and Officer N.R. defendant lost possession of the remaining portion of the flagpole. This first encounter between Webster and Officer N.R. lasts a total of one and a half seconds. (Exhibit " H " at 14:28:46) Webster does not regain possession or control of his flagpole after making physical contact with Officer N.R.   After a brief separation of

time and space (Exhibit "H" at 14:28:52), Webster can be seen charging Officer N.R. as the rest of the police line disintegrates. Outside the purview of Officer N.R.'s body cam, Webster alleges that this officer urged the defendant to charge on by using provocative hand gestures. At this point, the video depicts Webster wrestling with Officer N.R. for a period of approximately fourteen seconds. (Exhibit "H" at 14:29:07) The Government's Statement of Facts (Exhibit "I" at Pgs. 2-3) is devoid of any allegation that Officer N.R. suffered any serious injury as a result of this encounter. Most importantly, the Government's body cam video demonstrates that Webster never struck Officer N.R. with the flagpole. Following this brief struggle there is no evidence that Webster pursued Officer N.R. or engaged in any other type of assaultive behavior. In fact, a separate video derived from a public source (Exhibit "J") shows Webster shortly thereafter behind police lines with his hands up acting in a peaceful and compliant manner.

17. Finally, a later video posted on YouTube shows a deflated Webster on the staircase leading to the upper west entrance of the Capitol Building stating sheepishly to the camera, "Send more patriots. We need some help." Exhibit "K" *Compare,* Exhibit "I ". Defendant never entered the Capitol Building or caused any destruction to property. Webster also did not engage in any other form of aggressive or assaultive behavior towards members of law enforcement.

18. Shortly after appearing on the YouTube video (Exhibit "K"), Webster walked back to his hotel and departed for home the same day. Needless to say, Webster was not the subject of alleged criminal activity since leaving Washington D.C. on January 6th and voluntarily surrendering himself to the FBI on February 22, 2021. After Webster saw that his photo appeared as a person of interest on the FBI website's most wanted page, he quickly retained the legal services of our office. At the behest of the defendant, contact was made with the FBI's Hudson Valley office on February 16, 2021. Based upon this  contact, together with information already in the possession of the

Federal Authorities, a criminal complaint was filed against Webster with the United States District Court for the District of Columbia on February 19, 2021. (Exhibit " L") Arrangements were made on February 20th with the FBI for defendant's peaceful surrender on Monday, February 22nd. Defendant appeared with counsel at the FBI's Hudson Valley office on the afternoon of February 22nd, consented to be interviewed (Exhibit "E"), and surrendered a laundry list of property relevant to the Government's investigation, including all of the defendant's firearms. (Exhibit "M") At the same time, proof was provided to the FBI that counsel for the defendant was in possession of defendant's New York State Driver's License; New York State Pistol Permit; and United States Passport -- all of which currently remain in defense counsel's possession. During Webster's initial interview with the FBI, defendant expressed remorse and exhibited a level of candor not often demonstrated by an individual in his situation. (Exhibit "E" at pg. 14 -- pg. 18) Following defendant's interview (Exhibit "E") and the surrender of property receipt (Exhibit "M"), defendant was taken into custody without incident.

19.     Defendant and his wife Michelle Webster were interviewed by Officer Andrew Abbott from Pre-Trial Services during the late morning of February 23, 2021. (Exhibit "N") Defendant's personal history and deep ties to the community as described above are outlined in Pre-Trial Services' report. *Id.* Ms. Webster advised that she was/is employed as a sales account manager earning the sum of approximately $260,000.00 and expressed a willingness to co-sign a bond on her husband's behalf. As reflected by Officer Abbott's report the defendant and his wife maintain employment and assets commensurate with an upper middle- class family. Defendant was/is in good physical health. Webster has no history of mental health treatment, substance abuse history, alcohol abuse or substance abuse treatment. As stated, Webster has no prior criminal record as confirmed by the Federal Government. (Exhibit "F")  According to Pre-Trial Services' report, there were no

known factors indicating defendant poses a risk of non-appearance. The only negative finding made were that defendant posed a risk of danger due to the nature of the instant offense. Ultimately, Pretrial Services recommended to Magistrate Krause:

> To reasonably ensure the defendant's appearance and the safety of the community, Pretrial Services respectfully recommends the defendant be released on an unsecured bond, co-signed by two financially responsible people with the following additional conditions of release:
>
> 1. Pretrial Services supervision as directed.
>
> 2. Curfew enforced by Location Monitoring (hours to be set by Pretrial Services) and defendant shall be permitted to self-install the location monitoring equipment.
>
> 3. Surrender any travel documents/do not apply for passport.
>
> 4. Travel restricted to the Southern and Eastern Districts of New York and the District of Columbia for Court purposes or meetings with counsel only.
>
> 5. Not possess a firearm, destructive device, or other weapon.
>
> 6. Surrender any firearms located in defendant's residence or in his possession and provide proof to Pretrial Services.
>
> 7. Refrain from use or unlawful possession of narcotic drug or other controlled substances defined in 21 U.S.C. 802, unless prescribed by a licensed medical practitioner. (Exhibit "N")

