EXHIBIT "A"

1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ----------------------------------x
     UNITED STATES of AMERICA,
 3
              -against-                   21 mj 2050(AEK)
 4                                        Bail Hearing

 5   THOMAS WEBSTER,

 6                   Defendant.
     ----------------------------------x
 7
                                    United States Courthouse
 8                                  White Plains, New York
                                    February 23, 2021
 9

10

11    (All parties appearing via videoconference and teleconference)

12

13              THE HONORABLE ANDREW E. KRAUSE,
                    United States Magistrate Judge
14

15

16   AUDREY STRAUSS
          United States Attorney for
17        the Southern District of New York
     BY:  BENJAMIN A. GIANFORTI
18        Assistant United States Attorney

19

20   DUPEE & MONROE PC
             Attorneys for Thomas Webster
21   BY:  JAMES MONROE

22

     ALSO PRESENT:
23   ANDREW ABBOTT
     Pretrial Services Officer

24
     Special Agent Patrica Norden
25   Special Agent Michael Callan
```

Angela O'Donnell - Official Court Reporter
914-390-4025

1          THE DEPUTY CLERK:  This is the matter of USA Versus

2  Webster.  The Honorable Andrew Krause presiding.

3          Counsel, please state your name for the record,

4  starting with the government.

5          MR. GIANFORTI:  Good afternoon, your Honor.  Ben

6  Gianforti for the government.

7          THE COURT:  Good afternoon, Mr. Gianforti.

8          MR. MONROE:  Good afternoon, your Honor.  This is

9  James Monroe from the law firm of Dupee & Monroe, here on

10  behalf of Mr. Webster.

11          THE COURT:  Good afternoon, Mr. Monroe.  Good

12  afternoon, Mr. Webster.

13          THE DEFENDANT:  Good afternoon.

14          THE COURT:  Do we also have Pretrial Services on the

15  line?

16          PRETRIAL OFFICER ABBOTT:  Good afternoon, your Honor.

17  Andrew Abbott with Pretrial Services.

18          THE COURT:  Good afternoon, Mr. Abbott.

19          My name is Magistrate Judge Krause, and we are here

20  for an initial appearance.  As everybody knows, we are in the

21  midst of the COVID-19 pandemic.  I am conducting this

22  proceeding pursuant to the authority provided by section 15002

23  of the CARES Act and the standing orders issued by our Chief

24  Judge pursuant to the act.

25          Counsel and Mr. Webster are appearing before me today

Angela O'Donnell – Official Court Reporter
914-390-4025

1    by telephone and video.  I will note that the telephone line is

2    open to the public and the press on a listen-only basis, and I

3    will remind those of you who are listening that any recording

4    of this proceeding is strictly prohibited.

5             I'd like to make sure the everybody is able to see

6    and/or hear everybody else who is participating in the

7    proceeding here today.

8             Starting with you, Mr. Gianforti, are you able to see

9    and hear everyone so far?

10            MR. GIANFORTI:  Yes, your Honor.

11            THE COURT:  Thank you.

12            Mr. Monroe, are you able to hear and see everybody so

13   far?

14            MR. MONROE:  I am, sir.  Thank you.

15            THE COURT:  Mr. Webster, are you able to hear and see

16   everybody so far?

17            THE DEFENDANT:  Yes, I am, your Honor.

18            THE COURT:  And Mr. Abbott, are you able to hear

19   everybody so far?

20            PRETRIAL OFFICER ABBOTT:  Yes, your Honor.

21            THE COURT:  Thank you.

22            For everybody participating in the proceeding here

23   today, if at any point you become unable to hear any of the

24   participants, or if you are on video, unable to see any of the

25   participants, please let me know right away.  Do whatever it

1    takes to make sure that I am aware of that, even if it involves

2    interrupting me or interrupting someone else who may be

3    speaking.  So, if you're on video, you can wave your hand,

4    whatever it might take, or just speak up, so that I know that

5    there's a problem, and we can take a pause to try to address

6    whatever that problem is.

7            Some of you will be speaking at various points during

8    the proceeding here today.  For the most part, I will be

9    calling on you when you are to speak.  If for some reason there

10   is a need for you to speak as part of the proceeding but I have

11   not specifically called on you, I'll just ask that you identify

12   yourself by name before you speak so that we can have a clear

13   record of what's taking place today and the transcript that we

14   will create of today's proceedings can be as clear as possible.

15           With that in mind, I'll also ask that we all do our

16   best to try not to speak over one another.  I know that can be

17   difficult sometimes on the telephone and video, but it's much

18   easier for purposes of creating the transcript if only one

19   person is speaking at a time.

20           I understand, Mr. Gianforti, that Mr. Webster is

21   currently located in the Marshal's area of the courthouse here

22   in White Plains, 300 Quarropas Street; is that correct?

23           MR. GIANFORTI:  That's correct, your Honor.

24           THE COURT:  And can I have any FBI agents or anyone

25   other than the marshals who are present with Mr. Webster just

1    identify themselves for the record, please.

2              SPECIAL AGENT NORDEN:  Patrica Norden from Hudson

3    Valley, New York, FBI.

4              THE COURT:  Good afternoon, Agent Norden.

5              SPECIAL AGENT CALLAN:  Mike Callan(ph), FBI,

6    New York.

7              THE COURT:  Good afternoon.

8              SPECIAL AGENT CALLAN:  Good afternoon.

9              THE COURT:  Mr. Monroe, has Mr. Webster had an

10   opportunity to consult with you in advance of the proceeding

11   here today?

12             MR. MONROE:  He has, sir.

13             THE COURT:  And when did the most recent consultation

14   take place and how?

15             MR. MONROE:  I had an opportunity to speak with him

16   this morning before he was interviewed by Pretrial Services.

17             THE COURT:  Thank you, Mr. Monroe.

18             Mr. Webster, under normal circumstances everyone

19   participating in this proceeding would be physically present in

20   court.  Indeed, you have the right to be physically present in

21   court for most proceedings, but pursuant to the CARES Act, to

22   ensure the safety of everyone involved in the proceeding and to

23   limit the spread of COVID-19, we are conducting this proceeding

24   by video and telephone here today.  I'm going to ask you a few

25   questions to ensure that you agree to proceed this way.

1          Mr. Webster, have you had an opportunity to discuss

2    with Mr. Monroe the issue of waiving your right to be

3    physically present in court and instead participating in

4    today's proceeding by video and telephone?

5          MR. MONROE:  Yes, your Honor.

6          THE COURT:  How did that consultation take place, was

7    it by phone, by video, or something else?

8          MR. MONROE:  By phone, and a general idea what to

9    expect, a conversation was held in person.

10          THE COURT:  Very good.  And Mr. Webster, do you, in

11    fact, waive your right to be physically present in court and in

12    instead agree to participate in today's proceeding by video and

13    telephone?

14          THE DEFENDANT:  Yes, I do.

15          THE COURT:  Mr. Monroe, do you also consent to this

16    proceeding going forward by video or telephone here today

17    without being physically present in court?

18          MR. MONROE:  Yes, we do, your Honor.

19          THE COURT:  Thank you.

20          I find that Mr. Webster has knowingly and voluntarily

21    agreed to waive his right to be present in court and instead to

22    participate in this conference by telephone and video here

23    today.  And with that, we will proceed.

24          Mr. Webster, I want to advise you that today's

25    proceedings are not a trial.  You will not be called upon to

1  answer or plead to any charges at this time.  This proceeding

2  is called an initial appearance, and the purpose of the

3  proceeding is to advise you of your rights, inform you of the

4  charges against you, and determine whether bail should be set

5  that may allow you to be released, and if so, what that bail

6  should be.

7       Pursuant to Rule 5(c) of the Federal Rules of

8  Criminal Procedure, if an individual is arrested in a district

9  other than the district in which the alleged offenses were

10  committed, the initial appearance ordinarily must take place in

11  the district of arrest, which in this case is here in the

12  Southern District of New York, that's why today's proceeding

13  are taking place had here in White Plains rather than in

14  Washington, D.C.

15       Mr. Webster, you have the right to remain silent at

16  this and at every stage of the proceedings.  Any statement that

17  you do make may be used against you.  You have this right to

18  remain silent even if you have already made any statements to

19  law enforcement officers, and you are not required to answer

20  any questions that law enforcement officers may ask you from

21  this point forward.  For that reason I suggest that you consult

22  with Mr. Monroe before you answer any questions that you may be

23  asked.

