UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | Case No. 21-CR-208 (APM) |
| | : | |
| THOMAS WEBSTER, | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO REVOKE OR AMEND MAGISTRATE'S
ORDER OF PRE-TRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to defendant Thomas Webster's motion to revoke or amend the magistrate's order of pre-trial detention. Dkt. 24.

On January 6, 2021, Thomas Webster decided to take the law into his own hands. As a former U.S. Marine and a retired New York City Police Department Officer, Webster understood the danger that the officers defending the U.S. Capitol on January 6, 2021 faced as rioters pelted them with foreign objects, prodded them with sticks, maced them with bear spray, flattened them with metal barricades, and harangued them with vile epithets and profanities. And instead of supporting or, at the very least, not interfering with the officers, Webster violently and unapologetically unleashed on Metropolitan Police Department (MPD) Officer N.R. Without provocation or justification, defendant physically assaulted Officer N.R. -- first with a metal flagpole, and then with his bare hands. He struck his metal flagpole at Officer N.R., tackled him to the ground, clutched his gas mask, and caused him to stop breathing for ten seconds, all because defendant believed that Officer N.R. had acted uncharitably toward some rioters. As described in

greater detail below, given this offense conduct and the proclivity for violence that it reflects, there are no conditions that can reasonably assure the safety of any person and the community were defendant to be released.

## **FACTUAL BACKGROUND**

Defendant came to Washington, D.C. on January 5, 2021 armed and ready for battle. The day before his arrival, he downloaded a map of downtown D.C., which had marked certain tourist attractions, including the Capitol Building.



*Figure 1*

Defendant drove nearly five hours through the night, arriving in D.C. on January 5 at approximately 4:30 a.m. Defendant packed with him a Smith & Wesson 640 5-shot revolver,[1] his U.S. Marine-issued rucksack, his NYPD-issued bulletproof vest, and some military meals ready-to-eat ("MREs").

---

[1] While defendant claims to have left his firearm in his hotel room on January 6, *see* Def. Exh. E, Dkt. 24-5, at 29, he also could have easily concealed the firearm under his jacket or pant leg. Moreover, despite the government having raised concerns about the lawfulness of defendant carrying a firearm into Washington D.C. during defendant's initial appearance on February 23, 2021, defendant has still proffered no evidence to suggest that he possessed an active permit under the Law Enforcement Officers Safety Act (HR-218) to possess and carry a firearm in all fifty states. *See* Def. Exh. A, Dkt. 24-1, at 27.



*Figure 2*



*Figure 3*

He attended the rally that evening at Freedom Plaza, and the following day, he put on his NYPD-issued bulletproof vest and walked to the rally at the Ellipse.  There, he took several pictures of himself standing in front of the Washington Monument, holding a red U.S. Marine Corps flag.



*Figure 4*[2]

After attending the rally at the Ellipse, defendant made his way to the lower west terrace of the U.S. Capitol building.  In his motion, defendant repeatedly, and almost inconceivably, describes the rioters at the lower west terrace as "peaceful."  Dkt. 24 ¶¶ 11, 14, 29, 30.  But open source footage shows that the lower west plaza was nothing short of a war zone on January 6.  *See, e.g.*, Remember45, "Full video of initial breach and storming of Capitol grounds," YouTube, *available at* https://www.youtube.com/watch?v=wUmomtBJg0U (last accessed June 24, 2021) (~30:35 - 1:25:40).

As shown in this YouTube video, for over an hour, rioters hurled heavy objects at the police, emptied canisters of pepper spray into their often unshielded eyes, and spewed vitriolic, hateful, and profane language toward them  The photographs below are intended to illustrate the chaotic scene at the lower west terrace on January 6.  Figure 7 depicts a recently discovered photograph of the defendant, identified in the bottom right corner with a red arrow, leading the

---

[2] Defendant tried to delete this photograph, as well as six other photographs of himself posing in front of the Washington Monument, but law enforcement managed to recover the photographs during a forensic search of defendant's cell phone.

charge past the police line.



*Figure 5*



*Figure 6*



*Figure 7*

Officer N.R., a Metropolitan Police Department officer, was dispatched to the lower west terrace on January 6 to assist U.S. Capitol Police in protecting the Capitol building.  Officer N.R. was stationed behind a metal barricade just north of the media tower.  Officer N.R.'s orders were to hold the police perimeter, and to keep rioters away from, and off, the metal barricade.  For that reason, he is seen on his bodyworn camera (BWC) footage pushing away several rioters who approach and, in some instances, try to touch and/or push through the barricade.  *See* Def. Exh. H at 14:18:05-14:18:22; 14:18:53-14:19:07; 14:20:23-14:21:0.

