**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>)<br>)<br>v. )<br>)<br>THOMAS WEBSTER, )<br>)<br>Defendant. )<br>_____ ) | Criminal No. 21-cr-208 (APM)<br><br>**MOTION FOR CHANGE**<br>**OF VENUE** |

**Motion**

COMES NOW the defendant, Thomas Webster (hereinafter "Webster"), by and through his attorneys, Dupee & Monroe, P.C., and respectfully moves this Honorable Court for change of venue as required by the Fifth and Sixth Amendments of the U.S. Constitution and Federal Rules of Criminal Procedure 12(b)(3)(A)(i) & 21(a) .

**Background**

Webster is a resident of Orange County, New York which is located within the jurisdiction of the United States District Court for the Southern District of New York. This case arises from the events that transpired at the United States Capitol on January 6, 2021. Webster voluntarily surrendered himself to the FBI on February 22, 2021. Defendant was indicted by a Federal Grand Jury on March 16, 2021 charging him with: 18 U.S.C. §111(a)(1)(b); 18 U.S.C. §231(a)(3); 18 U.S.C. §1752(a)(1) and (b)(1)(A); 18 U.S.C. §1752(a)(2) and (b)(1)(A); 18 U.S.C. §1752(a)(4) and (b)(1)(A); 40 U.S.C. §5104(e)(2)(D); and 40 U.S.C §5104(e)(2)(F). *See,* ECF Dkt. No. 6. A superseding indictment charging defendant with the instant offenses was filed

by the Government on November 16, 2021. *See,* ECF Dkt. No. 39. This case is scheduled for a Jury Trial on April 4, 2022. The Government alleges that Webster illegally entered the Capitol grounds on January 6th when the United States Congress had convened to certify the vote count of the Electoral College of the 2020 Presidential Election. The Government contends defendant committed acts of assault against Metropolitan Police Department Officer N. R. The Government does not allege that Webster entered the Capitol at any point in time or caused the destruction of public property.

**Argument**

The Fifth and Sixth Amendments guarantee Webster's right to a Trial by an impartial Jury. *See,* U.S.Const. Amends.V&VI; *See, also, Skilling v. United States*, 561 U.S. 358, 378 (2010) F.R.C.P. 21(a) provides that "[u]pon defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that prejudice against defendant exists in the transferring district that is so great that the defendant cannot obtain a fair and impartial trial there." As the moving party, Webster carries the burden of proof to show a reasonable likelihood of prejudice. Following the analysis offered by the Supreme Court in *Skilling,* defendant must demonstrate either *presumed* or *actual* prejudice. Presumed prejudice refers to the conditions that existed before trial in the subject district. In this regard, the court typically considers whether there was a barrage of inflammatory publicity; whether news accounts were factual or opinionated; whether those news accounts included material that would not be admissible; the size of the overall jury pool; and the availability of judicial tools to mitigate the prejudicial effect of such publicity. *See, Skilling, supra.*

Actual prejudice focuses on whether the opinions expressed by potential jurors in the course of jury selection demonstrate impermissible bias. Historically, the D.C. Circuit has

deferred to *voir dire* as a sufficient tool to protect a defendant's right to a fair trial. *See, Jones v. Gash,* 404 F. 2d 1231, 1238 (D.C.Cir. 1967)("[t]he ultimate question" on the motion to transfer venue based upon prejudicial pretrial publicity "is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the *voir dire.* examination."); *United States v. Haldeman,* 559 F 2d 31, 63 (D.C.Cir. 1976)(*en banc*)(*per curiam*)("[I]f an impartial jury actually cannot be selected, that fact should become evident at the *voir dire*. The defendant will then be entitled to any actions necessary to assure that [they] receive a fair trial.") *See, also, United States v. Bochene,* 2022 WL 123893 at *2-3(D.D.C. 2022).

It is only in "extreme circumstances" that the Court may presume prejudice before *voir dire*. *Haldeman, supra,* 559 F. 2d at 60. Such circumstances might arise, for example, where "the population of Washington, D.C. [is] so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that due process requires "a change of venue prior to attempting selection of a jury." *Id.* at 62 Based upon the empirical evidence imparted below, such "extreme circumstances" exist here.

