**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-208-APM** |
| **THOMAS WEBSTER,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

For violently assaulting Metropolitan Police Department Officer Noah Rathbun with a deadly and dangerous weapon during a riot at the U.S. Capitol Building on January 6, 2021, for tackling Officer Rathbun to the ground and choking him by the chinstrap of his gas mask, for spearheading the breach of the police line at the Lower West Plaza, and for disgracing a democracy that he once fought honorably to protect and serve, the government respectfully requests that this Court sentence defendant Thomas Webster to 210 months of incarceration. This recommended sentence lies at the low end of the Guidelines range. The Government further recommends that the Court impose a term of supervised release of three years, restitution of $2,060, a mandatory $100 special assessment for each of the five felony counts of conviction, and a mandatory $10 special assessment for Count Six.

1

# **Table of Contents**

I.    FACTUAL BACKGROUND .................................................................................. 3

   A.    The January 6, 2021 Attack on the Capitol ....................................................... 3

       1.    Breach of West Front of the Capitol Grounds ............................................. 3

       2.    Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the Doors of the West Front of the U.S. Capitol Building................... 9

       3.    Injuries and Property Damage Caused by the January 6, 2021 Attack ..................... 13

   B.    Webster's Role in the January 6, 2021 Attack on the Capitol ....................................... 14

   C.    Webster's Lack of Remorse .................................................................. 26

II.    THE CHARGES AND VERDICT .................................................................. 26

III.    STATUTORY PENALTIES .......................................................................... 27

IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS........................ 28

   A.    Guidelines Sentencing Range.................................................................. 28

   B.    Sequencing of Guidelines Analysis for Each Count ...................................... 29

V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a) .................................... 32

   A.    Nature and Circumstances of the Offense.................................................. 32

   B.    Webster's History and Characteristics ...................................................... 33

   C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense ........... 35

   D.    The Need for the Sentence to Afford Adequate Deterrence ........................................ 36

       1.    General Deterrence .................................................................. 36

       2.    Specific Deterrence.................................................................. 37

   F.    Unwarranted Sentencing Disparities.......................................................... 39

VI.    RESTITUTION.............................................................................................. 42

VII.    FINE............................................................................................................ 46

VIII.    CONCLUSION ............................................................................................ 47

# I.      FACTUAL BACKGROUND

## A.      The January 6, 2021 Attack on the Capitol

On January 6, 2021, Webster joined thousands of rioters who descended upon the U.S. Capitol Building and grounds in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.  Some rioters, wielding deadly and dangerous weapons like Webster's, attacked, abducted, beat, and injured police officers.  Others threatened, cursed, shoved, and toppled officers and physical barricades.  The rioters who ultimately entered the Capitol Building terrified congressional staff and others on scene that day, many of whom fled for their safety.  The rioters went on to ransack the Capitol Building—stealing, vandalizing, and destroying artwork, furniture, and other historic and valuable property.

The breach of the U.S. Capitol Building was made possible by rioters like Webster, who led the charge against the police barricades at the Lower West Plaza.  The Lower West Plaza would ultimately come to resemble a medieval battle as rioters continuously bombarded officers with anything they could get their hands on—makeshift projectiles, tear gas canisters, fire extinguishers, wooden planks, glass bottles, and, as Webster did, metal flagpoles.  Each individual attack on an officer at the West Plaza weakened the defensive line, fueled the crowd, and brought the rioters one step closer toward disrupting our democracy.

### 1.      Breach of West Front of the Capitol Grounds

On January 6, 2021, the U.S. Capitol and its grounds were restricted from the public.  The outer perimeter of the Capitol Grounds, made up of bicycle-rack and snow fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]"  These fences were not actively manned, but members of the United States Capitol Police ("USCP") were

stationed nearby as well as patrolling throughout the grounds.

At approximately 12:45 p.m., a crowd began to assemble behind the barricades near the Peace Monument, which led to the Pennsylvania Walkway.  Seeing this, a half dozen USCP officers gathered behind what is labeled in Exhibit A as "1st Police Barricade," circled in red below and marked as Area A.  At 12:52 p.m., the crowd breached the outer perimeter by jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle.  The crowd then advanced further into the restricted area and began engaging with USCP officers at the first manned barrier in Area A.



*Exhibit A: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

Less than a minute later, the mob, already numbering in the hundreds, shoved the handful of USCP police officers in and around the barrier out of the way.  By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Exhibit A.  They flooded the area labeled "Lower West Plaza," Area C on Exhibit A, pushing against the barricade there.



*Exhibit B: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of

weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Exhibit C: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large metal-framed Trump billboard, which would later be used against the police line like a battering ram, is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, buttressed by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the officers' deployment of riot control chemical agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from rioters in front of, to the side of, and above them on the scaffolding.   Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.   By 2:28 p.m., the officers' situation had become untenable.   Rioters had begun breaching the defensive line, and the officers were forced to retreat.   As their perimeter collapsed, the officers were enveloped by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage.   There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



*Exhibit D: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### 2. Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the Doors of the West Front of the U.S. Capitol Building

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT"). The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors was a security screening area with metal detectors and an x-ray scanner and belt, and a hallway leading to the basement of the Capitol Building.