20.     In addition to Mrs. Webster, defendant's brother-in-law Robert Catanzaro and long time friend and retired N.Y.P.D. Lieutenant Frank Sialiano are also willing to co-sign a bond on defendant's behalf.  Defendant respectfully requests that the Court take judicial notice of the information and recommendations contained in Pretrial Services' report. (Exhibit "N ") *See, United States v. Grant*, 2020 WL 7640873 at *4 (D.Colo. Dec. 23, 2020); *United States v. Flores-Bocanegra*, 2021 WL 1215820 at *3 (S.D. Fla. April 1, 2021); *United States v. Dolan*, 2021 WL 2312860 at *5 (S.D. Fla. June 7, 2021).

21.     Later the same day, on February 23rd, Webster appeared with counsel via video conference before Magistrate Andrew E. Krause. (Exhibit "A") After hearing arguments from the Government and defense, Magistrate Krause made the following findings:

1.     The nature and circumstances of the offense charged here strongly, in my view, strongly support detention. We're talking about an assault on a law enforcement officer first by means of a weapon, later by means of physical confrontation with fists. That is significant, significant violent act that is extremely problematic in a civilized society. The nature and circumstances of the offense charged here certainly support detention, as does the weight of the evidence. (Exhibit "A" at pg. 50 L-17-- L-24)

2.     On the other hand, there's no question that Mr. Webster's history and characteristics strongly weigh in favor of release. He has, as Mr. Monroe capably pointed out, extremely deep ties to the community, multiple generations of his family, his spouse, his children, his parents, he's a business owner, he has been a productive, and more than just productive, but a valuable member of society in his prior work as a public servant, and clearly those factors all point very much in favor of release. (Exhibit "A" at pg. 51 L-7 --L-15)

3.     [P]retrial Services recommendation is also in favor of release, which I take very seriously, and I respect and appreciate the work of the Pretrial Services office. (Exhibit "A" at pg. 51 L-15--L18)

4.     At the end of the day, as you can tell, I think there are a lot of strong arguments on both sides of this case but the final factor in the statute is the nature and seriousness of the danger to any person in the community that would be posed by Mr. Webster's release, and at the end of the day I find that Mr. Webster would pose a danger to the community if released. I believe that the circumstances that lead to Mr. Webster's attack on the law enforcement officer that we see in this video could certainly repeat themselves. There were obviously some unusual circumstances and other outside factors on January 6, 2021, in Washington D.C., but the undercurrent of the political hostility and the other supporting factors that lead a person who has led an exemplary life, had an exemplary career of public service to act in this extraordinary way continue to be

part of our society, and will continue to be part of our society for the foreseeable future. So I cannot sit here today and conclude that the person that I have seen on this video attacking law enforcement does not pose a danger to the community, and I will order detention on that basis. (Exhibit "A" at pg. 51 L-19 -- pg. 52 L-12)

5.    I will for the record, find that I do not believe that Mr. Webster poses a risk of flight. I believe that the government has not met its burden even by a preponderance of the evidence that Mr. Webster poses a risk of flight. I think that with the financial resources documents in the Pretrial Services' report, the extremely strong ties in the community that Mr. Monroe has documented and that are also documented in the Pretrial Services' report, that there are conditions of release that could ensure Mr. Webster's appearance for all future proceedings in this criminal matter. (Exhibit "A" at pg. 52 L-13 -- L-22)

6.    So my determination in favor of detention today is based solely on the issue of danger to the community. (Exhibit "A" at pg. 52 L-23 -- L-24)

## III.  LEGAL STANDARD

22.    The Bail Reform Act 18 U.S.C. §1841 *et seq.* authorizes the detention of defendant awaiting trial on a Federal offense only under certain limited circumstances. 18 U.S.C. §3142(f) The policy underlying the Bail Reform Act "is to permit release under the least restricted condition compatible with assuring the future appearance of the defendant." *U.S. v. Price*, 773 F.2d 1526, 1527 (11th Cir. 1985) (*per curiam*). "Under the statutory scheme set forth in the Bail Reform Act,, 'it is only a limited group of offenders who should be denied bail pending trial.'" *U.S.. v. Munchel*, 991 F.3d 1273, 1279-80 (D.C. Cir. 2021) "In our society liberty is the norm, and detention prior to trial or without trial is the careful limited exception." *U.S.C. v. Salerno,* 481 U.S.. 739, 755 (1987)