24       Do you understand all of that so far?

25       THE DEFENDANT:  Yes, I do, your Honor.

1          THE COURT:  Mr. Webster, you have the right to be

2     represented by an attorney during all court proceedings at this

3     and at every stage of the proceedings against you, including

4     representation during any questioning by authorities or during

5     any line-up.  You have the right to consult with your attorney

6     prior to answering any questions.  Do you understand that?

7          THE DEFENDANT:  Yes, I do.

8          THE COURT:  You have the right to retain an attorney

9     of your own choosing, as you have done here today.  But if you

10    should become unable to afford the services of Mr. Monroe, you

11    may be able to -- excuse me, you may apply to the Court for

12    appointment of counsel, and if the Court determines that you

13    are financially unable to afford an attorney, one will be

14    appointed to represent you without cost to you.  Do you

15    understand that as well?

16         THE DEFENDANT:  Yes, I do, your Honor.

17         THE COURT:  Okay, Mr. Webster, if you are not a

18    United States citizen, you have the right to request that a

19    government attorney or a law enforcement official notify a

20    consular officer from your country of origin that you have been

21    arrested.  I understand from the Pretrial Services report that

22    you are a citizen of the United States; is that correct?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Are you a citizen of any country other

25    than the United States?

1          THE DEFENDANT:  No.

2          THE COURT:  In that case we will move on.

3          Ms. Brown, will you please place Mr. Webster under

4   oath or affirmation?

5          (Thomas Webster sworn)

6          THE COURT:  Mr. Webster, you are under oath now, and

7   it is important for you to understand that if you knowingly

8   make a false statement during these proceedings, you could be

9   subject to prosecution for perjury or for making a false

10  statement to the Court, and you could face a punishment of up

11  to five years in prison and a $250,000 fine, if you are

12  convicted of those offenses.  That punishment would be separate

13  and apart from any sentence you may be facing on the crimes

14  charged in the complaint that we are here on today.  Do you

15  understand that?

16          THE DEFENDANT:  Yes, I do.

17          THE COURT:  It is also important for you to

18  understand that any false statement that you make during this

19  proceeding, as well as any false statement that you may have

20  made already to Pretrial Services, may be used against you at

21  trial if you decide to testify at trial.  Do you understand

22  that as well?

23          THE DEFENDANT:  Yes, I do, your Honor.

24          THE COURT:  Mr. Webster, would you please state your

25  full name for the record.

1          THE DEFENDANT:  My name is Thomas Webster.

2          THE COURT:  How old are you?

3          THE DEFENDANT:  Fifty-four.

4          THE COURT:  Do you have any difficulty reading,

5    writing, speaking, or understanding English, Mr. Webster?

6          THE DEFENDANT:  No, I don't.

7          THE COURT:  How far did you go in formal school?

8          THE DEFENDANT:  I have some college.  Pretty much a

9    few credits short of an associate's degree.

10          THE COURT:  Have you taken or used any drugs,

11    alcohol, or medication within the last 24 hours?

12          THE DEFENDANT:  No.

13          THE COURT:  Are you sufficiently clear in your mind

14    today, Mr. Webster, to be able to understand these proceedings?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Mr. Gianforti, does the government have

17    any objection or concern with respect to Mr. Webster's

18    competency to proceed at this time?

19          MR. GIANFORTI:  I do not, your Honor.

20          THE COURT:  Mr. Monroe, any objection or concern with

21    respect to Mr. Webster's competency to proceed at this time?

22          MR. MONROE:  No, sir.

23          THE COURT:  The Court also has no concerns about

24    Mr. Webster's competence to proceed at this time.  He's been

25    able to understand and follow everything that is happening in

1    these proceedings and respond to my questions without any

2    difficulty.  So in view of that, we will proceed.

3              Mr. Webster, if you have made any statements to

4    Pretrial Services that you would like to correct or add to in

5    any way, you should discuss that with your attorney so that the

6    record can be corrected.  Do you understand that?

7              THE DEFENDANT:  Yes, I do.  I don't see any need to

8    do that.

9              THE COURT:  Mr. Monroe, any corrections or additions

10   to be made to the Pretrial Services report from your

11   perspective?

12             MR. MONROE:  None to offer the Court, sir.  Thank

13   you.

14             THE COURT:  Mr. Gianforti, may I have the time and

15   date of the arrest?

16             MR. GIANFORTI:  Yes, your Honor.  Mr. Webster

17   surrendered to the FBI yesterday, February 22nd, 2021, at

18   approximately 2:35 p.m. in New Windsor, New York.

19             THE COURT:  Thank you, Mr. Gianforti.

20             Mr. Webster, I'm now going to review the charges

21   against you.  First, though, I have before me an affidavit

22   which attaches the arrest warrant in this case and the

23   underlying documents.

24             Mr. Monroe, do you have a copy of the Rule 5(c)(3)

25   affidavit?

Angela O'Donnell - Official Court Reporter
914-390-4025

1          MR. MONROE:  Yes, your Honor.

2          THE COURT:  The version that I have, the copy that I

3    have is unsworn, so I will ask Agent Norden if you please come

4    into the video screen.

5          Good afternoon, Agent Norden.  Are you, in fact,

6    Patricia Norden?

7          SPECIAL AGENT NORDEN:  Yes, I am.

8          THE COURT:  Please raise your right hand.  Agent

9    Norden, do you swear or affirm that the information contained

10   in the Rule 5(c)(3) affidavit is true and correct to the best

11   of your knowledge and belief?

12         SPECIAL AGENT NORDEN:  Yes.

13         THE COURT:  And Agent Norden, the version of this --

14   you can put your hand down.  The version of the document I have

15   before me is not signed.  Do I have your permission to sign the

16   affidavit on your behalf?

17         SPECIAL AGENT NORDEN:  Yes, you do.

18         THE COURT:  Okay, I'll go ahead and do that.  Thank

19   you.  You can step aside.

20         SPECIAL AGENT NORDEN:  Okay.

21         THE COURT:  Mr. Webster, you've been arrested on a

22   warrant from the United States District Court for the District

23   of Columbia.  For ease of reference during today's proceedings,

24   I will refer to that as the District of D.C.

25         The underlying charges against you in that district

1   are based on a criminal complaint that asserts a total of six

2   separate statutory violations, allegations of statutory

3   violations.  I will list those briefly here.  These allegations

4   are set forth in much greater detail in the supporting

5   documents that were provided with the criminal complaint,

6   including a statement of facts prepared by an FBI agent out of

7   the District of D.C.

8          The charges against you in the criminal complaint are

9   as follows:

10          You are charged with a violation of Title 18, United

11   States Code Sections 111(a)(1) and 111(b) for assaulting,

12   resisting, or impeding certain officers with a deadly or

13   dangerous weapon;

14          You are charged with a violation of Title 18, United

15   States Code Section 231(a)(3) for obstruction of law

16   enforcements during civil disorder;

17          You are charged with a violation of Title 18, U.S.C.,

18   United States Code, Section of 1752(a)(1) and 1752(b)(1)(A) for

19   knowingly entering or remaining in any restricted building or

20   grounds without lawful authority with a deadly or dangerous

21   weapon;

22          You are also charged with a violation of Title 18,

23   United States Code Section 1752(a)(2) and 1752(b)(1)(A) for

24   disorderly and disruptive conduct in a restricted building or

25   grounds with a deadly or dangerous weapon;

Case 1:21-cr-00208-APM   Document 24-1   Filed 06/17/21   Page 15 of 56

1          You are also charged with a violation of Title 18

2     United States Code Section 1752(a)(4), and Section

3     1752(b)(1)(A) for engaging in physical violence in a restricted

4     building or grounds with a deadly or dangerous weapon; and

5          Finally, you are charged with a violation of Title

6     40, United States Code Section 5104(e)(2)(D) and (F) for

7     violent entry and disorderly conduct on Capitol grounds.  And

8     as I said, much more detail is provided with respect to each of

9     those charges in the supporting documentation.

10          Mr. Webster, have you seen a copy of the criminal

11    complaint, the warrant, the underlying documents in this case?

12          THE DEFENDANT:  No, I haven't.

13          THE COURT:  Okay.  It's not unusual that you would

14    not have received an actual copy of it at this early stage of

15    the proceedings.  I'm sure that Mr. Monroe will get you a copy

16    of all of the relevant documents as soon as he is able to do

17    that.

18          Mr. Monroe, have you received a copy of the

19    affidavit, the warrant, the criminal complaint, and all of the

20    underlying documents?