At approximately 2:28 p.m., defendant emerges from the back of the crowd holding his red Marine Corps flag and approaches Officer N.R.  As he walks toward the barricade, defendant points his finger at Officer N.R. and yells, "You fucking piece of shit. You fucking commie motherfuckers, man.  You wanna attack Americans?  No, fuck that.  Fucking Marines?  You commie fuck.  Come on, take your shit off.  Take your shit off.  You communist motherfucker." Def. Exh. H at 14:28:21-14:28:36.

6



*Figure 8*

As defendant keeps yelling, Officer N.R. tries to push him away from the metal barricade.

Contrary to defendant's assertion in his motion, Officer N.R. never punched defendant in the face.

*See* Dkt. 24 ¶ 16.  Rather, the BWC footage shows that Officer N.R. merely pushed the right side

of defendant's chest, without ever making contact with defendant's face.



*Figure 9*



*Figure 10*



*Figure 11*

In response, defendant shoves the metal barricade open.[3]  He then draws his flagpole behind his

head and forcefully swings downward, striking the metal barricade directly in front of Officer N.R.

---

[3] It is at this time that defendant appears to lose the top half of his flag.  While the BWC footage is not entirely clear, it appears that the officer standing to the right of Officer N.R. tries to grab hold of the top part of the flag, but defendant quickly lifts the flagpole away and swings it downward, causing the top half of the flag to fall off.  As depicted in Figure 15, below, another rioter ultimately recovers the top half of defendant's flag.



*Figure 12*



*Figure 13*



*Figure 14*

Defendant then attempts to lunge toward Officer N.R. with the flagpole, but Officer N.R.

is able to wrest the pole away from defendant's clutch before falling backward.



*Figure 15*



*Figure 16*

Officer N.R. eventually stands up and retreats behind the metal barricade. Defendant, visibly enraged, begins charging toward Officer N.R. and tackles him to the ground. Defendant and Officer N.R. wrestle on the ground for approximately ten seconds before another rioter comes to Officer N.R.'s rescue.



*Figure 17*



*Figure 18*



*Figure 19*

In open source photos of the assault, defendant is seen reaching for Officer N.R.'s gas mask and helmet.   During an interview with law enforcement on February 17, 2021, Officer N.R. reported that he could not breathe for those ten seconds of the assault because he was being choked by his chinstrap.



*Figure 20*



*Figure 21*

After violently assaulting Officer N.R., defendant is next seen emerging from behind a

police barricade with his hands raised.  *See* Def. Exh. J at  00:12-00:22.



*Figure 22*



*Figure 23*

Defendant is last seen in a YouTube video calling for reinforcements: "Send more patriots.  We need some help."  *See* Def. Exh. K at 00:30-00:32



*Figure 24*

13

Upon searching defendant's cell phone, the government found three photographs (as well as three videos) taken by defendant outside the Capitol.  Defendant tried to delete these videos and photographs, but law enforcement was able to recover them during a forensic search of defendant's cell phone.



*Figure 25*



*Figure 26*



*Figure 27*

That evening, at approximately 12:40 a.m., defendant sent a text to a friend stating: "All is well, in my room[.]  Never forget this date."

## PROCEDURAL HISTORY

More than seven weeks after violently assaulting Officer N.R., and more than three weeks after the FBI posted a photo of defendant on its "Be On the Lookout" webpage, defendant's attorney contacted the FBI's Hudson Valley office on February 16, 2021 to discuss defendant's potential self-surrender.  On February 19, 2021, a criminal complaint was filed in the United States District Court for the District of Columbia charging defendant with assault of certain officers with a deadly or dangerous weapon, in violation of 18 U.S.C. § 111(a)(1), (b); obstruction of law enforcement during civil disorder, in violation of 18 U.S.C. § 231(a)(3); knowingly entering or remaining on restricted grounds without lawful authority with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2), (b)(1)(A); engaging in physical violence on restricted grounds

15

with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4), (b)(1)(A); disorderly conduct on Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and act of physical violence within the Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2)(F).  Defendant self-surrendered to FBI agents in New York on February 22, 2021.  At the time of his self-surrender, defendant consented to an interview with FBI agents and his attorney.  *See* Draft Transcript of Defendant's FBI Interview, Def. Exh. E, Dkt. 24-5.