It has been recognized that the open hostility evidenced by a particular community can be so severe to give rise to a presumption of juror prejudice. *See, Patton v. Yount,* 467 U.S. 1025, 1031 (1984) (distinguishing between presumed and actual juror bias). The bias or prejudice of even a single juror is enough to violate defendant's Fifth & Sixth Amendment guarantee to an impartial jury. *United States v. Gonzalez,* 214 F. 3d 1109, 1111-12 (9th Cir. 2000); *See, United States v. Martinez – Salazar,* 120 S. Ct. 774, 782 (2000) ("nor did the District Court's ruling result in the seating of any juror who should have been dismissed for cause as we have recognized, that circumstance would require reversal.") The presumption of prejudice overrides a

prospective juror's protestations of impartiality. *Murphy v. Florida*, 421 U.S. 794, 802 (1975) ("[e]ven this indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *see, also, Sheppard v. Maxwell*, 384 U.S. 333, 349-50 (1966); *Irvan v. Dowd*, 366 U.S. 717, 728 (1961). Based upon the recited precedent, *voir dire* process is incapable of protecting Webster's Constitutional rights.

### A. The size and characteristics of the District of Columbia jury pool

The District of Columbia's population is under 700,000.[1] Approximately 200,000 Federal employees/retirees reside within the District of Columbia. *Id.* With a total population of approximately 690,000, any given member of the jury pool will be closely connected to the Federal Government. As of 2019, there were approximately 200,000 Federal employees - - including postal workers - - living and working in the District. As reported in the Human Capital Strategic Plan, dated 2021, 2,250 individuals were employed by the U.S. Capitol police force. Nearly 15,000 individuals are directly employed by Congress.[2] Taken together, these numbers account for nearly a third of all jobs existing in the District – not to mention the multitude of friends and family members who are connected to these federal employees.

The characteristics of the District of Columbia's jury pool is further exemplified by the survey conducted by Select Litigation, LLC on behalf of the Federal Public Defender's Office

---

[1] *See,* 2020 census date shows D.C.'s population growth nearly tripled compared to previous decade, D.C.gov (Apr.26, 2021) (D.C. population recorded by census as 689,545), as of 2017, the U.S. Office of Personnel Management reported that there were 600,000 Federal Civil workers and retirees in the greater D.C. area - - excluding postal employees, Federal Bureau of Investigation Workers, and staff associated with several Federal commissions. Federal Civilian Employment OPM (Sept. 2017), https://www/opm.gov/policy-data-oversight/data-analays-documentation/federal-employment-reports/publication/federal-civilian-employment/.

[2] Vital Statistics on Congress, Brookings Institute (July 11, 2013). This would be in addition to the approximately 2,250 Capitol police personnel assigned to protect the Capitol. As reported in the Human Capital Strategic Plan, as early as 2021, 2,250 individuals are employed by the U.S. Capitol police force. Human Capital Strategic Plan 2021-2025, U.S. Capitol Police (2020) to compliment the U.S. Capitol Police Force there are 4,400 individuals employed by the Metropolitan Police Force and approximately 2,700 active members of the D.C. National Guard. Metropolitan Police Force annual report 2020 DC.gov (2020)

with the Eastern District of Virginia. Exhibit "A"[3] The survey (Exhibit "A") polled 400 potential District of Columbia residents and 400 residents of the Northern District of Georgia. As a part of this survey, the media research firm New Exposure analyzed the January 6th news coverage. *See,* Exhibit "A" at Appendix B. The results of this polling establish that the prospective jurors possess a "decidedly negative impression of individuals arrested in conjunction with the activities of January 6, 2021." Exhibit "A" at Pg. 2. More importantly, the enclosed data conclusively establishes that such individuals are pre-oriented - - without having heard any evidence - - to be "inclined to vote "guilty" if called to serve as a juror. *Id.* Specifically, the attitudes of prospective jurors in this District are decidedly more hostile toward defendants than adults nationwide or prospective jurors in a demographically comparable jurisdiction. Based on these simple calculations the residents of the District of Columbia overwhelmingly have significant and unique connections with individuals or institutions that are/were directly impacted January 6th. Such intimate relationships are/were unique to the District of Columbia as the central location for the operation of our Federal Government. As a result of these intimate connections, District residents see themselves as victims of the events which transpired on January 6th.

As to this point, the polling data evidences that prospective jurors have pre-judged January 6th defendants as follows:

- Have unfavorable opinions of those arrested for participating in January 6th demonstration (84%); and
- Would categorize these individuals with broad brushes as conspiracy theorists, white supremacists, and members of violent right-wing organizations (70%, 58%, and 54% respectively). Exhibit "A" ¶¶ 9,14

---

[3] The Federal Public Defender's Office has graciously consented to defendant's use of Select Litigation's polling data for purposes of this motion.