The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is of great symbolic significance, having served as the backdrop for nine presidential inaugurations. On Inauguration Day, it is draped in bunting and functions as the entrance for the President-Elect and other dignitaries. *See* Exhibit E.



*Exhibit E: "Inauguration at the U.S. Capitol," Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress were sheltering nearby.  USCP and MPD officers were arrayed inside the doorway and guarding the entrance.  Many of these officers had already physically engaged with the mob for over an hour on the West Plaza before being forced to retreat.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the police officers reacted immediately by spraying Oleoresin Capsicum ("OC"), a gaseous chemical irritant, at the rioters.  The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging police with batons, poles, chemical spray, glass bottles, and other items.  Officers created a line in the doorway to block the rioters and to keep them back with batons

and OC spray.

At a July 27, 2021 congressional hearing about the events of January 6, Congresswoman Stephanie Murphy—in response to testimony from MPD Officer Daniel Hodges about his harrowing experience of being assaulted while caught in the tunnel doors—described her experience sheltering in an office near the tunnel:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people. And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me. So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in. That's about from the distance where I'm sitting here on the dais to that back wall. And from that office in close proximity to where you all held the line, I listened to you struggle. I listened to you yelling out to one another. I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall. And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight." Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat police officers. The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against police, including the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer Daniel Hodges. Officer Fanone described the violence in the LWT tunnel as follows:

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of

violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Id.* (Statement of Officer Michael Fanone).

During this battle, the vastly outnumbered officers were attacked with all manner of objects and weapons. They received blow after blow from rioters who took turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force. Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle. *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint. MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service. *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, until heavily armored reinforcements from the Virginia State Police arrived at around 5 p.m.

Despite being under constant assault, these officers continuously provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing from the chemical irritants. By heroically thwarting the mob at the LWT entrance, these officers

potentially saved the lives of those inside the building, including members of Congress and their staffs.

### 3.    Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). It was "a singular and chilling event in U.S. history, raising legitimate concern about the security— not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law."); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan.

In addition, the rioters injured more than one hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on   January   6   (June   7,   2021),   at   29,   *available   at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol

Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021 attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, shattered windows, broken doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the Capitol, resulting in losses of more than 2.7 million dollars.

**B.     Webster's Role in the January 6, 2021 Attack on the Capitol**

Webster, a former United States Marine and a twenty-year veteran of the New York City

14

Police Department ("NYPD"), came to Washington D.C. on January 5 armed and ready for battle. Not only did he pack his NYPD-issued bulletproof vest, but he also packed his "off duty" firearm—a Smith & Wesson Model 640 revolver, small enough to conceal inside a jacket pocket. *See* Exhibit F at 35:2-5.  Additionally, Webster brought with him his military-issued rucksack containing Meals Ready-to-Eat, water bottles, and Gatorade.  *See* Trial Transcript, Apr. 28, 2022, Morning Session, 102:7-16.  To the rally and to the riot, he wore his bulletproof vest, and he carried a large metal flagpole bearing the red and yellow flag of the United States Marine Corps.

After attending the rally on January 6, Webster walked down the mall toward the Capitol. When he arrived at the west front of the Capitol, the Lower West Plaza was overrun with rioters. The booming sounds of flashbang grenades reverberated across the plaza and the smell of tear gas permeated the air.  The vastly outnumbered police were trying desperately to keep the rioters away from the Capitol—they barricaded themselves behind metal bike racks, they pleaded with rioters to leave the restricted premises, and they repeatedly deployed tear gas and flashbangs to disperse the crowd.    But the rioters would not leave.  Instead, they used "anything [they] had their hands on" as weapons, including glass bottles, wood planks, stolen riot shields, and metal flagpoles.  *See* Trial Transcript, Apr. 26, 2022, Afternoon Session, 110:12-13 (Testimony of USCP Officer Joanna Burger).  The rioters also deployed their own personal canisters of bear spray and other chemical irritants at officers.  They accosted the officers, shouting profanities and expletives, and they accused officers of being unpatriotic for trying to protect the lawmakers inside the Capitol Building.

Webster could smell the tear gas and hear the flashbangs as he approached the Lower West Plaza.  He understood the significance of the less-than-lethal weapons and their intended deterrent

effect.  *See* Trial Transcript, Apr. 28, 2022, Afternoon Session, 42:6-8, 25 (Testimony of Thomas Webster).  As an NYPD officer who spent "countless hours . . . behind that metal barricade" protecting dignitaries, he was particularly attuned to how dire the situation was for the police who were trying to protect lawmakers and Vice President Pence.  Trial Transcript, Apr. 28, 2022, Morning Session, 85:21-22 (Testimony of Thomas Webster).  Further, as he testified at trial, he knew he would have been perceived as a threat by police officers guarding the Capitol on January 6 because of the metal flagpole that he was carrying.  Trial Transcript, Apr. 28, 2022, Morning Session, 132:9-19 (Testimony of Thomas Webster).

Notwithstanding his background and training, Webster did not try to de-escalate the situation or leave the premises.  Instead, he led the charge.  Webster spent eight minutes elbowing his way through the densely packed crowd so that he could position himself at the front of the mob.  *See* Trial Exhibit 217.  At approximately 2:28 p.m., Webster, still carrying his flagpole, approached Officer Rathbun, who was standing behind the bike-rack barricade, pointed his index finger at him, and immediately began shouting: "You fucking piece of shit.  You fucking commie, motherfuckers, man.  You wanna attack Americans?  No, fuck that."