23.    The Bail Reform Act of 1984 authorizes detention under limited exceptions by providing that the Court "shall order" a defendant detained before trial if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the

safety of any other person and the community." 18 U.S.C. §3142(e). "In common parlance, the

relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community'." *U.S. v.*

*Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). When the basis for pretrial detention is the

defendant's danger to the community, the Government is required to demonstrate the appropriateness

of detention by clear and convincing evidence. *See,* 18 U.S.C. §3142(f). When the basis for pretrial

detention is the defendant's risk of flight, the Government is required to demonstrate the

appropriateness of detention by a preponderance of the evidence. *See,* 18 U.S.C. §3142(e); *See, also*

*U.S. v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996). First, the Government may seek a defendant's

pre-trial detention if the charged offenses fall into any of five enumerated categories. 18 U.S.C.

§3142(f)(1). Those categories include:

> (A)    a crime of violence,[1] a violation of §1591, or an offense listed
>        in §2332(b)(g)(5)(B) for which a maximum term of imprisonment
>        of ten years or more is prescribed;

> (B)    an offense for which the maximum sentence is life imprisonment
>        or death;

> (C)    an offense for which a maximum term of imprisonment of ten
>        years or more prescribed in the Controlled Substances Act . . .
>        the Controlled Substance Import and Export Act . . . or [46 U.S.C.
>        §705];

> (D)    any felony [the person charged] has been convicted of two or
>        more offenses described in [§§3142(f)(I)(A-C)] if a circumstance
>        giving rise to Federal jurisdiction had existed, or a combination
>        of such offenses; or

> (E)    any felony that is not otherwise a crime of violence that involves
>        a minor victim or that involves the possession or use of a firearm
>        or destructive device -- or any other dangerous weapon. 18 U.S.C.

---

[1] The Bail Reform Act defines "crime of violence" as (A) "an offense that has an element of the offense the use, attempted use, or threaten use of physical force against the person or property of another," (B) "any other offense that is a felony and that, by its nature, involve a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," or (C) "any felony under chapter 77, 109 A, 110, or 117." 18 U.S.C. §3156(a)(4).

§3142(f)(I)(A-E)

24.     Second, the Government may also seek detention -- or the Court *sua sponte* may hold

a detention hearing to determine whether pretrial detention is appropriate -- when the case involves

"a serious risk" that the defendant willfully or "will attempt to obstruct justice, or threaten, injure,

or intimidate, or attempt to threaten, injure or intimidate a perspective witness or juror." 18 U.S.C.

§3142(f)(2).  If the Bail Reform Act authorizes pretrial detention, the judicial officer must hold a

hearing to determine whether there are conditions of release that would reasonably assure the

appearance of the defendant as required and the safety of any other person in the community.  18

U.S.C. §3142(f).  If the Court finds that "no condition or combination of conditions would

reasonably assure the appearance of the person as required and the safety of any other person and the

community," the judicial officer "shall order" the person detained pending trial.  18 U.S.C.

§3142(e)(1).  A finding that no condition or combination of conditions would reasonably assure the

safety of any other person and the community must be supported by *clear and convincing evidence.*

18 U.S.C. §3142(f) (Emphasis added) *See,also U.S. v. Munchel*, 991 F.3d at 1280.   Thus, a

defendant's detention based on dangerousness accords with due process only insofar as the Court

determines that the defendant's history, characteristics, and alleged criminal conduct make clear that

he or she poses *a concrete, prospective threat* to the public safety.  *Id.* (Emphasis added)

25.     Webster is charged with, among other crimes, Assaulting, Resisting, or Impeding

Certain Officers With a Dangerous Weapon, in violation of 18 U.S.C. §§111(a)(1) and (b). Section

111(a)(1) provides that anyone who "forcibly assaults, resists, opposes, impedes, intimidates, or

interferes with any [designated Federal officer, or person assisting a designated Federal officer][2]

---

[2] *See,* 18 U.S.C. §1114

"while engaged in or on account of the performance of official duties," is exposed to a maximum term of imprisonment of one year if the violation constitutes simple assault or eight years if the violation involves physical contact with the victim or the intent to commit another felony. *See,* 18 U.S.C. §111(a)(1).