21          MR. MONROE:  Judge, right before we got on I did get

22    a flurry of emails.  It may be in there.  I certainly have the

23    warrant and I have a full understanding of the charges that

24    have been filed against my client.

25          THE COURT:  Okay, in particular, I do want to make

1   sure that you have a copy of the statement of facts from

2   Special Agent Riley Palmertree of the FBI.  That's the

3   narrative document that lists out the charges and contains a

4   number of video screenshots from a police officer, the body cam

5   video, as well as screenshots that are purportedly taken from

6   open source media that allegedly depict Mr. Webster.

7          Do you have that set of materials?

8          MR. MONROE:  The US Attorney's office has done an

9   excellent job making sure that I have seen all those videos

10  referenced by the Court, and in my meeting with the FBI did go

11  over some of the still photos from the body cam, but the

12  affidavit, your Honor, that you're referring to, it does not

13  appear I have a copy as of yet, but I expect to have it.

14         THE COURT:  Okay.

15         Mr. Gianforti, if you have not provided that to

16  Mr. Monroe, please make sure you do that at your earliest

17  convenience.

18         MR. GIANFORTI:  Absolutely.

19         THE COURT:  Mr. Monroe, let me ask you specifically

20  with respect to that statement of fact, would you like to have

21  an opportunity to review it before we proceed here today?

22         MR. MONROE:  No, your Honor, we can proceed.

23         THE COURT:  Okay.

24         Have you reviewed the materials that you have and

25  have discussed with the government with Mr. Webster at this

1    time?

2            MR. MONROE:  Yes, your Honor.  We're prepared to

3    proceed.

4            THE COURT:  Are you satisfied that Mr. Webster

5    understands the charges against him?

6            MR. MONROE:  We went over them with the FBI last

7    night, and he understands the charges that are pending against

8    him.

9            THE COURT:  And does Mr. Webster waive a public

10   reading of the complaint at this time?

11           MR. MONROE:  He does, sir.

12           THE COURT:  Thank you.

13           MR. MONROE:  At this time we would enter a plea of

14   not guilty on his behalf.

15           THE COURT:  Okay you don't actually have to enter a

16   plea at this point because we're just dealing with the

17   complaint, we don't have an indictment or an information here.

18           MR. MONROE:  Understood.

19           THE COURT:  It's satisfactory for now that you've

20   waived a public reading of the complaint, and we can proceed.

21           Mr. Webster, you'll have an opportunity to enter a

22   plea at a later stage of the proceeding.

23           Let me first -- well, let me next turn to the issue

24   of the identity hearing.

25           Mr. Webster, because of the nature of your arrest,

1   that you were arrested here in the Southern District of New
2   York for offenses allegedly committed in the District of D.C.,
3   you have the right to what's called an identity hearing, which
4   is a hearing on the issue of whether you are the person named
5   in the warrant and the underlying documents.  You also have a
6   right to waive that hearing.
7           Mr. Monroe, what's Mr. Webster's position with
8   respect to the identity hearing?
9           MR. MONROE:  We would waive such a hearing, your
10  Honor.
11          THE COURT:  Thank you, Mr. Monroe.
12          I'll note for the record the identity hearing has
13  been waived, so there is no need to set a date for that
14  hearing.
15          Mr. Webster, you also have the right to a hearing in
16  this district or in the District of D.C. at which the
17  government will have the burden of establishing that there is
18  probable cause to believe that the crime for which you are
19  being charged has been committed and that you are the person
20  who committed it.  That hearing is called a preliminary hearing
21  under the Federal Rules of Criminal Procedure.  At that hearing
22  you or your counsel would be entitled to cross examine any
23  witnesses and introduce evidence.  If you are in custody,
24  Mr. Webster, you would have the right to have that hearing
25  within 14 days.  If you are not in custody, you would have the

1  right to have that hearing within 21 days; however, such a

2  hearing will not be held if before the date it is scheduled you

3  are indicted by a Grand Jury or an information is filed against

4  you by the government.  You also have the right to waive a

5  preliminary hearing.

6          Mr. Monroe, what is Mr. Webster's position with

7  respect to setting a preliminary hearing at this time?

8          MR. MONROE:  Judge, we would waive the preliminary

9  hearing at this point in time.

10         THE COURT:  All right.  Well, I think what we will do

11 is for purposes of the federal rules, we should still set a

12 preliminary hearing date.  You certainly can waive that hearing

13 to the -- in the common parlance, waive that to the 30th day.

14 So we can pick a date 30 days from today as a control date for

15 a preliminary hearing as the case progresses, and as you have

16 further opportunity to consult with Mr. Webster, if you choose

17 to waive that hearing completely, that is certainly

18 Mr. Webster's right, and you may make that decision.  But since

19 this matter is ultimately going to be adjudicated in the

20 District of D.C., I think it's prudent for me as an

21 administrative matter to set a date for the preliminary

22 hearing, and then, if you are going to fully and finally waive

23 that hearing, that's something that you can address in the

24 appropriate court in Washington.

25         So with that in mind, I will set as a control date

1    for the preliminary hearing as March 25, 2021, which is 30 days

2    from today.

3              Now, Mr. Webster, I am also required to tell you that

4    under certain circumstances pursuant to Rule 20 of the Federal

5    Rules of Criminal Procedure, you may choose to be prosecuted in

6    this district, that is, the Southern District of New York, if

7    you wish to plead guilty or *nolo contendere* here in the SDNY

8    and waive trial in the District of D.C.  But in order for that

9    to happen, the US Attorneys for both the Southern District of

10   New York and the District of D.C. will have to approve the

11   transfer.

12             From prior experience with other cases arising out of

13   the events of January 6th, it is my understanding from the

14   government that the respective United States Attorneys at this

15   time are not prepared to approve the transfer of any of these

16   cases to adjudication in the Southern District of New York even

17   if Mr. Webster were willing to plead guilty or *nolo contendere*

18   here in the SDNY.

19             Is that still the case, Mr. Gianforti, as far as you

20   understand?

21             MR. GIANFORTI:  As far as I know, your Honor, yes.

22             THE COURT:  So I will just note for the record that

23   Mr. Webster has been advised of his Rule 20 rights.

24             Mr. Webster, you can discuss that issue further with

25   Mr. Monroe as the case progresses.  To the extent the

1    government changes its position at all and would potentially

2    consent to have the case transferred to the Southern District

3    of New York and you were inclined to plead guilty or *nolo*

4    *contendere*, that's something that can be addressed at a future

5    point.

6              Okay, I think our next matter is the question of

7    bail, and I will hear from both parties on that.

8              Mr. Gianforti, without going into your full argument,

9    what is the government's position with respect to bail,

10   detention, or release at this time?

11             MR. GIANFORTI:  Your Honor, the government is seeking

12   detention in this matter.

13             THE COURT:  And Mr. Monroe, will you be making a bail

14   application at this time?

15             MR. MONROE:  Yes, your Honor.  We will.

16             THE COURT:  Let me just get my papers shuffled around

17   here for one moment and I will hear first from Mr. Gianforti

18   and then also from Mr. Monroe.  I will give both counsel plenty

19   of opportunity to be heard on these matters.

20             Mr. Monroe, I'm not sure I've had a proceeding with

21   you yet, but as Mr. Gianforti knows, I will hear from the

22   parties and make sure everybody has an opportunity to say

23   whatever it is they want to convey to me before I make a

24   determination.

25             I will say that I have reviewed certain videos that

1   are referenced in the underlying documents.  I was provided

2   with an opportunity to view those videos by the government, and

3   that is something I would have requested had they not offered

4   it anyway.  I reviewed a total of three videos.

5           One is the body cam footage from the officer who was

6   identified by his or her initials in the statement of facts.  I

7   reviewed that video or a portion of that video that relates to

8   the offenses charged against Mr. Webster.

9           I also reviewed another video that is referenced in

10  that statement of facts, specifically, a video is on page 8 of

11  the statement of facts.  That video apparently is available on

12  YouTube.  The URL for that video is included in the paperwork,

13  the statement of facts paperwork.  That is a video that shows

14  briefly Mr. Webster, or allegedly shows Mr. Webster briefly in

15  that video.  He is not the subject of that video, he is sort of

16  in the background, but he is speaking at various points briefly

17  in that video.

18          I also reviewed a video which I understand from the

19  government was provided to Mr. Gianforti by you, Mr. Monroe.

20  I'm not sure exactly what the source was of that video.  I

21  understand generally that it was some sort of public source,

22  open source material from the internet; is that correct?