An initial appearance was held on February 23, 2021 before Magistrate Judge Andrew E. Krause in the Southern District of New York.  The government moved for detention under 18 U.S.C. § 3142(f)(1)(A) because defendant is charged with a crime of violence -- namely, assault of a law enforcement officer with a deadly or dangerous weapon, in violation of 18 U.S.C. § 111(a)(1), (b).  *See United States v. Quaglin*, Case No. 21-3028, at *2 (D.C. Cir. June 24, 2021) (per curiam) (unpublished) (holding that § 111(b) is "categorically a crime of violence"); *see also United States v. Sabol*, Case No. 21-cr-35 (EGS), 2021 WL 1405945, at *7 (D.D.C. Apr. 14, 2021) (holding that using a deadly or dangerous weapon while assaulting an MPD officer assisting a federal officer is a crime of violence).  In support of its request for detention, the government proffered a 56-second clip from Officer N.R.'s BWC footage documenting the entirety of the assault, as well as the YouTube video of defendant saying into the camera: "Send more patriots. We need some help."  *See* Def. Exh. K.

Despite finding it to be a "difficult case," Def. Exh. A, Dkt. 24-1, at 43,[4] Magistrate Judge Krause agreed with the government that no condition or combination of conditions could reasonably assure the safety of any person and the community were defendant to be released. Magistrate Judge Krause explained that "the conduct on the video shock[s] the conscience . . .

---

[4] All docket citations are referenced by the pagination assigned by the Court's Case Management/Electronic Case Files (CM/ECF) system.

precisely because of Mr. Webster's proud and impressive track record as a public servant." *Id.*

The court also summarized its observations from the BWC footage:

> [W]hat we see in this video is a person who flat out attacks a law enforcement officer verbally, which is not a crime, but then with a metal pole that he swings repeatedly at the officer, hits the metal barricade in front of the officer multiple times to the point where in the video that pole is bent beyond recognition. Now I don't know how flimsy or sturdy the pole was, but it's a pole, and it doesn't resemble a flag pole by the time Mr. Webster is done swinging it and contacting whatever it was he contacted.
>
> And then when he is disarmed of the pole, he doesn't take a step back. The barricade opens up, and he charges through it at the officer, and they're wrestling on the ground. . . .

*Id.* at 44.

Magistrate Judge Krause then carefully analyzed each factor under 18 U.S.C. § 3142(g). With respect to the nature and the circumstances of the offense, the court found that this factor "strongly support[s] detention": "We're talking about an assault on a law enforcement officer first by means of a weapon, later by means of a physical confrontation with fists. That is a significant, significant violent act that is extremely problematic in a civilized society." *Id.* at 51. The court further determined that the weight of the evidence against defendant is "extremely strong." *Id.* at 52.

With respect to defendant's history and circumstances, the court found that this factor weighs in favor of release given the defendant's deep ties to his community, his employment, and his history as a public servant. *Id.* Ultimately, however, the court concluded that the defendant must be detained because the nature and seriousness of the danger to any person in the community -- coupled with the weight of the evidence and nature and circumstances of the offense -- weighed in favor of detention. As the court concluded,

> [T]he circumstances that led to Mr. Webster's attack on the law

17

> enforcement officer that we see in this video could certainly repeat
> themselves.  There were obviously some unusual circumstances and
> other outside factors on January 6, 2021, in Washington, D.C., but
> the undercurrent of political hostility and other supporting factors
> that led a person who has led an exemplary life, had an exemplary
> career of public service to act in this extraordinary way continue to
> be part of our society, and will continue to be part of our society for
> the foreseeable future.

*Id.* at 52-53.  Finally, the court noted that it did not perceive defendant to pose a risk of flight.  *Id.* at 53.

On March 12, 2021, a federal grand jury in the District of Columbia returned an Indictment charging defendant with the aforementioned five felonies and two misdemeanors.  Dkt. 6. Defendant was arraigned on April 9, 2021.  He filed the instant motion to revoke the magistrate judge's pre-trial detention order on June 17, 2021.  Dkt. 24.  A bond hearing is scheduled for June 29, 2021.