Such data confirms that most of the jurors are predisposed to find Webster guilty, and will likely consider him as posing a danger to the community, notwithstanding the strength or weakness of the evidence presented at trial. The empirical evidence also reveals that the prospective jury pool:

- Would categorize these individuals as "criminals" (62%); and
- Have already formed the opinion that these individuals are "guilty" of the charges brought against them (71%).

More than half of the District of Columbia residents admitted in this survey that they are likely to vote "guilty" if they find themselves on a jury in one of the January 6th cases (52%). Exhibit "A" at ¶11. Ironically, although 67% of the potential jurors polled believed that they themselves would receive a fair trial if they were a defendant in a January 6th case, 76% of those surveyed had already decided that the January 6th defendants are guilty. *Id.* at ¶12. This polling data also makes another obvious point - - that former President Donald Trump is/was inextricably connected with the events of January 6th. Of the individuals questioned, 84% believed that the January 6th defendants were:

- Trying to overturn the election and keep Donald Trump in power (84%);
- Insurrectionists (76%);
- Trying to overthrow the US Government (72%); and
- A protest that went too far (69%)

As of December 31, 2021, there were 524,088 registered voters in the District of Columbia.[4] The vast majority of these voters - - 400,552 - - are registered Democrats. This one-sided political dynamic - - unique to the District of Columbia - - is painfully obvious by the 2016 presidential election results between Hillary Clinton and former President Donald Trump where

---

[4] D.C. Board of elections monthly report of voter registrations statistics city wide registration summary as of December 31, 2021.

an overwhelming majority of District of Columbia voters (i.e. 92.8%) supported presidential contender Hillary Clinton over Donald Trump, who received a scarce 4.1% of the votes. [5] In the most recent election in 2020, then-President Donald Trump fared only slightly better in the eyes of District voters by garnering a mere 5.4% of the votes compared to the overwhelming majority of votes (i.e. 92.1%) casted in favor of President Joe Biden[6]. Given the lopsided political makeup of the District, it is impossible to panel a jury that is not entirely comprised of people preordained to find Webster - - a presumed Trump supporter - - guilty. Although significantly more populous than the prospective jury pool in *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963), Webster submits that the impact of the events of January 6th were felt by a larger proportion of District residents who have universally concluded that the January 6th defendants are guilty as charged.

### B. Nature and Volume of the National Local Media

Where the enormity of the publicity given to the January 6th protest has "inflamed passions in the host community" and "permeate[d] the trial setting . . [such] that a defendant cannot possibly receive an impartial trial," the District Court must accept the presumption of prejudice and transfer Webster's case to a venue where defendant can receive a fair trial. *See, Estes v. Texas*, 381 U.S. 532 (1964); *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966); *United States v. Quiles - Olivo,* 684 F. 3d 172, 177 (1st Cir. 2012). In *Skilling*, 561 U.S. at 378-9, the Supreme Court rejected the defendant's claims on both presumed and actual prejudice. With regard to presumed prejudice, the Court held that even pervasive adverse pretrial publicity does not inevitably lead to an unfair trial. News stories about Enron and Skilling, while not unbiased,

---

[5] www.washingtonpost.com/2016-election-results/primary//

[6] www.washingtonpost.com/2020-election-results/primary//

did not contain any confessions or present the kind of vivid and unforgettable information likely to produce prejudice. The Court observed that at trial, Skilling, had actually been acquitted of a number of insider trading counts. The Court also noted that four years had lapsed between Enron's bankruptcy and Skilling's trial.

Unlike Skilling, much of the evidence being used by the Government to prosecute the January 6th defendants - - including Webster - - comprises of video evidence. As for Webster's pending charges, the media, Congress, and the Government have all taken turns contributing to the public narrative as to their collective perception of the defendant's guilt. The Government likened the actions of Webster on January 6th to "a junkyard dog".[7] The local District of Columbia news media has taken a special interest spinning their views of Webster's case - - inviting the public to track the progress of defendant's prosecution. Interestingly enough, neither the Government nor the media have covered Officer N.R's use of excessive force by repeatedly throwing a female protester to the ground or punching Webster in the face with a closed fist - - prompting defendant to use self-defense.[8] A Google search using the terms "Thomas Webster Capitol" derives 4,690,000 search results. Approximately a week after Webster was indicted, former acting U.S. Attorney Michael Sherwin gave a lengthy interview to 60 Minutes suggesting that some of the January 6th defendants could face the rarely used sedition charges. Recognizing the Constitutional dangers posed by such Governmental misconduct, this Court correctly noted at a subsequent hearing:

> "No matter how much attention this matter gets, let me be clear that these
> defendants are entitled to a fair trial, not one that is conducted in the media . . .