*Trial Exhibit 204.1*

In response to Webster's unprovoked aggression, Officer Rathbun tried to swat Webster's hand away and create distance between himself and Webster. But Webster continued shouting, "A fucking Marine? You fucking commie fuck. Come on, take your shit off! Take your shit off!"

As a former NYPD cop, Webster understood the significance of the words, "Take your shit off" when uttered to a police officer. He knew that those were "terms that you might hear out on the street" when someone wants to fight an officer. *See* Trial Transcript, Apr. 28, 2022, Afternoon Session, 19:3-4 (Testimony of Thomas Webster). As Webster testified, "Someone might tell you, 'Let's take your stuff off, and let's settle this out on the street,' . . . You would take your shield off, you might take your gun belt off, give it to your partner, and just kind of like, you know, no paperwork, go old school." *See id.* at 19:3-8. But the only person interested in going "old school" that day was Webster. As Officer Rathbun testified at trial, his objective was not to incite or engage rioters in a physical fight, because that would "immediately trigger other people to act

17

violently" and place his fellow officers in danger.   Trial Transcript, Apr. 27, 2022, Morning Session, 70:18-25 (Testimony of Officer Rathbun).   Rather, Officer Rathbun's objective was "to prevent people from entering the building," and he would not have gestured Webster across the police line because "that would have compromised our . . . little bike rack perimeter . . . and that's not what we were there to do."   *Id.* at 39:21-25.

After trying to provoke Officer Rathbun into a fight, Webster forcefully pushed against the bike rack, twice.



*Trial Exhibit 204.3*

To protect himself from the belligerent and assaultive Webster, Officer Rathbun reached across the police line to shove Webster away and create distance.   In so doing, he struck the right side of Webster's face.   Webster then immediately took his flagpole and begin wielding it as a weapon, chopping it down repeatedly at the portion of the bike rack directly in front of where Officer

Rathbun was standing and where his hands were positioned.  *See generally* Trial Exhibit 204.



*Trial Exhibit 204.5*



*Trial Exhibit 204.6*



*Trial Exhibit 204.7*



*Trial Exhibit 204.8*

Webster swung the flagpole with enough force to break the metal pole in half.  A loud clang rang

out each time the flagpole struck the metal bike rack. As depicted in the screenshots above, Webster came dangerously close to hitting Officer Rathbun and the officers standing beside him with the metal flagpole. *See* Trial Transcript, Apr. 27, 2022, Morning Session, 33:21-23 (Testimony of Officer Rathbun) ("Q: Did it seem like he was trying to hit you with a flagpole? A: Yes, he did.").

As Webster swung his weapon at Officer Rathbun and the bike-rack barricade, police were forced to take a step back, allowing the mob to surge forward and breach the barricade. Determined to disarm Webster, however, Officer Rathbun did not immediately retreat; instead, he walked around the bike rack to wrest the flagpole from Webster's grip. Then, as Officer Rathbun retreated backward toward the inauguration stage, Webster crouched down, charged directly at Officer Rathbun, and tackled him to the ground.



*Trial Exhibit 204.9*



*Trial Exhibit 204.10*

Webster then dragged Officer Rathbun by his helmet, pinned him to the ground, and tried to rip off his gas mask.



*Trial Exhibit 204.11*



*Trial Exhibit 612*



*Trial Exhibit 111*

This caused tear gas to become trapped inside Officer Rathbun's mask, and his throat and nose

began to burn.  He also struggled to breathe because he was being choked by the chinstrap of his

helmet.  While Webster had Officer Rathbun restrained on the ground and unable to breathe, other

rioters began kicking Officer Rathbun.  *See* Trial Transcript, Apr. 27, 2022, Morning Session,

37:16-19 (Testimony of Officer Rathbun) ("I feel like I was being kicked while I was on the

ground.  I mean, I know there were a lot of people standing around, but I'm not sure who was

doing it.").

Officer Rathbun sustained several injuries as a result of Webster's attack, including visible

bruises and abrasions to his legs and arms.



*Left to Right: Trial Exhibits 607, 608, and 610*

Following the attack, Webster left Officer Rathbun on the ground and continued his

advance toward the Capitol Building, where he again disobeyed commands from other police

officers to stay back behind the police line.



*Trial Exhibit 110*

He then broadcast a plea for backup to other rioters on a live video being filmed by another person:

"Send more patriots.  We need some help!"  *See* Trial Exhibit 208.

Webster eventually made his way up the stairs to the inaugural stage, where he joined the angry mob of rioters gathered outside the LWT tunnel.  It was there that he witnessed rioters abduct and drag Officer Fanone face first down the stairs and beat him.



*Screenshot from Trial Exhibit 210*

While it is not clear what time Webster ultimately left the Capitol grounds, he was last seen on the Lower West Terrace at 4:13 p.m., about an hour after Officer Fanone was attacked, and approximately two hours after he attacked Officer Rathbun.