26.    The D.C. Circuit has determined that "the adverb 'forcibly' in the first element in the offense modifies each of the prohibited acts specified in the second element: that is, a defendant does not violate the statute unless he *forcibly* assaults or *forcibly* resists or *forcibly* opposes, etc." *U.S. v. Arrington,* 309 F.3d 40, 44 (D.C. Cir. 2002) citing, *U.S. v. Kleinbart,* 27 F.3d 586, 592 (D.C. Cir. 1994). Section 111(b) increases the maximum term of imprisonment to twenty years for anyone who "in the commission of any act described in subsection (a), uses a deadly or dangerous weapon -- or inflicts bodily injury" *Id* When the defendant is charged under the first prong of §111(b)- - for the use of a dangerous weapon - - "intent to use the weapon is a necessary element" of the offense. *See, Arrington,* 309 F.3d at 45. The Courts have observed that to violate §111(b), a defendant "must have committed one of the acts described in §111(a) "i.e., 'forcibly assault[ed], resisted, oppose[d], impede[d], intimidate[d], or interfere[d] with 'a [federal officer] in specified circumstances; and 'in committing the act,' either (1) 'use[d] a deadly or dangerous weapon' " or (2) " inflict[ed] bodily injury" *Gray v. U.S.* 980 F.3d 264, 266 (2d Cir. 2020) *quoting, 18 U.S.C. §§111(a)(1),(b).*

27.    Taking the elements of these offenses into account with 18 U.S.C. §3156(A)(4)'s definition of a crime of violence, defendant having been charged under 18 U.S.C. §§111(a)(1) and (b), the presumption of defendant's detention applies. *See, U.S. v. Sabol,* 2021 WL 1405945 at *7 (D.D.C. April 14, 2021).   On this point, the Government has taken the position in other January 6th cases that defendants charged only under §111(a) are not accused of a crime of violence - - making the distinction that defendant's charge under §111(a)(1) and (b) (*"the enhanced version of the*

*statute"*) should be subject to the presumption of detention. *See, U.S. v. Fitzsimmons*, No. Cr. 21-158-KBJ, ECF No. 14 at 2(D.D.C.) At bar, Webster is charged under both §111(a)(1) and (b) which statutorily triggers a detention hearing under the "Crime of Violence" category of 18 U.S.C. §3142(f). On this point, the question is raised whether Webster definitionally possessed a "deadly or dangerous weapon" while assaulting Officer N.R. In the context of Webster's pretrial motion, defendant enjoys the presumption of innocence as to all elements of the crime(s) charged. *See,* 18 U.S.C. §3142(j); *See also, U.S. v. Dolan,* 2021 WL 2312860 at *3 (S.D. Fla. 2021). Title 18 itself does not provide a general definition of the term "dangerous weapon."[3] The United States Sentencing Guidelines, define a dangerous weapon as "an instrument capable of inflicting death or serious bodily injury." U.S.S.G. §1(B1.1), commentary 1d. The Supreme Court uses a multi-factored inquiry which emphasizes the capacity of the instrument to instill fear or to inflict harm. *McLaughlin v. United States,* 476 U.S. 16, 17-18 (1986) (holding that unloaded handgun used during bank robbery was a dangerous weapon for purposes of 18 U.S.C. §2113(d), since display of gun would incite fear in the average citizen and thereby create risk of a violent response). Under 18 U.S.C. §3142(f)(1)(E), detention is permitted if the case involves "any felony . . . that involves the possession or use of a . . . dangerous weapon."

28. By all accounts, Webster attended the January 6th protest in the possession of a United States Marine Corps flag attached to a 5 foot long 1/2 inch diameter hollow aluminum flagpole weighing less than a pound. In its intended form, defendant possessed a First Amendment

---

[3]By comparison 18 U.S.C. §930 defines the term dangerous weapon to mean:

> A weapon, device, instrument, material or substance, adamant or in adamant, that is used for, or readily capable of, causing death or serious bodily injury, except that such term does not include a pocket knife with a blade of less than 2 1/2 inches in length.

> *See also, e.g.,* D.C. Code §§22-3202, 22-3214

right [4] to publicly display his flag without taking any steps to fashion it into a dangerous weapon.

29.    The bodycam video brought forth by the Government makes it clear that many of the protestors on January 6th possessed a flag or sign. Certainly the first female protestor depicted in the Government's video that was violently thrown to the ground by Officer N.R. had a First Amendment right to display her Trump flag. Notwithstanding this guarded constitutional right, Officer N.R. is observed on two separate occasions reaching over the metal barrier throwing this woman - - thereby unnecessarily inciting peaceful protestors.