23          MR. MONROE:  Yes, sir.

24          THE COURT:  Okay.  I did review that video as well.

25  So to the extent you want to make any reference to that video

1  during the course of your presentation, you should know that I

2  have viewed it one time earlier today.

3          Okay, with that said, Mr. Gianforti, let me hear from

4  you with respect to the government's application for detention.

5          MR. GIANFORTI:  Thank you, your Honor.

6          As you know, this is yet another Criminal Prosecution

7  stemming from the attempted insurrection at the U.S. Capitol on

8  January 6, 2021.  This one involves the defendant, Thomas

9  Webster, who is a former Marine and a former member of the

10  NYPD.  And Mr. Webster, like so many other people that day, was

11  caught on video engaging in an assault against a police officer

12  with a dangerous weapon.  In this case it was an aluminum pole

13  that had been holding a -- what I believe is a Marine Corps

14  flag.

15          As you noted, your Honor, I had shared three videos

16  with you earlier today, two of which the government generated

17  in the course of its investigation, or found in the course of

18  its investigation, another one that Mr. Monroe provided to the

19  government earlier today.

20          The first of those, as you indicated, is the body

21  camera footage from the officer that Mr. Webster assaulted, and

22  the second one, at least as I understand it, chronologically,

23  is the one that Mr. Monroe provided, which I believe shows just

24  a slightly different angle of the incident in question.  It's

25  sort of taken from behind where Mr. Webster was standing, and

1   you can kind of see how it picks up from when he sort of busts

2   through the barricade, that he can be seen in the first video.

3           And then the third video, it's not exactly clear when

4   that video was taken, but I think you can surmise that it was

5   taken after those first two videos because he is sort of

6   leaning against the wall, which appears to be sort of the outer

7   of -- right near the outer arches of the Capitol, so he's

8   nearer to the Capitol at that point than he was in the earlier

9   video where he's still behind some crowd control, crowd control

10  barriers.

11          So it's important here to know what we see in those

12  videos.  In those first two that I mentioned, we see the

13  defendant clear as day, especially in the body cam footage,

14  because it's sort of -- the police officer was facing him

15  directly, so you can see the defendant's face very, very

16  clearly.  You see the defendant attacking a police officer,

17  first with that aluminum pole that I mentioned, and then with

18  his bare hands, and you can see him ripping the officer's

19  protective gear off, the gas mask or the helmet that he was

20  wearing at the time, which, as reflected in the complaint,

21  caused the police officer to choke.  It cut off his air, at

22  least for a short period of time.

23          And what else do we see in that video?  We see what I

24  would describe, your Honor, is a look of pure rage on the

25  defendant's face.  His teeth are gritted.  This is a man who is

1    about to unleash some kind of violence on somebody.  And in

2    fact, he did, on that poor police officer.

3            And, your Honor, we also can hear the defendant in

4    that body cam footage.  And this is a former police officer,

5    the defendant.  And what do we hear the police officer

6    saying -- I'm sorry.  What do we hear Mr. Webster saying to

7    that police officer, your Honor?  We hear him calling him a

8    fucking piece of shit, and a commie motherfucker.  This is a

9    cop calling another cop that.

10           Shortly thereafter we see the defendant closer to the

11   Capitol, as I mentioned.  He's calm.  He's collected.  And he

12   turns to the camera that guy is holding and asks for more

13   patriots to come to the Capitol to help.

14           So, your Honor, I would submit that this cuts against

15   an argument that I anticipate the defense will make that

16   Mr. Webster was simply caught up in the moment, that he got a

17   little ahead of himself.  The truth is, your Honor, he seemed

18   pretty collected to me, and at that point, when he's closer to

19   the Capitol, he says that he's ready for more action.

20           Your Honor, these videos shock the conscience, and

21   sadly, they're consistent with other videos that we've seen

22   from January 6th.  And, your Honor, as you know, you and I,

23   just by sheer happenstance, were both on duty when a number of

24   these other rioters were presented in this district.  And I

25   think what we see here is worse than what we saw there.  And

1    the two prosecutions I'm about to mention I referenced to

2    Mr. Monroe earlier so he has a sense of what I was about to

3    speak about.

4            First, your Honor, there was Patrick McCoy who was

5    accused of using a riot shield to pin and injure a police

6    officer against the door in one of the Capitol arches.  That

7    video was widely circulated in the media.  It shows the officer

8    screaming out in pain.

9            I would submit that the videos of Webster here are no

10   less vivid, certainly no less clear.  You can clearly make out

11   the defendant's face, as I mentioned.

12           And even though you detained Mr. McCoy, your Honor, I

13   recall you noting Mr. McCoy's brief moment of compassion for

14   that pinned officer.  I forget exactly what was said by

15   Mr. McCoy in the course of that incident, but something

16   indicated that he showed some modicum of concern for the police

17   officer.

18           I think what's striking about the videos here, your

19   Honor, is the utter lack of compassion from the defendant.

20   Frankly, your Honor, he goes after that cop like a junkyard

21   dog.  As I said, teeth bared, fists clenched.

22           And then, your Honor, later in the week you and I had

23   the pleasure of dealing with Jeffrey Sabel, who is accused of

24   dragging a police officer down the Capitol steps which allowed

25   another man to beat that cop with a pole that had been holding

1    an American flag.

2            Well, here, your Honor, Webster is the guy holding

3    the pole, and in a no less ironic twist, that pole held a

4    Marine flag.

5            What we can also see in the videos and still images,

6    your Honor, is that the defendant was wearing a bulletproof

7    vest.  And I believe the defendant's going to say something

8    like he wore it for his own protection.  But either way it

9    suggested the defendant was ready for some kind of a violent

10   conflict on that day.

11           And I can proffer, your Honor, that we learned last

12   night that the defendant told the FBI that he brought a gun

13   with him when he went to Washington.  Now he's going to claim

14   that he left it in his hotel room, he didn't have it when he

15   actually went to the Capitol.  Now I think that statement is

16   plainly self-serving.  The defendant was wearing bulky

17   clothing, including a winter coat, and easily could have been

18   concealing a weapon, which would likely be in violation of D.C.

19   law.  And even if he wasn't carrying it that day, my

20   understanding is it's unlawful to simply transport and possess

21   a gun in the district without a permit.  I don't understand

22   Mr. Thomas to have a permit.

23           And I think taken together with the bulletproof vest,

24   your Honor, there's just one logical inference here, the

25   defendant was not only prepared for violence, he was prepared

1    for armed violence.  And this is a man who obviously knows how

2    to use weapons as a former Marine and as a former NYPD officer.

3              Although he apparently surrendered the guns that he

4    has registered to his name to the FBI either last night or

5    earlier today, this is a man who has access to guns, and

6    plainly a fondness for guns, which I think is concerning and

7    also demonstrates the danger he poses here.  I suspect that the

8    crux of the defense's argument here is going to be that

9    Mr. Thomas turned himself in --

10             THE COURT:  You just said Mr. Thomas, but you mean

11   Mr. Webster.

12             MR. GIANFORTI:  I'm sorry.  I'm sorry.  I suspect the

13   crux of Mr. Webster's argument is that he surrendered

14   voluntarily today and that therefore he doesn't pose a danger

15   and he's no longer a flight risk.  I think there are several

16   reasons why the Court should not credit that.

17             First, I think it's important to note the timing

18   here.  He turned himself in almost seven weeks after the

19   incident.  The FBI's first wanted notices of a BOLO, be on the

20   lookout I believe is what that stands for, notices for this

21   particular defendant went out on January 23rd.  So he was on

22   notice that he was wanted personally for a month.  Of course

23   the other Capitol rioters started getting arrested much sooner

24   than that, which has been all over the press.  And this

25   defendant knew what he did, and he could have come in much,

1   much sooner, but here we are, almost two months later, before

2   your Honor.

3          Another important thing here, your Honor, is I

4   suspect the defense may argue that now that the election has

5   been certified and President Biden is in office, that the

6   danger is somehow dissipated, and I just think that's not so.

7          Whatever brought the defendant to the Capitol on

8   January 6 and caused him to snap is not the kind of thing that

9   just gets wiped from the mind overnight.  This kind of violent

10  extremism that fueled in riot is still very much alive in

11  America today as evidenced by the hearing that is going on in

12  the Senate, as we speak.

13         And the Marine motto, your Honor, of course is Semper

14  Fi, which we all know means forever loyal, and indeed, the

15  defendant named his landscaping business after that very motto.