## APPLICABLE LAW

Pursuant to 18 U.S.C. § 3145(b), if a magistrate orders a defendant detained, the defendant "may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order."  Although the D.C. Circuit has not squarely decided the issue of what standard of review a district court should apply to review of a magistrate's detention order, *see United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021), courts in this district have held, in line with courts across the country, that such detention decisions are reviewed *de novo*.  *See United States v. Hunt*, 240 F. Supp. 3d 128, 132-33 (D.D.C. 2017) (referencing cases from the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleven Circuits that support this proposition); *see also United States v. Chrestman*, Case No. 21-mj-218 (ZMF) (BAH), 2021 WL 765662, at *5-6 (D.D.C. Feb. 26, 2021).

As a threshold matter, defendant is eligible for pretrial detention pursuant to 18 U.S.C.

§ 3142(f)(1)(A) because he is charged in Count One of the Indictment with a "crime of violence" -- namely, 18 U.S.C. § 111(a)(1) and (b).  *See* Dkt. 6 (Indictment); *Quaglin*¸ Case No. 21-3028, at *2; *Sabol*, 2021 WL 1405945, at *7; *United States v. Klein*, Case No. 21-cr-236 (JDB), 2021 WL 1377128, at *4-7 (D.D.C. Apr. 12, 2021).

Because defendant is eligible for pretrial detention pursuant to § 3142(f)(1)(A), the Court must determine whether any "condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  With respect to the danger defendant presents to the safety of any other person and the community, the Court "must identify an articulable threat posed by the defendant to an individual or the community," though "[t]he threat need not be of physical violence, and may extend to 'non-physical harms such as corrupting a union.'"  *Munchel*, 991 F.3d at 1283 (quoting *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1998)).  "The threat must also be considered in context," and "[t]he inquiry is factbound."  *Id.* (citing *United States v. Tortora*, 922 F.2d 880, 888 (1st Cir. 1990)).

In determining whether defendant presents a flight risk and/or danger to the community, the Court considers the 18 U.S.C. § 3142(g) factors, including: (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence"; (3) "the history and characteristics" of the defendant and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release."  18 U.S.C. § 3142(g).

The government is not arguing that defendant poses a risk of flight.

## ANALYSIS

### I.   The Nature and Circumstances of the Offense Favor Detention.

The gravity of defendant's offenses is undeniable, and the nature and circumstances of the

19

offenses weigh in favor of his continued pretrial detention.  As noted and reaffirmed today by the D.C. Circuit, defendants, like Webster, who "actually assaulted police officers and broke through windows, doors, and barricades" are in "a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way."  *Quaglin*, Case No. 21-3028, at *2-3 (citing *Munchel*, 991 F.3d at 1284).  Here, the footage of defendant violently assaulting Officer N.R. shocks the conscience and cements defendant in the category of January 6 rioters for whom pre-trial detention is plainly appropriate and warranted.

There is no discernible reason why defendant chose to target Officer N.R. on January 6. Contrary to defendant's assertion that his assault of Officer N.R. was a "spur-of-the-moment response to what he perceived as [Officer N.R.'s] misuse of force."  Dkt. 24 ¶ 41, there is no indication that defendant was present for, much less witnessed, Officer N.R.'s interactions with other rioters.  For example, defendant and his flag are not visible when Officer N.R. pushes a female protester who tries to pass through the barricade.  *Id.* ¶ 11; Def. Exh. H at 14:18:05- 14:18:22.  Nor is defendant visible when Officer N.R. pushes away a male rioter in a maroon sweatshirt who keeps reaching toward the barricade.  *Id.* ¶ 14; Def. Exh. H at 14:18:53-14:19:07; 14:20:23-14:21:00.  Defendant's violent assault of Officer N.R. was unprovoked.  There is nothing in the BWC footage that shows defendant anywhere near Officer N.R. until approximately 2:28 p.m., when defendant emerges from the back of the crowd shouting, "You fucking piece of shit. You fucking commie motherfuckers, man."  *See* Def. Exh. H at 14:28:21.

Even if defendant had personally witnessed Officer N.R.'s actions that day -- which he did not -- nothing that Officer N.R. did could justify the violence and rage that defendant exhibited toward him.  The BWC footage shows that Officer N.R. was simply doing his job of keeping rioters away from, and off, the metal barricade.  He pushes away the female rioter because she,

unlike others, repeatedly ignores Officer N.R.'s orders to get back and instead tries to push the metal gate open.  Def. Exh. H at 14:18:07.