---

[7] www.newyorktimes.com/2021/02/23/nyregion/nypd-officers-arrested-capitol-riot.htttml. The media has repeatedly dubbed defendant as the "eye gouger" in a case where there were no allegations being made by the Government or no proof offered in the video evidence of defendant gouging Officer N.R. eyes. www.huffpost.com/entry/former-nypd-cops-arrested-for-capitol-riot_n_6036722cc5b6dfb6a735ba6c.

[8] https://youtu.be/VmJRQUYjlY4 at 0:26.

> they are also entitled to defend against the charges that are currently brought against them, not speculation about what might or might not be coming."[9]

Customarily, "something more" than intense media attention or gruesome reporting is required to establish prejudice. *See, Murphy, supra,* 421 U.S. at 799 (1975) ("in those cases the influence of the news media either in the community at large, or in the courtroom itself, pervaded the proceedings"). To date, approximately 769 American citizens have been charged by the Government with crimes connected with the January 6th protest.[10] Given the large number of arrests associated with January 6th together with the media coverage that has followed, the citizens of the District of Columbia have been inundated with unrelenting information and news about and concerning the events occurring at the Capitol on January 6th. By comparison in *Skilling*, the defendant relied on hundreds of media reports about the Enron scandal in his motion for a transfer of venue. *Skilling, supra,* 561 U.S. at 358. Skilling argued that as the former Capital Chief Executive Officer, such articles implicated him by proxy, if not directly. *See Id.* The Court disagreed, referencing its early opinions concerning the modern ubiquity of news media, and reiterating its former conclusion that volume does not, on its own, create prejudice. *See,* Id at 382. Just in the past year, District of Columbia newspapers have published at least five hundred articles about January 6th and local news syndicates have broadcasted over seven thousand news stories covering these events. Exhibit "A" at App.B-7[print data] & App.B-1(broadcast data). This coverage is substantially more expansive than the media attention encountered by the defendant Skilling. *See, Skilling, supra,* 561 U.S. at 428-30. The empirical evidence (Exhibit "A") establishes that District of Columbia residents have been inundated with

---

[9] Judge criticizes DOJ for talking about Capitol riot conspiracy case in the press
www.npr.org/2021/03/23/980511734/judge-criticizes-doj-for-talking-about-Capitol-riot-conspiracy-case-in-the-press

[10] 769 people have been charged in the Capitol insurrection so far. This surgical table shows them all.
www.insider.com/all-the-us-capitol-pro-trump-riot-arrest-charges-deems-2021-1

news coverage about January 6th. See, Exhibit "A" ¶30 & App. B-1 & B2. With the advent of Facebook, Twitter and national news media outlets, the influence of local newspapers in America continues to decline. Notwithstanding these current realities, the news coverage in the District of Columbia has been unrelenting. Given the intense concentration of local media coverage of the January 6th protest, it is impossible for a prospective juror from this District to be truly fair and impartial.

### C. The Timing of the Proceedings

The Court in *Skilling* empanelled a jury four years after defendant was arrested. *Skilling, supra,* 561 U.S. at 383. Given the length of time involved there, the media attention concerning the Enron case all but disappeared. *Id.* Literally millions of news articles about the events which occurred on January 6th have circulated over the short span of the past approximately 13 months. Congress itself has assisted in keeping the January 6th protest as a feature story in the media by the assembly of a House Select Committee to investigate the events of January 6th.[11] As we move towards Webster's April 4th trial, there is absolutely no reason to believe that the media coverage will diminish. It stands to reason that as additional individuals are arrested and/or brought to trial, the public interest and media attention will only intensify.

### Conclusion

WHEREFORE, the defendant respectfully requests that this Court grant a change in venue pursuant to FRCP 21(a) and transfer the trial from the District of Columbia.

---

[11] Dan Burman, the latest in the Jan. 6th Investigation, CNN (Nov. 28, 2021), https://www.cnn.com/2021/11/28/politics/January-6-investigation/index.html

Dated: Goshen, New York
      February 9, 2022

Yours, etc.,

DUPEE & MONROE, P.C.
Attorneys for Defendant

BY: _____
JAMES E. MONROE, ESQ.
Office & P.O. Address
211 Main Street, Box 470
Goshen, New York 10924
Phone: 845-294-8900
Fax: 845-294-3619
Email: jim@dupeemonroelaw.com

CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to: Hava Mirell, Assistant United States Attorney.

JAMES E. MONROE, ESQ.