### C.      Webster's Lack of Remorse

Webster did not regret his actions on January 6.  Quite the contrary.  That evening, when one of his friends texted him to ask if he was okay or if he needed bail money, Webster responded: "All is well[,] in my room[.]  Never forget this date."  *See* Trial Exhibit 304.  He knew that night that FBI agents were trying to identify and apprehend the rioters, but he did not immediately turn himself in to the FBI.  *See* Trial Exhibit 314 (web search from January 6, 2021 at 11:13 p.m. entitled "NOW: Facial Recognition Proves Who Stormed Capitol").  Instead, at some point during the seven weeks between his assault of Officer Rathbun and his self-surrender, Webster obstructed justice by attempting to delete photographs he took on his cellular phone on January 6 while on Capitol grounds.  *See* Trial Exhibits 308 and 309.

Far from demonstrating remorse or disavowing his actions, Webster doubled down by taking the stand at trial to villainize and blame Officer Rathbun.  During his testimony, Webster called Officer Rathbun a "rogue cop," and questioned Officer Rathbun's training, integrity, and professionalism.  Trial Transcript, Apr. 28, 2022, Morning Session, 135:8 (Testimony of Thomas Webster).  To this day, Webster has never once apologized to Officer Rathbun, much less accepted responsibility for his unprovoked violence against the police on January 6, 2021.

## II.      THE CHARGES AND VERDICT

On April 13, 2022, the grand jury returned a second superseding indictment charging Webster with the following six counts:

- Count One, Assaulting, Resisting, or Impeding Certain Officers Using a Deadly or Dangerous Weapon, 18 U.S.C. § 111(a)(1) and (b).

- Count Two, Obstructing Officers During a Civil Disorder, 18 U.S.C. § 231(a)(3).

- Count Three, Entering or Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A).

- Count Four, Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(2) and (b)(1)(A).

- Count Five, Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(4) and (b)(1)(A).

- Count Six, Engaging in an Act of Physical Violence in the Capitol Grounds or Capitol Buildings, 40 U.S.C. § 5104(e)(2)(F).

ECF No. 76.

The Court presided over the trial from April 25 through May 2, 2022.  On May 2, the jury found that Webster had not testified credibly, rejected his self-defense claim, and returned a verdict of guilty on all counts.  ECF No. 86.  On August 1, 2022, the Court denied Webster's post-trial Motion for Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure 29(c).  ECF No. 99.

## III.   STATUTORY PENALTIES

Webster now faces sentencing on all six counts.  As noted by the U.S. Probation Office, the statutory maximum term of imprisonment is twenty years for Count One (Assaulting, Resisting, or Impeding Certain Officers, with a Deadly or Dangerous Weapon), five years for Count Two (Civil Disorder), ten years each on Counts Three, Four, and Five (Entering and Remaining, Disorderly and Disruptive Conduct, and Engaging in Physical Violence on Restricted Grounds with a Deadly or Dangerous Weapon), and six months for Count Six (Act of Physical Violence on Capitol Grounds).  PSR ¶¶ 114-19.

The statutory maximum fine for each of Counts One through Five is $250,000. 18 U.S.C. § 3571(b)(3); PSR ¶ 143. The statutory maximum fine for Count Six is $5,000. 18 U.S.C. § 3571(b)(6); PSR ¶ 144. The maximum term of supervised release for each of Counts One through Five is three years. 18 U.S.C. § 3583(b)(2); PSR ¶ 124. Because Count Six is a "petty offense," there is no applicable term of supervised release. *See* 18 U.S.C. §§ 19 and 3583(b)(3); PSR ¶ 126.

## IV.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.*

### A.   Guidelines Sentencing Range

The PSR correctly calculates Webster's Guidelines range. While the government respectfully submits that the offense level computations for each count should be performed prior to the grouping analysis, as discussed further below, the government agrees that Counts One through Five group pursuant to U.S.S.G. § 3D1.2(c), and that the offense level applicable to the group is the offense level for the most serious of the counts comprising the group – in this case, Count One. *See* U.S.S.G. § 3D1.3(a); PSR ¶¶ 45-48. The Guidelines calculation for Count One: Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) and (b),

28

is:

| | | |
|---|---|---|
| U.S.S.G. § 2A.2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily Injury | +3 |
| U.S.S.G. § 2A2.2(b)(7) | Convicted Under 18 U.S.C. § 111(b) | +2 |
| U.S.S.G. § 3A1.2(a), (b) | Official Victim Adjustment | +6 |
| U.S.S.G. § 3A1.3 | Restraint of Victim | +2 |
| U.S.S.G. § 3B1.5(2)(B) | Use of Body Armor in Crime of Violence | +4 |
| U.S.S.G. § 3C1.1 | Obstructing the Administration of Justice | +2 |
| | **Total Offense Level:** | **37** |

PSR ¶¶ 50-58. The U.S. Probation Office correctly calculated Webster's criminal history as Category I. PSR ¶ 65. Based on a total offense level of 37 and a criminal history category of I, the Guidelines range is 210 to 262 months of incarceration. Because the statutory maximum for Count One is twenty years, however, the Guidelines range is capped at 240 months of incarceration.[1]

## B.    Sequencing of Guidelines Analysis for Each Count

As set forth in the addendum to the PSR, the government respectfully submits that the offense level computations for each count should be performed prior to the grouping analysis. Sequencing the analysis as the government suggests (and as the Guidelines require) shows that the total offense level for Count Two is 33, the total offense level for Count Three is 27, the total offense level for Count Four is 33, and the total offense level for Count Five is 33. Pursuant to U.S.S.G. § 1B1.9, the Guidelines do not apply to Count Six.