30.    As for Webster, the bodycam video depicts Webster emerging from the crowd of protestors towards the bike rack barricade line where Officer N.R. is positioned angered by what he perceived as the police "attacking Americans". (Exhibit "H" at 14:48:26) By the time Webster is first seen, various acts of excessive force were employed by the police towards a group of Americans who are peacefully standing around this police line.   Notwithstanding the peaceful condition of the protestors present, the general peaceful mood of the protestors was radically changed by law enforcement's decision to deploy pepper spray and tear gas. (Exhibit "H" at 14:25:50 -- 14:26:45) To avoid the perception that Webster was using the flagpole and/or flag to intimidate the officer's presence, defendant deliberately keeps the flagpole and flag positioned behind his body while voicing his intense displeasure with the manner in which Officer N.R. and his fellow officers conducted themselves. Like the Marine Corps flag, Webster's vulgar words directed at police are protected under the First Amendment. *See, Gooding v. Wilson*, 405 U.S. 518, 527-28 (1972); *Lewis v. City of New Orleans*, 415 U.S. 130, 133 (1974).   The transformation between a symbol of protected speech (i.e., defendant's Marine Corps flag), to what the Government describes as a "dangerous weapon" occurs as several officers reached to grab the top of Webster's flag causing the

---

[4] *See, U.S.v Grace*, 461 U.S. 171, 177-78 (1983)

aluminum pole to bend and separate from the lower section of the pole.  (Exhibit "H" at 14:28:38 -- 14:28:40) Incensed by the police interaction, Webster can be seen drawing the remaining portion of the 2 1/2 foot long pole -- weighing .425 pounds or 6.8 ounces -- downwards striking the top of the metal police barrier.  (Exhibit "H" at 14:28:40 -- 14:28:41).  By this point, Webster has already been shoved (Exhibit "H" at 14:28:27) and punched by Officer N.R. with a tactical glove.  (Exhibit "H" at 14:28:28).  Officer N.R. was equipped with a police riot helmet, face shield, gas mask and a full complement of body armor.  By comparison, Webster is wearing his police issued bullet proof vest, winter jacket, blue jeans, work boots and a 2 1/2 foot long hollow aluminum pole weighing approximately .425 pounds.

31.     In this context, what constitutes a dangerous weapon depends not on the hollow pole's intrinsic character but on its capacity, given "the manner of its use," to endanger life or inflict serious physical injury. *See, U.S. v. Johnson,* 324 F.2d 264, 266 (4th Cir. 1963); *See, also U.S. v. Moore,* 846 F.2d 1163, 1166 (8th Cir. 1988) ("[A]lmost any weapon, as used or attempted to be used, may endanger life or inflict great bodily harm; as such, in appropriate circumstances, it may be a dangerous and deadly weapon.") The term "dangerous weapon" has been loosely interpreted to include a variety of innocuous objects or instruments which become capable of inflicting serious injury when put to assaultive use. *See, e.g. United States v. Riggins,* 40 F.3d 1055, 1057 (9th Cir. 1994) (belt and shoe could be dangerous weapons when used to beat a two-year-old child); *Johnson* 324 F.2d at 266 (metal and plastic chair can be a dangerous weapon when held overhead and brought down on a victim's head); *Arthur v. U.S.,* 602 A.2d 174, 177-78 (D.C.App. 1992) (tennis shoes can be dangerous weapon when used to stomp on victim's head). *See, U.S. v. Chansley,* 2021 WL 861079 at *7-8 (D.D.C. March 8, 2021) ("As used in sections §§111 and 113, Courts have consistently defined "dangerous weapon" as an object that is either inherently dangerous or is used

in a way that is likely to endanger life or inflict great bodily harm.") *Citing, U.S v. Anchrum,* 590 F.3d 795, 802 (9th Cir. 2009). Defendant contends that the bottom portion of the flagpole left in his hand did not constitute a "dangerous weapon" nor was it used in a manner likely to cause a bodily harm to Officer N.R.   *See.   U.S. v.* Rocha, 598 F.3d 1144, 1154 (9th Cir. 2010). In particular, defendant never struck Officer N.R. with the flagpole (i.e., the dangerous weapon). Unlike the defendant in *Chansley,* neither the fully intact flagpole nor its remnant lower section was pre-equipped with any type of spear, sharpened point, or finial capable of remotely penetrating the officer's helmet, face shield, or body armor. Looking at the Government's video, Webster's first physical contact with Officer N.R. lasted less than a second (Exhibit "H" at 14:28:46).   The remaining two and a half foot section of the pole is taken from the defendant by the Officer. After this point, defendant never regains possession or control of either section of his flagpole nor does he make any attempt to re-arm himself with any type of object available to him on the ground. In the second alleged assault, defendant does not possess any object in his hands. In fact, the 2 1/2 foot long pole can be seen in Officer N.R.'s possession. (Exhibit "H" at 14:28:52 -14:29:07)

32.     The construct of the law as compared with 18 U.S.C. §§111(a)(1) and (b) is an important distinction given the fact that a defendant's exposure to incarceration swings on whether he is convicted of a "simple assault" exposing him to a maximum term of one year of imprisonment; an assault involving physical contact carrying eight years of imprisonment; or an assault using a deadly or dangerous weapon carrying twenty years of imprisonment.