16  And you know, I did a little research, your Honor, and marines

17  take an oath when they enlist that's codified at 10 U.S.C. 502,

18  and each marine swears to support and defend the Constitution

19  of the United States against all enemies foreign and domestic.

20  Here, your Honor, the defendant was trying to subvert the very

21  Constitution he swore to protect, which begs the question to

22  what or to whom is this defendant forever loyal, and if

23  summoned to take action against the government again, would he

24  do it?  I would submit the risk to that answer is just too

25  high.

1          And your Honor, there's other arguments with respect

2     to flight.  I mean, the evidence here is overwhelming.  We have

3     him on video, clear as day.  He also identified himself to the

4     FBI in the various videos and stills that are reflected in the

5     complaint.  And I believe we now have his phone in custody, and

6     I suspect there will be incriminating information there.

7          He's facing very serious exposure given the violence

8     that he exhibited towards a police officer.  Our conservative

9     estimate is that, if he goes to trial, he could face anywhere

10    from 87 to 108 months in jail.  And if he pleads, it's 63 to

11    78, which is a long time.  That's a minimum of five years.  And

12    as reflected in the pretrial report, this defendant appears to

13    have some means, so he may have the resources to run.

14          And frankly, your Honor, there's also an obstruction

15    risk here.  We asked him to voluntarily surrender a number of

16    items when he came in to the FBI, including his phone, and the

17    clothes that he wore to the Capitol, and he said he'd do that.

18    He didn't show up with his phone.  We have it now, but he

19    didn't show up with it.

20          And you know the most notable clothing item that we

21    asked for was this winter jacket which you could see in the

22    videos, and he said that he lost the jacket.  You know, with

23    all due respect, kindergarteners lose their winter coats, not

24    full-grown adults.  Particularly not full-grown adults who wore

25    a distinctive jacket to a criminal event.

1          All of this suggests to me, your Honor, a lack of

2   trustworthiness, and a potential for the destruction or other

3   tampering of evidence if he is allowed to stay out on pretrial

4   release.

5          So with that, your Honor, unless you have any

6   questions for me, I will turn it over to Mr. Monroe.

7          THE COURT:  Okay, thank you, Mr. Gianforti.

8          I do have a few question, but I'm actually going to

9   reserve my questions until after I've heard from Mr. Monroe,

10  because there may be some further things that I want to ask you

11  about after I've heard Mr. Monroe's presentation.

12         MR. GIANFORTI:  Of course.

13         THE COURT:  So let me turn to Mr. Monroe, and I'll

14  turn back to you, Mr. Gianforti.

15         Mr. Monroe.

16         MR. MONROE:  Judge, thanks so much.  We know that

17  Title 18 guides the Court towards the least restrictive means

18  to assure Mr. Webster's return to court.  The government knows

19  that, your Honor knows that, defense counsel knows that.

20         We searched the record to make sure that someone like

21  Mr. Webster has adequate contacts with our community.  This is

22  a gentleman who's spent the last 54 years, absent his several

23  years in the Marine Corps, living entirely here in the State of

24  New York.  His parents come from the State of New York.  His

25  siblings live in the State of New York.  His wife, where he

1    lives with here in the Village of Florida, New York, in Orange

2    County, from New York.  He's raised his three children here in

3    New York.  He owns his home in New York.  His business is here

4    in New York.  Every contact, every person, every relationship

5    he's ever had is right here in the State of New York.

6          The government speaks a story about Mr. Webster being

7    a danger to the community because that's the only way they can

8    convince this Court not to follow the recommendations offered

9    by Pretrial Services.

10          Mr. Webster has spent the last 54 years up until

11   today, your Honor, free from contact with law enforcement.  No

12   prior arrests.  This man served in the United States Marines

13   and distinguished himself by being honorably discharged.  I

14   know a lot of civilians, people -- the government will scoff at

15   that, but that means something, Judge, that means something to

16   people like me that someone like Mr. Webster is willing to

17   sacrifice his own time and his own life for the service of his

18   country.

19          I understand the US Attorney's remarks about the --

20   about his commitment to the Constitution.  But Mr. Webster went

21   to the Capitol on January 6 to participate in a protest, Judge.

22   He's not part of any group.  The government's not going to find

23   anything on the internet about Mr. Webster.  He's not a leader

24   of any organization.  He went there as an American citizen to

25   protest, to protest an event that was urged on by our former

1    president, to protest an issue that Tom felt very strongly

2    about.  That's protecting the Constitution.

3            Now we understand what we see in the video, Judge.  I

4    don't fail to appreciate what the US Attorney is talking about

5    in terms of Mr. Webster's conduct.  But at this proceeding,

6    Judge, we have to understand two elements.  We want to know

7    whether Mr. Webster poses a risk to the public, this gentleman

8    right here before the Court, and whether or not there are

9    enough indicia to lead this Court to believe that he's not a

10   flight risk.

11           If you take a careful look at what Pretrial Services

12   advises the Court, Mr. Webster, within the day of hiring this

13   law firm, Judge, was in the -- was in communication with the

14   FBI and making arrangements to surrender himself.  When he

15   learned from a mutual friend that his face was being circulated

16   on the FBI wanted list, he came to a lawyer, he did what he was

17   supposed to do and got legal counsel.  And we told him the best

18   course of action was to reach out to the FBI, and in a

19   peaceful, organized way, surrender himself.  And you know, when

20   you deal with the government in good faith, you would think

21   that they would get behind it and support the notion that

22   someone like Mr. Webster who has to deal with these types of

23   serious charges should be allowed to come to their local FBI

24   agent to be processed.

25           You know the first thing we did, Judge, is at my --

1    Mr. Webster turned over all the weapons he had.  He didn't have

2    a court order.  He didn't have the US Attorney office telling

3    him that.  He did that on his own volition.  At the advice of

4    his attorney, he handed me all of his IDs, including his pistol

5    permit, his driver's license, his passport.  He did this

6    because he wanted to be dealt with fairly the same way the

7    government should be dealing fairly with him.  They didn't have

8    to chase him around.  They didn't have to -- the government

9    didn't have to this expend time and resources finding out who

10   Tom Webster was.

11          And after we went through the process of turning over

12   the guns voluntarily and getting a property receipt for that,

13   Mr. Webster sat down in front of the agents who showed him

14   several photographs which your Honor has seen yourself, and

15   they said, Mr. Webster, is this you?  And he said, yes, that's

16   me.  I'm the man in the red jacket.  I'm the man that you're

17   looking for.  That's why we waived the whole ID hearing.  It

18   wasn't necessary.  Mr. Webster's not denying that the person in

19   that video isn't him.

20          So you know, I take offense to the government mocking

21   my client about the loss of the red jacket.  If this was an ID

22   case, the jacket would be of some significance.

23          Thomas Webster is not denying to anyone that he's not

24   the man in the red jacket.  Tom is not familiar with

25   Washington, D.C.  He's been there very infrequently.  In fact,

1    the last time he was there he said it was sometime in the

2    mid-90s with someone that he was dating before he was married.

3    So this is not someone who was a political activist.  This is a

4    regular citizen, Judge.  He did 20 years with the New York City

5    Police Department and successfully retired.  But you know the

6    government scoffs at that, gives the man no credit for that

7    time of service in this proceeding.

8          Judge, what we want to know is does Mr. Webster pose

9    a threat to the community based upon what we view all by itself

10   as to what happened on January 6.  He hasn't reoffended.

11   There's no evidence that he has any issue with the government,

12   or with the Capitol Police.  There's no evidence the government

13   is telling you that he's circulated the somewhere on the

14   internet and was planning or part of any type of organization.

15         This is an individual, aside from what we see in the

16   video, poses no, absolutely no danger to the community.  This

17   man has done a terrific job as a husband and as a father.  He's

18   raised three great kids who are -- two them are still dependent

19   upon him, and if we do what the government asks, we will make a

20   mockery of people like Mr. Webster who has the courage to come

21   forward under their own power and deal with these serious

22   offenses.

23         If everyone is dealt with of the like the

24   US Attorney's office suggests, it would be under the threat

25   that no one would be willing to surrender themselves because

1   you're dealing with terms of automatic remand.

2           The Pretrial Services have recommended that

3   Mr. Webster be released on an unsecured bond for a good reason

4   because this man has lived a good life.  He's financially

5   stable.  He's in a terrific marriage, Judge.  He's got terrific

6   people around him in the community that will sign an unsecured

7   bond to the satisfactory of Pretrial Services, and this man can

8   remain in the community and invoke -- like we banter around

9   about the Constitution, but this man has an Eighth Amendment

10  and due process right to fair bail.  And for the government to

11  stand up and point to one incident in this guy's entire life

12  and say that's why he should sit down in a D.C. lockup until we

13  get this guy a trial is much more than what the Constitution

14  would permit.