*Figure 28*

Similarly, Officer N.R. pushes the rioter in the maroon sweatshirt away only after repeatedly instructing the man to "go home."  Def. Exh. H at 14:18:49-14:19:06.



*Figure 29*



*Figure 30*

Compared to other January 6 rioters who remain detained, defendant's offense conduct was significantly more violent and disturbing.  For example, unlike Jeffrey Sabol, who held a baton to the back of an officer's neck before helping rioters drag the officer face-first down the Capitol steps, defendant repeatedly attempted to inflict injury with a metal flagpole before tackling the officer to the ground and tearing away his gas mask and ballistic helmet, causing the officer to suffocate and gasp for air.  *Cf. Sabol*, 2021 WL 1405945, at *2.  Moreover, as an instigator, defendant cannot, like Sabol, claim that he was somehow spurred on by other members of the crowd.  The BWC footage shows that prior to defendant's assault of Officer N.R., there were hardly any skirmishes between officers and rioters at that portion of the police barricade.  It's clear, then, that defendant riled up the rioters, not the other way around.

In assessing the nature and circumstances of the offense charged, Chief Judge Howell has set forth a number of helpful considerations to differentiate the severity of the conduct of the hundreds of defendants connected to the events of January 6.  *See Chrestman*, 2021 WL 765662, at *7.  These considerations include whether a defendant: (1) "has been charged with felony or misdemeanor offenses;" (2) "engaged in prior planning before arriving at the Capitol;" (3) carried or used a dangerous weapon during the riot; (4) "coordinat[ed] with other participants before, during, or after the riot;" or (5) "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct;" and (6) the nature of "the defendant's words and movements during the riot," including whether he "damage[d] federal property," "threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot."  *Id.* at *7-8.

Five of the six *Chrestman* factors support a finding that defendant's offense conduct is more egregious than many of the individuals who participated in the January 6 insurrection.

First, defendant has been charged with five felonies. The most serious felony charge against defendant -- assault of a law enforcement officer with a deadly or dangerous weapon -- carries a maximum term of twenty years' imprisonment. 18 U.S.C. § 111(b).

Second, defendant engaged in prior planning before arriving at the Capitol. He downloaded walking maps (Figure 1), he packed a Marine rucksack and MREs (Figure 2), he brought a revolver to the District (Def. Exh. E, Dkt. 24-5, at 29), and he wore his NYPD-issued bulletproof vest. It is no coincidence that defendant was eager to attack Officer N.R. when one considers that he had mentally and physically prepared himself for armed battle before ever stepping foot on the Capitol grounds.

Third, defendant converted his flagpole into a dangerous weapon during the riot, which he swung repeatedly at Officer N.R. and others.

Fourth, while there is no evidence to suggest that defendant coordinated with other participants before, after, or during the riot, he did assume a de facto leadership role in the breach of the police barricade and in the ensuing assault of law enforcement. Prior to defendant's unprovoked assault, there had been only minor skirmishes at the barricade. It was not until defendant burst out from the crowd and began striking the barricade that chaos ensued, the rioters broke through the barricade, and the officers were forced to retreat. Therefore, defendant assumed a de facto leadership role by initiating the assault against Officer N.R. and by enabling hundreds of other protesters to advance past the police barricade and attack law enforcement.

Finally, the nature of defendant's words and movements during the riot are particularly troublesome and strongly favor detention. Before defendant ever comes into view in the BWC footage, he can be heard calling Officer N.R. a "fucking piece of shit" and a "commie motherfucker." Defendant was also the initial aggressor. He instigated the assault against Officer

N.R., without provocation or encouragement from the crowd.  He influenced others, by word and deed, to storm past the police barricade and to inflict violence on law enforcement officers.  As defendant progressed further toward the Capitol, he continued to flout police orders by going behind the police line.  *See* Def. Exh. J at  00:12-00:22.  His comments on the YouTube video calling for more "patriots," coupled with his text that evening to "Never forget this date," reflect a deep sense of pride for his actions on January 6.

In his motion, defendant makes several arguments in an effort to minimize the seriousness of his conduct on January 6.  First, he contends that his hollowed aluminum flagpole did not constitute a "dangerous weapon" in part because it was taken away from him before he could ever use it to physically strike Officer N.R.  *See* Dkt. 24 ¶¶ 31, 37.  This argument betrays a fundamental misunderstanding of the elements of assault and, specifically, what it means to "forcibly assault" a law enforcement officer under 18 U.S.C. § 111(a) and (b).