The Guidelines set out the specific "order" of the analysis: first, for each count of

---

[1] Based on the facts and circumstances of Webster's case, the Government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4, n.4 because a sentence within the Guidelines range as determined in the PSR is sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

conviction, determine the offense guideline; second, determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3.  U.S.S.G. § 1B1.1(a)(1)-(3).  *Then*, repeat each step for each additional count of conviction.  U.S.S.G. § 1B1.1(a)(4).  *Finally*, perform the grouping analysis in Part D of Chapter 3.  *Id.*

Probation did not follow this procedure in preparing the PSR.[2]  Rather, Probation started with the grouping analysis in Part D of Chapter 3, PSR ¶¶ 45-49, then did the Guidelines analysis in U.S.S.G. § 1B1.1(a)(1)-(3), but only for Count One.  PSR ¶¶ 50-61.  But the grouping analysis should be "[a]ppl[ied]" only *after* the Guidelines analysis is performed for each separate count.  U.S.S.G. § 1B1.1(a)(4).

The PSR did not include a Guidelines analysis for Counts Two through Five.  Although, as stated above, the government agrees with Probation's grouping analysis and that the offense level applicable to the grouped offenses is the offense level which produces the highest offense level—in this case, the offense level for Count One—the PSR should have included the offense level computation for all counts.

The government submits that the appropriate offense level computations for Counts Two, Three, Four, and Five, prior to any grouping analysis under Part D of Chapter 3, are as follows:

**Count Two: 18 U.S.C. § 231(a)(3)**

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact or Dangerous Weapon | +3 |
| U.S.S.G. § 2A2.4(c)(1) | Aggravated Assault Cross-Reference | |

---

[2] On page 25 of the PSR, Probation explained that the *Guide to Judiciary Policy* allows the grouping analysis to take the place of certain individual count analyses.  But the Guidelines themselves are clear on the necessary sequencing.

*Applying U.S.S.G. § 2A2.2 (Aggravated Assault)*

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily Injury | +3 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under 18 U.S.C. § 111(b) | +2 |
| U.S.S.G. § 3A1.2(a), (b), (c) | Official Victim | +6 |
| U.S.S.G. § 3A1.3 | Restraint of Victim | +2 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **33** |

## Count Three: 18 U.S.C. § 1752(a)(1), (b)(1)(A)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Building/Grounds | +2 |
| U.S.S.G. § 2B2.3(b)(2) | Dangerous Weapon | +2 |
| U.S.S.G. § 2B2.3(c)(1) | Intent to Commit Felony Offense Cross-Reference | |

*Applying U.S.S.G. § 2X1.1 (Attempt, Solicitation, or Conspiracy)*

**From Count 1**

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily Injury | +3 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under 18 U.S.C. § 111(b) | +2 |
| U.S.S.G. § 3A1.3 | Restraint of Victim | +2 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **27** |

## Count Four: 18 U.S.C. § 1752(a)(2), (b)(1)(A)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact or Dangerous Weapon | +3 |
| U.S.S.G. § 2A2.4(c)(1) | Aggravated Assault Cross-Reference | |

*The applicable guideline becomes U.S.S.G. § 2A2.2 (Aggravated Assault)*

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily Injury | +3 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under 18 U.S.C. § 111(b) | +2 |
| U.S.S.G. § 3A1.2(a), (b), (c) | Official Victim | +6 |

| | | |
|---|---|---|
| U.S.S.G. § 3A1.3 | Restraint of Victim | +2 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **33** |

### Count Five: 18 U.S.C. § 1752(a)(4), (b)(1)(A)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact or Dangerous Weapon | +3 |
| U.S.S.G. § 2A2.4(c)(1) | Aggravated Assault Cross-Reference | |

*The applicable guideline becomes U.S.S.G. § 2A2.2 (Aggravated Assault)*

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily Injury | +3 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under 18 U.S.C. § 111(b) | +2 |
| U.S.S.G. § 3A1.2(a), (b), (c) | Official Victim | +6 |
| U.S.S.G. § 3A1.3 | Restraint of Victim | +2 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **33** |

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).  Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).  In this case, as described below, all of the Section 3553(a) factors weigh in favor of the recommended sentence.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 was a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the

only times in our history when the grounds and the building were literally occupied by hostile forces.  By its very nature, the attack defies comparison to other events.  While each defendant should be sentenced based on his individual conduct, each person who participated in the breach of the Capitol and interfered with or assaulted law enforcement officers on January 6 did so under the most extreme of circumstances.

Webster played a critical role in the attack on the Capitol.  Webster was an agitator who riled up the mob with his rhetoric and rage.  He instigated the violent assault against Officer Rathbun and left him vulnerable to further attack by other rioters.   Webster also directly contributed to the collapse of the police line at the Lower West Plaza, enabling thousands of rioters to penetrate the grounds and ultimately break into the building.   Put simply, Webster did not just violently attack a police officer; he facilitated and furthered a riot at the U.S. Capitol Building that injured hundreds of police officers, traumatized staff and members of Congress, and that resulted in the loss of life.