33.     Taking this argument through its logical paces, a broad definition of the term "dangerous weapon" can include just about any inanimate object rendering superfluous the concept of simple assault defined under 18 U.S.C. §111(a)(1) -- *compare, U.S. v. Duran*, 96 F.3d 1495, 1511 (D.C. Cir. 1996) ([A]s relevant here, under §111(b) "the use of a deadly or dangerous weapon [is]

sufficient . . . to boost the crime above the level of 'simple assault'")

34.     The District of Columbia recognizes some limits on what can be deemed a weapon. In *Edwards v. U.S.*, 583 A.2d 661, 664 (D.C. App. 1990), the Court of Appeals held that a stationary bathroom fixture, against which the defendant had repeatedly slammed his wife's head, could not be deemed a weapon within D.C. Code § 22-3202. The court recognized that, had *Edwards* detached the fixture and bludgeoned his wife with it, he would surely have been guilty of using a dangerous weapon. "The distinction is a common sense one -- a weapon is something with which one can 'be armed,' something one can pick up and use." *U.S. v. Sturgis*, 48 F.3d 784, 791 (4th Cir. 1995) Certainly, from viewing the video, Webster is not using the flagpole to assault Officer N.R. (Exhibit "H" at 14:28:46) The second encounter between Webster and Officer N.R. shows that defendant is not armed with a weapon. (Exhibit "H" at 14:28:45 -- 14:29:07) Should the Court determine that defendant did not use a "deadly or dangerous weapon," the rebuttable presumption contained in 18 U.S.C. §3142(e)(2-3) would not apply in determining Webster's pre-trial release.

35.     However, should the Court find that Webster is eligible for pre-trial detention, a determination must be made as to whether any "condition or combination of conditions will reasonably assure the appearance of [Webster] as required and the safety of any person and the community." 18 U.S.C. §3142(e)(1). With respect to the danger Webster presents to the safety of any other person in the community, the Court "must identify an articulable threat posed by the defendant to an individual or the community," though "[t]he threat need not be of physical violence, and may extend to 'non-physical harms such as corrupting a union.'" *Munchel*, 2021 WL 1149196 at *7 quoting *U.S. v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988). For the reasons recited by Magistrate Krause (Exhibit "A" at pg. 52) - - together with the recommendations made by Pretrial Services - - defendant comes from a very socially and financially stable household, possesses deep

roots in his community, and cannot be characterized as a flight risk.  Following the Magistrate's

determination, defendant's current pre-trial detention is based on the prior Court's determination that

the defendant represents a "danger to the community." (Exhibit "A" at pg. 52)  That being said, 18

U.S.C. §3142(g) factor including: (1) the nature and circumstances of the offense charged; (2) the

weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and

seriousness of the danger to any person or the community that would be posed by the [defendant's]

release are addressed *seriatim*.

### A. NATURE AND CIRCUMSTANCE OF OFFENSE

36.     The first factor that the Court must consider is the nature and circumstance of the

offense charged, "including whether the offense is a crime of violence."  18 U.S.C. §3142(G)(1)

Defendant does not hesitate to concede that the alleged charges are serious.  However any evidence

that Webster planned his alleged conduct before arriving at the Capitol on January 6th is noticeably

absent.  *Compare, Chrestman* 2021 WL 765662 at *8; *Sabol,* 2021 WL 1405945 at *10-11.

Defendant did not arrive at the Capitol equipped with a "weapon".  With the exception of Webster

wearing his bullet proof vest that he kept from his retirement with the N.Y.P.D., defendant was

normally dressed for the cold weather conditions.  Defendant has no social media presence affiliation

with any form of militia or organization such as the Proud Boys, Three Percenters, Groyper Army

or Oath Keepers.  Prior to January 6th Webster never attended or participated in a political rally or

protest.  Prior to the subject date, defendant had not visited Washington D.C. in over twenty years.

Defendant has no social media presence and possesses no strong political beliefs.  Given Webster's

many years of public service, he possesses a deep devotion to his country and the rule of law.  The

record contains no evidence that Webster coordinated with any other protester before, during or after

January 6th or assumed any meaningful leadership role.  The only words of encouragement the

defendant is alleged to have spoken comes from a short YouTube video where a deflated Webster can be heard/seen stating sheepishly "Send more patriots. We need some help." Such language could hardly qualify defendant as a *de facto* leader of a group of mostly peaceful protestors present at the base of the west side of the Capitol Building.