15          We can offer all types of abilities to make sure that

16  this man attends to this case, which is, we can -- he will

17  consent to the monitoring, he will consent to supervision by

18  Pretrial Services, he will abide by all the traveling

19  restrictions.  All the other suggestions offered by Pretrial

20  Services are things that Tom does as a matter of course or what

21  he's already accomplished at the advice of counsel.

22          Judge, this case speaks out for Mr. Webster to be

23  released on an unsecured bond.

24          THE COURT:  Thank you, Mr. Monroe.

25          I am going to have some questions for both of you,

1   but let me just start by saying I wanted to give you an

2   opportunity to respond, Mr. Monroe, because Mr. Gianforti made

3   some colorful arguments in his presentation, you made some

4   colorful arguments in response.

5           In response to my questions, we can dispense with the

6   hyperbole and the rhetoric and the color.  I get it.  I get the

7   basic argument on both sides, and I don't need the florid

8   language any further.

9           Mr. Gianforti, adults lose things all time.  I do.

10  So I don't think that it's necessarily the case the possibility

11  that he may have lost a jacket is beyond crediting.

12          You know, the Monroe, you know, the notion that

13  Mr. Webster should automatically be entitled to bail because he

14  happened to have received good advice from counsel to surrender

15  himself and not put the government to further paces to try to

16  locate him, that's not the standard either.  I mean, of course

17  there are people who surrender who still get detained.  That

18  happens all the time.

19          So, those two things, there's a bit of disconnect in

20  that argument, as far as I'm concerned.  The things that we

21  have to evaluate to decide whether a person is entitled to

22  bail, I mean, it's all well and good that he surrendered, and

23  I'm glad that he did that, but that does not put a huge thumb

24  on the scale, and it certainly doesn't suggest that everybody

25  who surrenders -- I tried to take notes as you were saying this

 1   particular part -- but that everybody who surrenders would be

 2   subjected to automatic remand.  That's completely untrue also.

 3        So listen, you both said your piece and made your

 4   arguments in the way that you made them, and that's fine.  I

 5   wanted to make sure you both had an opportunity to say what you

 6   wanted to say, but the case is more complicated than that.  I

 7   think you both understand that.  And there are complicated

 8   factors here that make this not an easy decision.  You both

 9   identified them in broad strokes the nature of the offense from

10   the government's perspective and the defendant's history and

11   characteristics from the defendant's perspective to quote from

12   the specific requirements under the Bail Reform Act.

13        So I understand all of that, and I think from this

14   point forward, to the extent you have anything else to add, we

15   can just dial it down a notch or two.

16        Mr. Gianforti -- and let me also add just one

17   additional point I wanted to make.  Mr. Gianforti referred to a

18   number of other cases that were present before me several weeks

19   ago.  Every case is different because every case involves

20   different defendants and the defendants in those cases have

21   different circumstances and characteristics that weigh on the

22   Court's determination with respect to bail.  So, while it is

23   instructive to understand how some of these other cases have

24   turned out, no one case is exactly the same as any other case

25   and so I need to consider of the unique factors that are

1    present in each individual circumstance to make a determination

2    with respect to bail in that case.

3           So I don't think we need to spend a whole heck of a

4    lot of time talking about the other cases and the outcome of

5    those cases.  I certainly am aware of the outcome of those

6    cases.

7           Mr. Gianforti, at one point you referred to the

8    bulletproof vest and there's a reference to that in the

9    statement of facts that is also captured or allegedly captured

10   at least in one of the still videos.  You made some points

11   about what that may or may not have suggested with respect to

12   Mr. Webster's expectations that day, but setting aside what you

13   might try to extrapolate from his decision to allegedly -- his

14   alleged decision to wear a bulletproof vest, I just want to

15   make sure I understand for purposes of the charges, is that a

16   component of any of the charges that are set forth in the

17   criminal complaint?

18          MR. GIANFORTI:  Not as our understanding, your Honor.

19   It's not like a firearms charge where a firearm would be a

20   necessary element.

21          THE COURT:  Right.  That's basically what I was

22   getting at, and I was wondering if -- there are a lot of

23   charges here and they all implicate different statutes.  I was

24   trying to understand if this issue with the bulletproof vest

25   was an element of any of those offenses.  But not to your

1    knowledge?

2              MR. GIANFORTI:  No, purely raised for the purposes of

3    demonstrating his danger to the community.

4              THE COURT:  Okay.  Mr. Gianforti, let me turn to you.

5    I don't know that I have too many more questions, actually, in

6    light of the presentation from Mr. Monroe, but let me turn back

7    to you to see if you have anything further that you'd like to

8    add.

9              MR. GIANFORTI:  Your Honor, I think that some of the

10   points that Mr. Monroe raised were fair ones, obviously, in

11   terms of the defendant's public service, both as a Marine and

12   as a member of the NYPD.  I think it was fair for him to note

13   as well.  Of course, his family ties in Orange County.  But,

14   your Honor, I think that those things cut both ways in an

15   argument like this.  I think somebody who has spent as much

16   time in public service, and particularly as a police officer,

17   should have known better, and I think that Mr. Monroe was sort

18   of suggesting that a member, a veteran of the armed forces

19   should somehow get a break in a situation like this.  But of

20   course, it's been widely reported in the press, most of the

21   most violent ring leaders of the riot were people with military

22   backgrounds.  So I think that that cuts both ways.  Certainly

23   being a family man, you know, it makes you wonder why he was

24   there at all and why he took the actions that he did.  So I

25   think that those are mitigators in some sense and aggravators

1    in other senses.

2           And your Honor, I think Mr. Monroe alluded to the

3    Eighth Amendment in the course of his argument, which might

4    have been a moment of hyperbole on his part, but there's

5    certainly nothing cruel and unusual about pretrial detention.

6           THE COURT:  Well, I agree with that, Mr. Gianforti.

7    I will say in response to your earlier point, so that

8    Mr. Monroe doesn't have to respond to it, I did not take

9    Mr. Monroe to be saying that just because Mr. Webster was a

10   military veteran that he should somehow not be subject to the

11   laws of the United States or subject to the analysis of the

12   bail reform statute.  I took that to just mean that he was

13   making a point about Mr. Webster's history and characteristics.

14          I took that for what it was, Mr. Monroe, so there's

15   no need for you to address that.

16          Is there anything you'd like to add, Mr. Monroe,

17   before I make my determination?

18          MR. MONROE:  Judge, you're spot on as far as a

19   determination and the remarks made about Mr. Webster was to

20   speak to this gentleman's character.  A former Marine,

21   honorably discharged, exemplary service with the NYPD.  More

22   importantly, a terrific father, a devoted husband with very,

23   very deep roots in the community.  That's within the purview of

24   Title 18, as far as what the Court has to consider in terms of

25   how to set bail in this case.  And that's why they were offered

1   to your Honor, and that's why they're outlined in the Pretrial

2   Service report, because they all militate towards allowing this

3   man to be released under the terms recommended.

4          THE COURT:  Okay.  Thank you, Mr. Monroe.

5          MR. GIANFORTI:  Your Honor, if I may.  I apologize.

6   I don't mean to make anymore arguments on dangerousness or

7   flight or to respond to anything that Mr. Monroe said.  I just

8   wanted to lay out, if I might, if you are going to, if you are

9   minded to grant bail, there's an alternative set of conditions

10  I would want to propose for your Honor's consideration before

11  you make a determination, if that's all right.

12         THE COURT:  Okay, thank you, Mr. Gianforti.

13         MR. GIANFORTI:  So, your Honor, the government would

14  recommend a $200,000 bond secured by the defendant's home in

15  Florida, New York.  The government would also ask for a

16  so-called stay away order from the District of Colombia unless

17  for court proceedings or he's summoned by Pretrial or he's

18  consulting with a D.C. based lawyer.  The government would ask

19  for him to call Pretrial Services once a week and advise

20  Pretrial Services of any travel outside of whatever geographic

21  jurisdiction he is limited to, which I would suggest be the

22  SDNY and the EDNY, maybe the District of New Jersey because

23  it's adjacent to Orange County.  No travel outside the U.S.

24  without Court approval.  And he's already surrendered his

25  firearms but an additional condition he not acquire any new

1   ones, and the surrender of his passport, which I believe has

2   already been accomplished.