To violate § 111(a), a defendant must: "(1) forcibly; (2) assault, resist, oppose, impede, intimidate, or interfere with; (3) a designated federal officer;[5] (4) while engaged in or on account of the performance of official duties.  In addition, the defendant must have: (5) the intent to do the acts specified in the subsection."  *United States v. Arrington*, 309 F.3d 40, 44 (D.C. Cir. 2002) (internal quotation marks omitted).  To violate § 111(b), a defendant must, in addition to the aforementioned elements: "(1) use a deadly or dangerous weapon; (2) in the commission of any of the acts described in the prior subsection . . . [and] (3) the defendant must use the weapon intentionally."  *Id.*

As the D.C. Circuit has explained, assault need not involve actual physical contact.  Rather,

---

[5] Defendant does not dispute that Officer N.R., an MPD officer, was assisting federal law enforcement officers -- namely, the United States Capitol Police -- in the performance of their official duties.  *See* 18 U.S.C. §§ 111(a) and 1114.

a defendant may violate § 111(b) by attempting to cause or purposely or knowingly causing bodily injury to a designated officer with a deadly or dangerous weapon, or by using a deadly or dangerous weapon with the purpose of causing the designated officer to fear imminent serious bodily injury. *See United States v. Duran*, 96 F.3d 1495, 1509-11 (D.C. Cir. 1996).  Here, defendant used the metal flagpole to cause Officer N.R. to fear imminent serious bodily injury by vigorously striking it at the gate directly in front of Officer N.R.  Although defendant did not make physical contact with Officer N.R. until tackling him to the ground, defendant still forcibly assaulted Officer N.R. with the metal flagpole.

Defendant also attempts to downplay the dangerousness of his metal flagpole because it did not contain any type of "spear, sharpened point, or finial capable of penetrating an officer's helmet, face shield, or body armor."  *See* Dkt. 24 ¶ 31.  This argument is unavailing.  While § 111(b) does not include a definition for "deadly or dangerous weapon," multiple courts of appeal have defined "dangerous weapon" as an object that is either "inherently dangerous or is used in a way that is likely to endanger life or inflict great bodily harm."  *United States v. Chansley*, Case No. 21-cr-3 (RCL), 2021 WL 861079, at *7 (D.D.C. Mar. 8, 2021) (collecting cases).  Here, the flagpole was wielded in a way that was likely to endanger life and inflict great bodily harm. Indeed, one need only look at defendant's facial expression and listen to the sound of the flagpole hitting the metal barricade to appreciate the degree of force with which defendant wielded the metal flagpole.  *See* Def. Exh. H at 14:28:38 - 14:28:41.



*Figure 31*

In fact, later photographs show that defendant actually dented the flagpole and, as Magistrate Judge

Krause stated, it didn't "resemble a flag pole by the time Mr. Webster [was] done swinging it."

Def. Exh. A, Dkt. 24-1, at 44.



*Figure 32*

Courts in this district have found skateboards and police batons to be "deadly or dangerous

weapons" for purposes of § 111(b).  *See, e.g.*, *United States v. Owens*, Case No. 21-cr-286 (BAH),

2021 WL 2188144, at *7 n.5 (D.D.C. May 28, 2021) (skateboard); *Sabol*, 2021 WL 1405945, at

*11 (police baton).  Here, irrespective of whether the flag pole could penetrate Officer N.R.'s helmet and body armor, it was plainly capable of inflicting great bodily harm and therefore qualifies as a dangerous weapon for purposes of § 111(b).

## II.    The Weight of the Evidence Favors Detention.

The evidence against defendant is overwhelming and incontrovertible.  The entire assault was captured on Officer N.R.'s bodyworn camera and is well-documented in open source media. Moreover, defendant has failed to present evidence to corroborate his self-serving statements that he was trying to "protect the innocent" or avenge the perceived misuse of force by police officers.  Dkt. 24 ¶ 15.  Rather, the BWC footage suggests that defendant did not witness any interactions between Officer N.R. and the other rioters before deciding to attack Officer N.R. with a deadly and dangerous weapon.