## B.    Webster's History and Characteristics

Webster does not have a criminal history and is not, to the government's knowledge, a member of any militias or extremist groups.   He served honorably in the United States Marine Corps from 1985 to 1989, and as a NYPD officer from 1991 to 2011.  PSR ¶¶ 103-04.  But Webster's prior military and police service render his violent assault of Officer Rathbun more troubling.  It is particularly disturbing that a former NYPD officer, once responsible for manning bike-back barricades and protecting dignitaries, would help lead the breach of the barricades outside the U.S. Capitol.  It is also disturbing that a former Marine would use his U.S. Marine Corps flag as a deadly and dangerous weapon during an attack on our democracy.

Webster's training and experience in law enforcement means that he should have been helping the police, not tackling them to the ground and trying to rip off their gas masks.  He should have been commending officers for their professionalism, courage, and restraint, not calling them "commie motherfuckers" or "rogue cops."  Finally, he should have accepted responsibility for his actions and apologized to Officer Rathbun instead of taking the stand to try and smear Officer Rathbun's reputation.

At trial, Webster attempted to wield his police service as both a sword to attack Officer Rathbun's actions and a shield to defend his own.  He tried to distract the jury from his own culpability by suggesting, inaccurately, that Officer Rathbun had failed to comply with police policies and procedures.  He also invoked his academy training and police experience to justify his violence against Officer Rathbun.  In fact, Webster relied on his NYPD experience to defend some of the more gruesome aspects of his assault of Officer Rathbun.  For example, Webster claimed, incredibly, that when he placed his hands on Officer Rathbun's gas mask, as depicted in the picture below, it was because he "just . . . wanted [Officer Rathbun] to see my hands" because when he had "been in altercations like one on one, like, fighting or trying to arrest somebody, you want to know where their hands are."  Trial Transcript, Apr. 28, 2022, Morning Session, 149:2-9 (Testimony of Thomas Webster).



*Trial Exhibit 111*

34

Where, as here, Webster relied on his service to justify his unlawful, unprovoked, and undignified attack on Officer Rathbun, that service should not subsequently be used to support a significant downward variance from the Guidelines.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol Building and grounds, and all that it involved, was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3]  As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration.

Webster's criminal conduct—swinging a metal flagpole bearing the U.S. Marine Corps flag at a police officer, tackling the officer to the ground, and choking the officer by ripping off his gas mask, all while within a restricted area and while donning body armor—epitomizes the disrespect for law that rioters exhibited on January 6.  Police officers and the lawmakers they sought to protect were under siege that day, and Webster understood that better than most.  His argument that he, a twenty-year NYPD veteran, believed he was entitled to retaliate with deadly and dangerous force against the vulnerable and non-violent Officer Rathbun is not only absurd, but dangerous.  It may cause others to follow suit and use violence against an officer because of a political grievance.  A lesser sentence would undervalue the bravery and self-control Officer Rathbun demonstrated on January 6, and could risk sending a message to the general public that

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

entering a restricted area and perpetrating violence against the police is an acceptable form of protest. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.   The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### 1.   General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong because January 6 involved acts of violence that were intended to influence the government through intimidation or coercion—acts that have been defined, by statue, as domestic terrorism. *See* 18 U.S.C. § 2331(5).

The violence at the Capitol on January 6 was calculated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power. As noted by Judge Moss during a different sentencing hearing,

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

*United States v. Paul Hodgkins*, 21-cr-188-RDM (Sentencing Hearing, July 19, 2021) at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was [before January 6]

for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. And it is important to convey to future rioters and would-be mob participants that their actions will have consequences. This is especially true for those who violently attacked members of law enforcement. There is possibly no greater factor that this Court must consider.

### 2.      Specific Deterrence

The need for the sentence to specifically deter this particular defendant weighs in favor of the recommended sentence. Webster's sentence should reflect not only that he assaulted Officer Rathbun with a deadly a dangerous weapon within a restricted area and while donning protective gear, but also that his assault contributed to the collapse of the police line, the general retreat of officers, and, ultimately, the hostile occupation of the Capitol Building and grounds. Webster's sentence should also reflect that he has expressed no remorse or contrition for his conduct on January 6, and that he chose to testify untruthfully about what happened that day. This is extraordinary conduct, even among the subset of violent January 6 rioters.

Webster's failure to appreciate the wrongfulness of his conduct on January 6 suggests the need for further deterrence. In the minutes and hours following his attack on Officer Rathbun, when he had time to reflect on what he had done, Webster was not apologetic or ashamed. To the contrary, he deliberately inserted himself in the background of another rioter's live video to call for more "patriots" to come to the Capitol and join the fight against police. *See* Trial Exhibit 208. Instead of leaving the premises after attacking Officer Rathbun, Webster joined the mob atop the

inauguration stage.  Once there, Webster positioned himself toward the front and center of the entrance to the Lower West Terrace tunnel.  He did not intervene as he watched rioters drag Officer Fanone out of the tunnel.  In fact, Webster did not leave the Lower West Terrace until after 4:13 p.m.—approximately two hours after he attacked Officer Rathbun, and approximately one hour after he watched other rioters beating and tasing Officer Fanone.  *See* Trial Exhibit 201.1 (showing Webster on the Lower West Terrace at 4:13 p.m.).  That night, when Webster returned to his hotel room, he did not express remorse or regret for having participated in the riot; instead, he texted a friend to "Never forget this date."