37.     Officer N.R. is not alleged by the Government to have suffered serious injuries from the two altercations with Webster lasting a total of fifteen seconds. Defendant does not enter the Capitol Building or cause any property damage. Although Webster deeply regrets his physical confrontation with Officer N.R. for all the obvious reasons attached to this good man's character - - the alleged conduct taken together amounts to nothing more than a simple assault *See,* 18 U.S.C. §111(a)(1). That does not mean to say that Webster could not have caused serious injury to Officer N.R. - - particularly given the chaotic and politically charged atmosphere outside the Capitol. But defendant's actions are distinguishable from other detained defendants charged under 18 U.S.C. §§111(a)(1) and (b) who clearly possessed the intent to injure members of law enforcement by striking them with fists, batons, baseball bats, poles or other dangerous weapons. *See, e.g., U.S. v. Sabol,* 2021 WL 1405945 at *6 – 7. *See, United States v. Foy,* 21-CR-108-1 (D.D.C.) (defendant lifted hockey stick above his head and struck an officer lying on the ground multiple times); *U.S. v. Lang,* 21-CR-53 (D.D.C.) (defendant swung bat at officer's shield); *U.S. v. Mellis,* 21-CR-206 (D.D.C.) (defendant repeatedly struck or attempted to strike officers' necks between their helmets and body armor). Unlike other detained defendants charged under this statute, Webster's alleged use of force is directed specifically at Officer N.R. and is not perpetrated to gain entry into the Capitol or to stop the certification of the Presidential Election. Given the record placed before the Court, defendant has a very low propensity for violence that is nearly impossible to trigger in the absence of the exceptionally extraordinary circumstances present at the Capitol on January 6th. Taking these

factors into consideration, the nature and circumstances of the charged offense(s) weigh in favor of the defendant's release.

## B.  WEIGHT OF THE EVIDENCE

38.     Adopting an honest and straight forward approach, the alleged conduct perpetrated by Webster is captured on video. Webster does not deny that he is the individual depicted - - a position that a man of this caliber has taken from the moment he sat down with the FBI agents and voluntarily surrendered himself on February 22nd.  In the absence of a deadly or dangerous weapon or the infliction of any bodily injury upon Officer N.R. (18 U.S.C. §111 (b)), the defendant is only answerable to the assault charges contained in 18 U.S.C. §111 (a)(1). While common sense would dictate that such a factor weighs in favor of defendant's detention, it is considered "the least important" consideration in the Courts' assessment. *U.S. v. Klein,* 2021 WL 1377128 at *10 (D.D.C. April 12, 2021) *Citing, U.S. v. Gebro,* 948 F.2d, 1118, 1121-22 (9th Cir. 1991).

## C.  HISTORY AND CHARACTERISTICS OF THE DEFENDANT

39.     Webster's history and characteristics weigh heavily in favor of release.  Defendant' is 55 years old and has lived in the State of New York - - absent his time in the United States Marine Corps - - his entire life.  He was raised in a stable and loving family environment. After graduating from Suffern High School in 1984, defendant enlisted in the United States Marine Corps and served our country until being honorably discharged in 1989. Webster's love and devotion for his country are aptly noted by his Marine Corps Service records. (Exhibit "B"). Defendant also completed an exemplary twenty year career with the N.Y.P.D.  Webster was held in such high regard and esteem by the N.Y.P.D. that he was trusted to be assigned as a Firearms Instructor and o the Mayor's private security staff. (Exhibit "C") Defendant's alleged actions on January 6th, stand in direct conflict with that narrative.

40.     Webster has been married to a loving and devoted wife Michelle Webster since January 16, 1999.  Together they have raised three beautiful and successful children, one of which is currently enlisted in the United States Marine Corps in the family's great tradition of proudly serving our country.  Webster, his wife and family are devoted Catholics and regular parishioners of the Church of St. John The Evangelist in Goshen, New York.  Webster has strong ties to his close-knit family and ran a successful landscaping business since his retirement from the N.Y.P.D. Defendant has no history of drug or alcohol abuse.

41.     Defendant's time with the United States Marine Corps and N.Y.P.D. over a twenty-five year period was unblemished and filled with superlatives about defendant's good character, peaceful nature, and high moral qualities.  Prior to January 6th, defendant had no criminal history. Beyond being a devoted husband and father, Webster has a storied reputation of selflessly helping others in need.  The character letters attached collectively as Exhibit "O" are testament to this incredibly decent man's compassionate and peaceful nature.  At best, Webster's encounter with Officer N.R. on January 6th is an  unfortunate aberration brought about by defendant's spur-of-the-moment response to what he perceived as the officer's misuse of force. Notwithstanding defendant's momentary lack of restraint, this defendant's exemplary history and high morale qualities warrant his release.