3              MR. MONROE:  Your Honor, as an officer of the court,

4   I can represent I'm in physical custody of Mr. Webster's

5   passport.

6              THE COURT:  Okay.  Thank you, Mr. Monroe.

7              Thank you, counsel for your arguments on this matter,

8   and as I said at one point during my remarks, I find this to be

9   a difficult case, as some of these other cases have been

10  arising out of the events of January 6, 2021.

11             On the one hand, one of the hyperbolic statements

12  that Mr. Gianforti made that I absolutely agree with is that

13  the conduct on the video does shock the conscience.  And a part

14  of the reason that it does for me is precisely because of

15  Mr. Webster's proud and impressive track record as a public

16  servant.

17             Mr. Monroe at one point said that some people don't

18  value that type of public service.  That may be true, but I'm

19  not one of those people.  I greatly value the public service

20  that is provided by members of our armed forces and members of

21  our domestic law enforcement.  As a public servant myself, I

22  have deep respect and appreciation for public service rendered

23  by people like Mr. Webster, and I'm appreciative of all of that

24  service.  But it makes it particularly troubling and upsetting

25  and perplexing to me to weigh that impressive resumé of public

1   service against what we see in this video.  And what we see in

2   this video is a person who flat out attacks a law enforcement

3   officer verbally, which is not a crime, but then with a metal

4   pole that he swings repeatedly at the officer, hits the metal

5   barricade in front of the officer multiple times to the point

6   where in the video that pole is bent beyond recognition.  Now I

7   don't know how flimsy or sturdy the pole was, but it's a pole,

8   and it doesn't resemble a flag pole by the time Mr. Webster is

9   done swinging it and contacting whatever it was he contacted.

10          And then when he is disarmed of the pole, he doesn't

11   take a step back.  The barricade opens up, and he charges

12   through it at the officer, and they're wrestling on the ground.

13   I don't, I just don't understand it.  And I'm quite sure that

14   if this same thing happened to Mr. Webster while he was an NYPD

15   officer and someone in swung a pole -- and maybe it did, I

16   don't know -- if someone swung a flag pole at him repeatedly,

17   charged at him, tackled him to the ground, I imagine he would

18   have wanted that person to be detained without bail.

19          So I find it to be a difficult situation because I

20   do --

21          THE DEFENDANT:  Your Honor, can I say something,

22   please?

23          THE COURT:  Mr. Webster, it's generally not a good

24   idea for a defendant to speak during a proceeding of this

25   nature, but if you'd like an opportunity to consult with

1   Mr. Monroe for you to assess whether you think that's

2   advisable, I will give you an opportunity to do that.  I will

3   say that it's generally not a good idea, but I'm not here to

4   give you legal advice, that's not my role in this matter,

5   that's Mr. Monroe's role.

6           So we can make arrangements through the video system

7   for you to have a private conversation with Mr. Monroe and then

8   we can reconvene.  Would you like to do that?

9           Mr. Webster?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Okay.  Let us set that up for you right

12  now.  We're going to take a --

13          THE DEFENDANT:  Okay.

14          THE COURT:  Just hold on, Mr. Webster.

15          We're going to take a recess of a total of ten

16  minutes, and what I'm going to do is set up so that Mr. Monroe

17  and Mr. Webster can be moved into a breakout room on the

18  teleconference system.  Nobody else will be present in that

19  room other than Mr. Monroe and Mr. Webster.

20          Mr. Monroe, you should -- Mr. Webster is wearing a

21  mask, so we won't be able to hear him and we won't be able to

22  see his mouth moving, we won't have any idea what he's saying.

23          Mr. Monroe, you should either turn off your video or

24  just turn the around so no one on the screen, which really

25  would just be me or Mr. Gianforti, can see you either.  Okay?

1         MR. MONROE:  Yes, your Honor.

2         THE COURT:  Hold on one second.  You'll hear a beep

3    or two when you're transferred into the breakout room, and then

4    I will come back in approximately ten minutes.  If you're done,

5    Mr. Monroe, if you're done before that, you can come back on

6    the screen, give me the thumbs up or whatever it is, and we'll

7    end the breakout session.  Okay?

8         MR. MONROE:  Yes, sir.

9         THE COURT:  Hold on one second.

10         (Recess)

11         MR. MONROE:  Magistrate Krause, can you hear me, sir?

12         THE COURT:  I can.

13         MR. MONROE:  So --

14         THE COURT:  Just hold on one second, Mr. Monroe, I

15    just want to make sure we have Mr. Webster back first.  My

16    camera is not really moving.

17         (Pause)

18         THE COURT:  Thanks, everybody, for your patience as

19    we work through the technical issues.  It's now 2:46, we've

20    taken approximately a ten-minute recess.

21         Mr. Monroe has had an opportunity to consult with

22    Mr. Webster and we are ready to resume the proceedings.

23         Mr. Monroe, you wanted to be heard?

24         MR. MONROE:  Yes, I'd like to.  Thank you, Judge.

25         Appearing virtually has some downside.  As a defense

1    lawyer, you can't confer with your client as you normally would

2    if you were appearing in person.  I appreciate the Judge's

3    indulgence in allowing me to confer with my client.

4           Mr. Webster does bring up a couple of good points I'd

5    like to share with your Honor before a decision is rendered,

6    and they speak to the issue of Mr. Webster not posing a risk of

7    danger.

8           Number one, Mr. Webster states that during his career

9    with the United States Marine Corps and with the NYPD he's

10    never fired his weapon in connection with his service towards

11    another human being, which is, you know, given the years of

12    service with the NYPD not ever using your service revolver

13    shows, even to a common person, that this man is of great

14    restraint and is not someone prone to violence.  He's never

15    been in a shooting incident in his career.  This was his one

16    and only protest that he's ever been a part of.  One and only.

17    He has a total unfamiliarity with, you know, this type of

18    political stife.

19           And the video exchange between him and the officer,

20    according to Mr. Webster, was precipitated by Mr. Webster being

21    punched by this officer.  So this was, this was Mr. Webster

22    responding to the officer having punched him.  Again, speaking

23    to the issue of whether or not Mr. Webster really poses the

24    type of risk of danger that the government would suggest.  No

25    other, no other event, no other factor, as the government

1    pointed out today, other than what transpired on January 6.

2              That's all we wanted to add, Judge.  Thanks so much

3    for your indulgence.

4              THE COURT:  Thank you, Mr. Monroe, and thank you

5    Mr. Webster for that additional information.  I'm going to give

6    Mr. Gianforti an opportunity to respond.

7              MR. GIANFORTI:  Thank you, your Honor.  Let me start

8    with the last point.  Mr. Monroe had told me prior to the

9    proceeding that Mr. Webster asserts that he was struck by the

10   officer that he assaulted before the assault took place.  We

11   have acquired the full body camera footage from that officer.

12   We acquired it today in response to that specific allegation.

13   We weren't able to review all of it, but we were able to review

14   the footage from approximately ten minutes prior to the

15   incident, ten minutes worth of footage before the assault of

16   the officer, and there's just nothing in there that suggests

17   that Mr. Webster was struck by this officer or any other

18   officer.

19             Your Honor, I think that is an incredibly

20   self-serving statement and likely a fabrication.  Even if he

21   was struck 15 minutes before that footage, I don't know, it

22   just doesn't hold up to me that he could have gotten punched 15

23   minutes before, held on to that anger for a full 15 minutes and

24   was still that angry 15 minutes later and then charged the

25   officer.

1          With respect to Mr. Monroe's argument that

2    Mr. Webster has never fired a shot at a human being while in

3    the Marine Corps or with the NYPD, I commend him for his

4    restraint in that context but, your Honor, I think we have

5    every reason to believe that Mr. Webster had a gun on him when

6    he was at the Capitol and that could have been the first day

7    that he fired a shot at a human being.  Thank God it wasn't,

8    but he seemed prepared in case that had to happen.

9          And, your Honor, the fact that this is his first

10   protest, I'm not arguing that Mr. Webster didn't have the right

11   to be there, to be in Washington to make his views, however

12   misguided, known loudly and proudly, but I think, something

13   that I meant to respond to earlier, to suggest that somehow

14   Mr. Webster was protecting the Constitution by taking his First

15   Amendment rights and then, you know, and then turning them into

16   a violent protest, I just don't think that that holds water.

17   He may have gone there with good intentions to protest the

18   largely ceremonial functioning of the Constitution, but at some

19   point that took a turn.  It broke bad, and it broke very bad,

20   and that is why Mr. Webster is before your Honor.