Furthermore, the government has obtained additional incriminating evidence from defendant's cell phone, including ten photographs that defendant attempted to delete.  The photographs from defendant's phone show that he came to Washington D.C. prepared for armed combat.  Not only did defendant travel across state lines with his firearm, but he also brought with him MREs and a Marine rucksack (which is by no means a lightweight or convenient bag for travelling).  Finally, defendant sent a text message to a friend at 12:54 a.m. on January 7, stating: "All is well, in my room[.]  Never forget this date."  The evidence from defendant's cell phone further corroborates defendant's identity and provides additional proof regarding his intent and motive in traveling to Washington D.C., his lack of remorse regarding his conduct on January 6, and his consciousness of guilt.

**III.     The History and Characteristics of the Defendant Favor Detention.**

As a former U.S. Marine and a retired NYPD officer, defendant should have known better.  While defendant deserves recognition for his commendable service to our country, his service also comes with higher ethical standards and expectations.  As a U.S. Marine, he swore an oath to support and defend the Constitution.  Yet his actions on January 6 posed one of the greatest threats to the Constitution that our nation has ever endured.  If, as defendant claims, his instinct as a former member of law enforcement was to "protect the innocent," Dkt. 24 ¶ 15, then he should have been at the front lines helping to push the rioters *away* from the police barricade. Instead, however, he was one of the first rioters to breach the barricade and to attack an innocent member of law enforcement.

In addition, even if this Court were to credit defendant's assertion that he was somehow defending rioters from Officer N.R., this argument only underscores defendant's willingness to act as a vigilante and to take the law into his own hands.  Indeed, the open source video of defendant walking out from *behind* the police line is further proof that defendant believes he is above the law; the same rules that apply to all rioters about staying behind the police line do not apply to Thomas Webster.  *See* Def. Exh. J.

Finally, rather than accept responsibility for his unlawful conduct, defendant to this day continues to blame Officer N.R. by leveling baseless accusations of police misconduct.  *See, e.g.*, *United States v. Cua*, Case No. 21-cr-107 (RDM), 2021 WL 918255, at *4 (D.D.C. Mar. 10, 2021) (noting that while "contrition is not a defense, it has some bearing on the character of the defendant").  His inability to accept responsibility for his actions speaks volumes about his willingness to engage in similar conduct in the future.  Defendant has not accepted full responsibility for his actions, and he still fails to appreciate the wrongfulness of his conduct on

January 6.

Thus, notwithstanding defendant's decades of public service, his ties to his community and his lack of criminal history, this factor still weighs in favor of detention.

## IV. The Nature and Seriousness of the Danger Posed by Defendant's Release Favor Detention.

The same considerations that inform analysis of the nature and circumstances of the charged offenses from the January 6 assault on the Capitol are probative to the Court's consideration of the nature and seriousness of the danger posed by defendant's release. *Chrestman*, 2021 WL 765662, at *15. Defendant's conduct on January 6 evinces a clear disregard for the safety of law enforcement, a propensity toward violence, and a willingness to take the law into his own hands. Whatever police misconduct defendant may or may not have witnessed on January 6, his response was disproportionate and unjustifiable, especially for a former U.S. Marine and NYPD officer, and reflects an inability and unwillingness to conform his behavior to the law.

While the circumstances underlying the January 6 insurrection were in some ways unique, the presence of the protesters at the U.S. Capitol was not necessary for defendant to cause danger to the community. Put differently, defendant was motivated to act violently not solely by the presence of the mob or President Trump's encouragement, but by his belief that, as a veteran and retired member of law enforcement, he was entitled to take matters into his own hands and to put law enforcement officers in their place. There is no indication, and defendant does not argue, that he was provoked by the political climate of January 6. Rather he maintains that he was fueled by his desire to defend "innocent" protesters from police misconduct. Dkt. 24 ¶ 15. If defendant is willing to violently assault and suffocate a law enforcement officer to defend total strangers from conduct that he did not personally observe or witness, there is no saying what other violence he is capable of inflicting. Overall, defendant has proven that he is unable to control his rage and to

conform his behavior to the law, and that he presents an ongoing articulable threat to the community.

## **<u>CONCLUSION</u>**

This Court should deny defendant's motion to revoke or amend the magistrate judge's pretrial detention order.

Respectfully submitted,
CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793


By:     */s/  Hava Arin Levenson Mirell*
HAVA ARIN LEVENSON MIRELL
CA Bar No. 311098
Assistant United States Attorney (Detailee)
312 N. Spring St., Suite 1100
Los Angeles, CA 90012
(213) 894-0717
Hava.Mirell@usdoj.gov