Webster's testimony at trial further underscores his failure to appreciate the wrongfulness of his conduct.  Throughout trial, Webster continuously blamed Officer Rathbun and never once accepted responsibility for his conduct.  For example, Webster attempted to blame Officer Rathbun for his rage, claiming, falsely, that Officer Rathbun waved him over the fence and "looked up at [his] flag" in a provocative way.  *See* Trial Transcript, Apr. 28, 2022, Morning Session, 127:13-18; 130:7-9; 133:6-7 (Testimony of Thomas Webster).  But, as the evidence at trial showed, Webster was enraged before ever approaching Officer Rathbun.  *Id.* at 126:9-21 (Webster admitting that he emerged from the crowd "pretty upset").  Webster also attempted to blame Officer Rathbun for failing to keep the bike racks connected, even though Webster himself pried open the bike racks.  *Id.* at 130:23-25.  Webster further faulted Officer Rathbun for not standing stoically like a statue while Webster harassed him and physically invaded his space.  *Id.* at 131:7-18 ("Q: How were they responding to you cursing at them, the other officers standing to Officer Rathbun's left and right?  A: Like a statue, like you're supposed to be.").  Webster even went so far as to blame Officer Rathbun for getting tackled to the ground, claiming—falsely, again—that

Officer Rathbun "came out and met me . . . and we kind of just, like, ran into each other." *Id.* at 148:15-17.

Overall, through his conduct on January 6 and his testimony at trial, Webster has shown that he will not accept responsibility for his unlawful conduct, and that he does not believe that he did anything wrong on January 6.  Clearly, a lengthy term of incarceration is needed to deter him from committing future crimes of violence based on his political grievances.

### F.      Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Webster and others like him committed on January 6 are unprecedented.  These crimes defy statutorily appropriate comparisons to other assaultive or obstructive related conduct in other cases.  To mechanically compare defendants who violated § 111(b) before January 6, 2021 would fail to take into consideration the context in Webster's crimes occurred and would be a disservice to the magnitude of what the riot entailed and signified.

As of the date of this sentencing memorandum, by the government's count, only four Capitol Riot defendants have been sentenced for convictions under 18 U.S.C. § 111(a)(1) and (b).[4] While some of those defendants also attacked officers with metal poles and other dangerous weapons, none physically tackled and restrained an officer on the ground.  None put hands on the officer, let alone dragged the officer across the ground by his gas mask.  None choked an officer. None caused bodily injury to an officer.  None wore body armor.  None had prior law enforcement experience or the same appreciation for the dangers that officers protecting the Capitol faced on

---

[4] *See United States v. Robert Palmer*, 21-cr-328-TSC (63 months); *United States v. Devlyn Thompson*, 21-cr-461-RCL (46 months); *United States v. Nicholas Languerand*, 21-cr-353-JDB (44 months); *United States v. Mark Ponder*, 21-cr-259-TSC (63 months).

January 6.  None provided materially false information under oath.  None blamed the victims of their assaults.  None attempted to delete evidence from their cellular phones.  None had a sentencing range anywhere close to Webster's Guidelines range.  And because none of the other defendants was convicted after trial, all of those defendants, by definition, expressed at least some acceptance of responsibility.

Consider, for example, Mark Ponder, who assaulted several police officers on the West Plaza after breaking through the bike rack barricade.  Like Webster, Ponder swung a flagpole at an officer with enough force to break the pole in half.  Unlike Webster, however, Ponder's victim had a riot shield and hard gear to protect himself.  After breaking his first pole, Ponder secured a second, sturdier flagpole,[5] which he used to attack two additional officers.  None of the officers reported any bodily injury from Ponder's assaults.  Ponder's Guidelines range was 57 to 71 months; Judge Chutkan sentenced him to 63 months.

Ponder, unlike Webster, accepted responsibility for his conduct.  He did not blame his violence on his victims; he did not physically restrain his victims or tackle them to the ground; he did not use body armor during the commission of the offense; and he did not obstruct justice by deleting photographic evidence from his phone or by providing materially false testimony under oath.  Moreover, Ponder had an extraordinarily difficult childhood and continues to suffer in his adult life from addiction and mental health issues.  *United States v. Ponder*, 21-cr-259-TSC, ECF No. 54 at 26.  Webster, by contrast, does not suffer from those afflictions.  While Webster did have

---

[5] Ponder's second weapon was a pole colored in red, white, and blue stripes.  At sentencing, Judge Chutkan remarked on the "palpable" irony of using a red, white, and blue pole as a weapon against police.  That irony is even more pronounced in this case, where Webster used a U.S. Marine Corps flag as a weapon.

a challenging childhood, PSR ¶ 72, his decades of training and experience as a NYPD officer should have specifically deterred him from attacking a fellow police officer with a metal flagpole.