### D. NATURE AND SERIOUSNESS OF THE DANGER

42.     The final factor that the Court must consider is "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." 18 U.S.C. §3142(g)(4).  "Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope" as it requires the Court to engage in an "open-ended assessment of the 'seriousness' of the risk to public safety." *U.S. v. Cua*, 2021 WL 918255 at *5 (D.D.C.) Unlike

other pre-trial detainees (*e.g., U.S. v. Chrestman,* 2021 WL 765662 at \*14) Webster's encounter(s) with Officer N.R. were extremely brief (*i.e.,* fifteen seconds) and ended with Webster seen behind police lines with his hands up and fully complying with police instructions. (Exhibit "J") There is no evidence, however, that defendant injured Officer N.R. or anyone else, entered the Capitol, destroyed any Federal property -- or had any plan or design to such ends.  Webster has never verbally threatened others or advocated political violence against the United States government either before, during, or after January 6th.  Nor, has defendant made any public statements celebrating the events of January 6th or suggested that he would ever participate in similar actions again.

43.     Defendant has led an exemplary and lawful life for the last 55 years and has spent his time incarcerated in the custody of the Federal Government since February 23rd without further violence or incident.  Webster's only plan in traveling to D.C. on January 4th was to attend several rallies hosted by prominent public officials including the former President of the United States and to participate in a protest about the results of the 2020 Presidential Election.   Nothing about Webster's intentions or decisions leading up to his encounter with Officer N.R. can be described in any way as illegal.  As much as Mr. Webster's political views as of January 6th may have been misguided, they were his to peacefully possess.  Any determination of dangerousness must rest on the specific circumstances of each defendant.  *See, Munchel,* 991 F.3d at 1283 ("[W]hether a defendant possesses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant".)  On this point, several defendants who faced charges under 18 U.S.C. §111(b) for assaulting officers -- who like Webster did not engage in planning activities -- were released without objection from the Government. *See, U.S. v. Leffingwell,* 21-CR-5 (D.D.C.) (defendant repeatedly punched officer with closed fist in attempt to push past wall of officers); *U.S. v. Gossjankowski,* 21-CR-123 (D.D.C.) (defendant activated Taser within tunnel

multiple times as he pushed towards the police lines); *U.S. v. Blair,* No. 21-CR-186 (D.D.C.) (defendant struck an officer in the chest with a Lacrosse stick); *U.S. v. Sanford,* 21-CR-86 (D.D.C.) (defendant hurled a fire extinguisher that struck one officer and ricocheted off two other officers' helmets) *U.S. v. Coffee,* 21-CR-236 (D.D.C.) (defendant pushed a crutch into an officer's body at the archway to the tunnel and then charged at several officers in the tunnel with the crutch).

44.     By comparison, Webster's encounter with Officer N.R. was of a much shorter duration and was followed by defendant quickly bringing himself back under control and within the bounds of the law. A finding of Webster's dangerousness must be predicated on a "concrete" determination that the defendant poses a "continued, identified and articulable threat to the community" or to another person. *Munchel*, 991 F.3d at 1282 (quoting *Salerno*, 481 U.S. at 751). Only the circumstances present on January 6th made it possible for an exceptionally law abiding and decent individual such as Webster to threaten and/or cause harm to a fellow member of law enforcement.  Webster's alleged use of force was not a vehicle to achieve any political objective, but, rather was a response engendered by defendant's perception of Officer N.R.'s misuse of force. Given Webster's lack of any past criminal history, his voluntary surrender to Federal Authorities, and his exceptional and law-abiding behavior for the last fifty-five years leading up to his arrest on February 22nd, there is no " clear and convincing evidence" that Webster would violate this Court's Order(s) upon his release. Absent defendant's "concrete" and "prospective" threat to public safety, which cannot be mitigated by strict pre-trial conditions, the Court must apply "the default rule favoring liberty." *See, Klein*, 2021 WL 1377128 at *13; *Cua,* 2021 WL 918 255 at *8; *U.S. v. Owens*, No. 21-CR-286. For all the reasons stated, Webster should be released pending trial, subject to the conditions set forth in defendant's Pre-Trial Service report dated February 23, 2021. (Exhibit "N")

## CONCLUSION

WHEREFORE, counsel requests that this Honorable Court release Mr. Webster subject to the conditions recommended by Pre-Trial Services together with any additional pretrial release conditions the Court believes necessary to satisfy the statutory criteria found in 18 U.S.C. §3142(g)(4).

Dated:      Goshen, New York
            June 17, 2021

                              Respectfully submitted,

                              JAMES E. MONROE, ESQ.
                              Dupee & Monroe, P.C.
                              211 Main Street, P.O. Box 470
                              Goshen, New York 10924
                              Telephone: 845-294-8900
                              Fax 845-294-3619
                              Email: info@dupeemonroelaw.com