21          So unless you have further questions for me, your

22   Honor, that's how I would respond.

23          THE COURT:  Thank you both.  I do not have any

24   further questions at this time, and I appreciate the additional

25   arguments.

1         I will say with respect to Mr. Webster's claim that

2    he was punched at some point previously, look, I only reviewed

3    approximately 30 to 45 seconds of the body cam video prior to

4    the incident that is depicted in the statement of facts and for

5    which we are largely here today, at least on the most serious

6    charges against Mr. Webster.  I will note that in that brief

7    period of time Mr. Webster was not even on the screen because

8    he appears to come running up from some location behind the

9    group of protestors who are standing directly in front of the

10   officer who is ultimately the subject of Mr. Webster's attack.

11   I cannot say for sure what happened or didn't happen before

12   that or whether Mr. Webster may have been punched by a

13   different law enforcement officer, maybe not this particular

14   officer, because obviously body cam footage is from the

15   perspective of the one officer who's wearing the body cam.

16         That said, I don't really know what to do with that

17   piece of information in the context of all of this.  Certainly

18   I have not seen any evidence to support that assertion by

19   Mr. Webster.  I haven't seen anything to conclusively refute

20   it, but I also don't have anything before me to support that

21   assertion.

22         You know, I was in the middle of speaking earlier

23   when we took that pause.  I will say that with respect to this

24   issue of the protest, as a judge, I certainly have the utmost

25   respect for people's constitutional rights to assert -- to

1   protest and speak out in whatever way they see fit, regardless

2   of whether I agree with them or other members of law

3   enforcement agree with them or whatever.  The point is, as an

4   American, you have the right to free speech and people should

5   exercise that right, absolutely.  But what we see in this

6   video, the events that give rise to the most serious charges in

7   this complaint goes well beyond First Amendment speech and

8   moves into criminal activity.  So the notion that this was

9   somehow protest activity, and I don't actually take Mr. Monroe

10  or Mr. Webster to be saying that the assault on the law

11  enforcement officer was part of a lawful protest.  Understood

12  that Mr. Webster was there for a lawful means to begin with to

13  assert his First Amendment right to protest, but it went far

14  beyond that in a most unfortunate and disturbing way.

15          So, on balance, let me review the various statutory

16  factors.

17          The nature and circumstances of the offense charged

18  here strongly, in my view, strongly support detention.  We're

19  talking about an assault on a law enforcement officer first by

20  means of a weapon, later by means of a physical confrontation

21  with fists.  That is a significant, significant violent act

22  that is extremely problematic in a civilized society.  The

23  nature and circumstances of the offense charged here certainly

24  support detention, as does the weight of the evidence.

25          I understand that Mr. Webster has raised this point

1    about a prior involvement with this officer.  Again, I have not

2    seen any evidence to support that, and the evidence, video

3    evidence provided by the government, both in the still photos

4    that are included in the supporting documents and the video

5    that I've reviewed, suggest that the weight of the evidence

6    against Mr. Webster here is extremely strong.

7         On the other hand, there's no question that

8    Mr. Webster's history and characteristics strongly weigh in

9    favor of release.  He has, as Mr. Monroe capably pointed out,

10   extremely deep ties to the community, multiple generations of

11   his family, his spouse, his children, his parents, he's a

12   business owner, he has been a productive, and more than just

13   productive, but a valuable member of society in his prior work

14   as a public servant, and clearly those factors all point very

15   much in favor of release.  And the Pretrial Services

16   recommendation is also in favor of release, which I take very

17   seriously, and I respect and appreciate the work of the

18   Pretrial Services office.

19        At the end of the day, as you can tell, I think there

20   are a lot of strong arguments on both sides in this case but

21   the final factor in the statute is the nature and seriousness

22   of the danger to any person in the community that would be

23   posed by Mr. Webster's release, and at the end of the day I

24   find that Mr. Webster would pose a danger to the community if

25   released.  I believe that the circumstances that led to

1    Mr. Webster's attack on the law enforcement officer that we see

2    in this video could certainly repeat themselves.  There were

3    obviously some unusual circumstances and other outside factors

4    on January 6, 2021, in Washington, D.C., but the undercurrent

5    of political hostility and other supporting factors that led a

6    person who has led an exemplary life, had an exemplary career

7    of public service to act in this extraordinary way continue to

8    be part of our society, and will continue to be part of our

9    society for the foreseeable future.  So I cannot sit here today

10   and conclude that the person that I have seen on this video

11   attacking a law enforcement officer does not pose a danger to

12   the community, and I will order detention on that basis.

13          I will, for the record, find that I do not believe

14   that Mr. Webster poses a risk of flight.  I believe that the

15   government has not met its burden even by a preponderance of

16   the evidence that Mr. Webster poses a risk of flight.  I think

17   that with the financial resources documented in the Pretrial

18   Services report, the extremely strong ties to the community

19   that Mr. Monroe has documented and that are also documented in

20   the Pretrial Services report, that are there are conditions of

21   release that could be set that could ensure Mr. Webster's

22   appearance for all future proceedings in this criminal matter.

23   So my determination in favor of detention today is based solely

24   on the issue of danger to the community.

25          And so, with that, Mr. Webster will be remanded to

1   the custody of the Attorney General for confinement in a

2   correctional facility separate to the extent practicable from

3   persons awaiting or serving sentences or being held in custody

4   pending appeal.

5          Mr. Webster must be afforded a reasonable opportunity

6   for private consultation with defense counsel.  On order of the

7   court of the United States or on request of an attorney for the

8   government, the person in charge of the corrections facility

9   must deliver Mr. Webster to United States Marshals for purpose

10  of an appearance in connection with a court proceeding.

11         And I will state for the record that of course

12  Mr. Webster has the right to appeal my determination to a

13  District Judge at some further point in this case as the case

14  proceeds.

15         Mr. Monroe, are there any medical needs I should

16  include in the detention order?

17         MR. MONROE:  No, Judge.

18         THE COURT:  Mr. Gianforti, what is the government's

19  position or current information with respect to setting a date

20  for Mr. Webster's next appearance in the District of D.C.?

21         MR. GIANFORTI:  Your Honor, they're still following

22  the same policy in Washington where they ask that you pick a

23  date at least three business days from today for an initial

24  appearance, which would be virtual, I think even from wherever

25  Mr. Webster will be held.  So really just my understanding is

1    pick any weekday at 1:00 p.m. three days or more from today and

2    the US Attorney's office in D.C. will communicate that to the

3    Court and the appropriate arrangements will be made.

4            THE COURT:  All right.  Well, with that in mind, as

5    unusual as it is, Mr. Monroe, for me to be in a position of

6    setting a conference date for a different judicial officer in a

7    different judicial district, my understanding from prior

8    matters is that that is the way in which the US Attorney's

9    office in the District of D.C. and the courts, my colleagues in

10   the District of D.C. have asked that these proceedings be

11   scheduled.

12           So with that in mind, I will set a date one week from

13   tomorrow, that would be Wednesday March 3rd, 2021, for a next

14   appearance in the District of D.C.  I understand that it is

15   likely that appearance will take place virtually.  That would

16   be true if Mr. Webster had been released from custody today as

17   well.  I understand that it is unlikely that Mr. Webster will

18   be transferred to the District of D.C. by the Marshal Service

19   at any time between now and next Wednesday, but the

20   US Attorney's office both here in the Southern District of New

21   York and the US Attorney's office in the District of D.C. will

22   be in further contact with you, Mr. Monroe, I'm sure, to let

23   you know about further plans with respect to Mr. Webster's

24   custody situation.

25           Mr. Gianforti, is there anything further that we

1   should discuss today from the government's perspective?

2          MR. GIANFORTI:  No, your Honor.  Thank you.

3          THE COURT:  Thank you, Mr. Gianforti.

4          Mr. Monroe, is there anything further we should

5   discuss today from Mr. Webster's perspective?

6          MR. MONROE:  No, Judge.  That's all we have for

7   today.

8          THE COURT:  Thank you, counsel.  Thank you,

9   Mr. Webster.  Thank you, Mr. Abbot.

10          We're adjourned for today.

11          (Proceedings concluded)

12   Certified to be a true and accurate

13   transcript of the digital electronic

14   recording to the best of my ability.

15   _____

16   U.S. District Court

17   Official Court Reporter

18

19

20

21

22

23

24

25