Consider, also, Robert Palmer, who threw a wooden plank at officers stationed in the Lower West Terrace tunnel and emptied the contents of a fire extinguisher at officers before hurling the metal extinguisher at them. Palmer was denied any credit for acceptance of responsibility because of false statements he made on the Internet claiming that his actions on January 6 were purely defensive. Palmer's Guidelines range was 63 to 78 months; he was sentenced by Judge Chutkan to 63 months of incarceration. If Palmer's online statements were sufficient to deprive him of any acceptance of responsibility credit, then Webster's apocryphal and ahistorical retelling of the assault under oath, which the jury determined was not credible, should warrant even further punishment.

Only one Capitol Riot defendant who already went to trial has been sentenced. *See United States v. Guy Reffitt*, 21-cr-32-DLF. On August 1, 2022, Reffitt was sentenced to 87 months of incarceration—the low-end of the Guidelines range—for leading the mob's breach of the police line at the top of the northwest staircase. Unlike Webster, Reffitt did not physically attack any officers, and, though he was armed with a handgun, did not use or brandish it on January 6. Reffitt also did not take the stand at trial or provide materially false testimony under oath. He did not blame officers for provoking him into violence, and he did not attack the integrity and professionalism of the police who protected the Capitol Building on January 6. As with Reffitt, a Guidelines sentence is appropriate in this case because it adequately reflects the scope and severity of Webster's conduct, his lack of remorse and acceptance of responsibility, and the harm that his conduct inflicted on Officer Rathbun and, more broadly, on our country and our democracy.

41

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.  Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  Two general restitution statutes provide such authority.  First,  the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096.  Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096.  The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features.  Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).  Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as

a result of" the offense of conviction.[6]   *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2).   Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.   *See Papagno*, 639 F.3d at 1097; § 3663(b); § 3663A(b).   Finally, under both statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.   *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).   The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result.   *See Emor*, 850 F. Supp. 2d at 202.   The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[7]   *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

---

[6] The government or a governmental entity can be a "victim" for purposes of both the VWPA and MVRA.   *United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012).

[7] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."   *Fair*, 699 F.3d at 513.

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[8]

Applying these principles to this case leads to the conclusion that Webster should be required to pay $2,060 in restitution.

First, under the MVRA, Webster is obligated to pay any expenses incurred by Officer Rathbun during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. *See* 18 U.S.C. § 3663A(b)(4). Officer Rathbun has represented to undersigned counsel that he is seeking $60 to cover the estimated cost of gas for transportation to and from witness preparation meetings and trial.[9]

---

[8] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

[9] If the United States learns of any further expenses incurred by Officer Rathbun as a result of Webster's offense or as a result of Officer Rathbun's participation in the investigation and prosecution of this case, the United States may file a supplemental request for restitution. 18 U.S.C. § 3664(d)(5).

Second, one of the offenses for which Webster was convicted, 18 U.S.C. § 1752(a)(1), triggers mandatory restitution under the MVRA as an "offense against property" that resulted in pecuniary loss for the Architect of the Capitol. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii). Moreover, Webster's four additional convictions under Title 18 fall within the VWPA. As the evidence at trial showed, Webster's conduct, in conjunction with that of many other rioters, directly and proximately resulted in damage to the Capitol Building and grounds and losses suffered by law enforcement officers deployed to protect Members of Congress, their staff, and other Capitol employees. A "reasonable estimate," *Gushlak*, 728 F.3d at 196, of the restitution for which Webster should be responsible is $2,000. That is the same amount that defendants convicted of felony offenses in connection with the events of January 6 have typically agreed to pay under their plea agreements.

The VWPA and MVRA also provide that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d); 18 U.S.C. § 3663A(d). Because this case essentially involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h).

Webster's crimes on January 6 affected several entities responsible for the Capitol

Building, among them the Architect of the Capitol, the Office of the Chief Administrative Officer of the United States House of Representatives, and the Office of the Secretary of the United States Senate.  Attached as Exhibits G, H, and I are letters from each of these three entities, attesting to the pecuniary damages each suffered as a result of the attack on the Capitol on January 6: $1,253,354.01, $547,411.27, and $32,075.00, respectively.  That is a total amount of $1,832,840.28, which does not even account for the damages suffered by the Capitol Police, Metropolitan Police Department, or myriad other law enforcement entities.[10]

Here, Webster should be directed to pay $2,060 as an approximate estimate of the losses for which he is responsible.  Webster's restitution payment should be made to the Clerk of the Court, who will forward the payment to Officer Rathbun and the Architect of the Capitol, respectively.

## VII.    FINE

Webster's felony convictions subject him to a statutory maximum fine of $250,000.  18 U.S.C. § 3571(b)(3).  In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.  *See* 18 U.S.C.  § 3572(a)(1); U.S.S.G. § 5E1.2(d).  In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public."  *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).  The government is not seeking a fine in this case.

---

[10] The government estimates that, as of April 5, 2022, the approximate total losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 210 months' imprisonment, which is at the low end of the Guidelines range.  The government further recommends that the Court impose a term of supervised release of 3 years, restitution of $2,060, a mandatory $100 special assessment for each of the five felony counts of conviction, and a mandatory $10 special assessment for Count Six.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By: _____
Hava Arin Levenson Mirell
Assistant United States Attorney
CA Bar No. 311098
Brian P. Kelly
Assistant United States Attorney
DC Bar No. 983689
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530
Phone: 213-894-0717
Email: Hava.Mirell@usdoj.gov

47