**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>)<br>)<br>v. )<br>)<br>THOMAS WEBSTER, )<br>)<br>Defendant. )<br>) | Criminal No. 21-cr-208 (APM) |

**Sentencing Memorandum & Motion**
**For Downward Variants**

Defendant Thomas Webster, by and through his attorneys Dupee & Monroe, P.C., pursuant to 18 U.S.C. §§ 3553 & 3661 and Fed. R. Crim. P. Rule 32(i), respectfully moves this Honorable Court for a downward departure from the advisory Sentencing Guidelines range and, in addition, presents the following relevant information for the Court to consider in determining a fair and reasonable sentence:

**Facts & Sentencing Considerations**

Following a trial, a Jury convicted Mr. Webster on each of the six counts with which he was charged. Four of those counts - - One, Three, Four & Five - - charged defendant with the use of "a deadly or dangerous weapon" in the commission of these offenses. The "deadly or dangerous weapon" by all counts was a metal flagpole. While holding a metal flagpole with an attached Marine Corps flag, defendant angrily confronted Officer Rathbun positioned along the lower West terrace of the U.S. Capitol while attempting to prevent people from entering the U.S. Capitol Building. Officer Rathbun and the Officers assigned to this police line were separated from the crowd by a metal bike rack. Defendant angrily confronted Officer Rathbun and his

fellow officers, screaming obscenities and questioning their patriotism. Following a brief exchange, defendant wielded the flagpole as a weapon, chopping it down repeatedly onto the portion of the bike rack immediately in of front Officer Rathbun. Mr. Webster brandished the flagpole with sufficient force as to cause the pole to break apart.

This evidence was sufficient for a Jury to convict Defendant of using the flagpole in a manner that was "capable of causing serious bodily injury." Officer Rathbun managed to take the flagpole away from defendant and retreated back towards the U.S. Capitol Building. Defendant thereafter charged at the officer, struggled briefly on the ground with him, and angrily attempted to remove the Officer's protective mask. At the conclusion of this violent exchange, Mr. Webster did not pursue Officer Rathbun, nor did the defendant engage in any additional acts of violence at the Capitol. Fortunately, beyond being bruised, Officer Rathbun was not injured. The entire encounter between the defendant and the officer as captured on video lasted approximately 46 seconds. Mr. Webster never struck Officer Rathbun with the flagpole. The defendant never entered into the Capitol Building or caused any damage to public property. Mr. Webster, a husband; father of three; decorated retired New York City Police Officer, United States Marine; and private business owner recognizes that his actions were inexcusable.

As recited below, Mr. Webster committed his crime(s) while swept up in the fervor of the large crowd of protesters. As soon as defendant learned that he was under investigation, he peacefully surrendered himself to law enforcement; admitted his role in the events of January 6th; and offered self-defense - - which was rejected by the Jury - - as the only justification for his conduct.

Mr. Webster's Guideline range, as calculated by Probation, falls at a total offense level 37 and a criminal history category I. At this range, the recommended sentence is 210 to 240

months. Presumably, recognizing the disparity of imposing such a sentence, Probation has recommended a sentence of 120 months. Mr. Webster was arrested on February 22, 2021 and remanded to Federal custody until his release on June 29, 2021, totaling 127 days of incarceration. Upon being released by the Court on personal recognizance, Defendant has remained on a strict home confinement under the supervision of pre-trial services' High Intensity Supervision Program without incident for the last 421 days. Regardless of the recommended range, Mr. Webster respectfully proposes a downward variance to time served together with a term of supervised release as a sufficient sentence, which is not greater than necessary, to satisfy the statutory criteria set forth in 18 U.S.C. § 3553(a).

## 18 U.S.C. § 3553(a) Factors

The facts and circumstances surrounding Mr. Webster's conviction(s), though certainly very serious, do not call for the imposition of a sentence as high as the Guidelines, Probation, or the Government would suggest. The Guidelines, "as a matter of administration and to secure nationwide consistency. . .should be the starting point and the initial benchmark," but are not the only consideration in formulating a fair and just sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). After properly calculating the Guidelines range, the Court must make an individualized assessment of the Defendant and consider each of the factors set forth in 18 U.S.C. § 3553(a). *Id* at 49-51. As recited by this Court in *United States of America v. Lolos*, 1:21-cr-00243-APM (Exhibit "A" at pg. 49), the Court must consider all the factors that are set forth in 18 U.S.C. § 3553(a) and impose a sentence that's sufficient but not greater than necessary to achieve the objectives in this statute. These factors include:

      1. The Nature and circumstances of the offense;
      2. The history and characteristics of the defendant;
      3. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;

      4. The need to protect the public;
      5. The Guidelines range;
      6. The kinds of sentences available;
      7. The need to avoid sentencing disparity among similar defendants who had been found guilty; and
      8. The need to provide restitution of victims of the offense.

*United States v. Martin*, 455 F. 3d 127, 1236 (11th Cir. 2006); *United States v. Simpson*, 430 F. 3d 1177, 1187 (D.C. Cir. 2005). Taking an accounting of the factors applicable at bar, including the defendant's history and characteristics; the need to impose just punishment; protect the public, and avoid unjust sentencing disparities; collectively demonstrates that a sentence within the proposed range would invoke a punishment far greater than necessary to accomplish a fair and just sentence.

### A. Defendant's History and Characteristics

      A year and a half ago, defendant joined a violent mob, guided by unscrupulous politicians, stormed the capitol; and almost succeeded in preventing the peaceful transfer of Presidential power. Promoters of the lie that the 2020 election was stolen have nearly taken over one political party and stoked national distrust in our electoral process. These forces championed by former President Donald Trump exerted an extraordinary amount of influence over those Americans present at the Capitol on January 6th through their relentless disinformation which turned otherwise decent, law abiding individuals such as Mr. Webster against his fellow Americans. Disabused of any notion that the 2020 election was illegitimate, Mr. Webster as a man of immense character is deeply ashamed and remorseful for having participated in the January 6th protest and violently attacking Officer Rathbun.

      As aptly written by poet Paul Eldridge, to judge Mr. Webster's character solely on the events of January 6th, "is like judging the sea by a jug full of its water." Defendant is 56 years old having been born on March 25, 1966. Defendant was born in Brooklyn, New York. Defendant's

parents separated and divorced at a very early age in his life. Initially, defendant was raised by his father until moving with his siblings into his mother's apartment in Suffern, New York. Both of defendant's parents struggle with alcohol. Mr. Webster suffered the loss of his older brother shortly before graduating high school. Despite the family's personal and financial struggles, defendant managed to graduate from Suffern High School in 1984. After a short stint in Community College, defendant made the selfless decision to enlist in the United States Marine Corps in 1985 until his Honorable Discharge in 1989. Mr. Webster's love and devotion to his country is competently noted by his Marine Corps service records. Exhibit "B". The truest determination of a person's character must be measured over time and is best described by the Latin phrase *non vox sed votum*. An early glimpse of defendant's character is revealed in a letter issued to defendant as a young Lance Corporal which reads:

> As you return to your parent unit, I hope you continue this superb conduct and continue to be an example for all. Your conduct reflects great credit upon yourself, the Marine Corps, and the United States Naval Services.

Mr. Webster's exceptional character as a United States Marine separately earned him a citation on November 1, 1988. After four exceptional years of service with the United States Marine Corp., defendant was Honorably Discharged on October 31, 1989.

Upon being discharged from the United States Marine Corps, defendant returned to Suffern, New York to join the New York City Police Department in 1990. Again, Mr. Webster's impeccable conduct as a uniformed Police Officer speaks to this gentleman's exceptional character. Exhibit "C" The restraint and professionalism exhibited by the defendant as a Police Officer is especially telling when understanding the particularly violent neighborhoods he was assigned to patrol. In this context, a group of private citizens living in the Gun Hill Housing

Projects thought enough of Mr. Webster's character to write former Mayor Rudolph Giuliani a letter on May 15, 1997 (Exhibit "D") stating:

> I am a Resident Patrol Supervisor of Gun Hill houses located in the North Bronx. I am writing to let you know what a great job the residents of Gun Hill think your officers are doing.
>
> Police Officer Webster and Police Officer Morales have demonstrated to us that they are concerned about the quality of life in our community. They are always courteous and ready to respond to any situations.
>
> Just as we speak out when we think there is a problem in our community with the Police Officers, we are writing to give Police Officer Webster and Police Officer Morales the praise they so richly deserve.

The strength of the trust and high regard the NYPD had for Mr. Webster is illustrated by the fact that the defendant was assigned as a Firearms Instructor and to the Mayor's private security detail. Defendant's time with the United States Marine Corps and the NYPD over a twenty-five year period was unblemished and filled with superlatives that directly speak to defendant's good character, peaceful nature and high moral qualities. It is also worth mentioning that Mr. Webster worked at the World Trade Center following the 9/11 attack and suffers from a variety of health conditions as a consequence.

Mr. Webster has been married to his loving and devoted wife Michelle Webster since July 16, 1999. Together they have raised three beautiful and successful children, one of which is currently serving our country in the United States Marine Corps. Mr. Webster, his wife and family are faithful Catholics and have relied heavily on each other and their faith as they struggle through this extraordinarily difficult time in their lives. Mr. Webster's wife and children share in defendant's shame and remorse over defendant's violent role in the events of January 6th. Each member of the family, including the defendant himself, have required professional support to deal with the grief and hardship brought on by defendant's conduct. On this point, Mr. Webster's

treating psychologist Shahla Gorovoy, Ph.D. states in her report dated August 24, 2022 (Exhibit "E") in relevant part:

> From the beginning of our work together, Mr. Webster showed a great deal of mixed emotions that range from fear to grief, loss, regret, and remorse. He perseverated about how he wished he "had stayed home that day". He showed appreciation of the severity of the charges stating, "I understand violence is not acceptable and I wish I had known things I have learned in therapy to deal with my emotions and not be in the place I am right now."

After retiring from the New York City Police Department, defendant demonstrated his high moral character and commitment to his family by working tirelessly as a self-employed landscaper. Defendant's wife and children describe him as their "rock." Over the years, Mr. Webster has often turned to alcohol to cope with life's many challenges, but this crutch has not kept defendant from fulfilling his personal or professional obligations.

While Mr. Webster's turbulent childhood and alcohol abuse certainly do not excuse his criminal conduct, he submits that they are relevant factors for the Court's consideration under § 3553(a). Having received much needed mental health counseling (Exhibit "E"), Mr. Webster will be of no risk to ever re-offended, particularly given the exemplary personal and professional life defendant has lived. Under the circumstances, a sentence within the advisory Guidelines range or as recommended by the Government would be a sentence that is far in excess of what is necessary.

### B. Need to Provide Just Punishment

The crimes committed by Mr. Webster are unmistakably violent and reprehensible. As much as the defendant's time with the United States Marine Corps and New York City Police Department speaks to defendant's high moral character, it also belies the fact that such a person would have known better. As a retired police officer, Mr. Webster himself was assigned to duties as performed by Officer Rathbun on January 6th and was trained to confront angry and

sometimes violent protestors. Mr. Webster was one of the few people among the thousands of Americans present at the U.S. Capitol on January 6th who should have fully appreciated the enormity of the task assigned to Officer Rathbun and his fellow officers. Casted in this light, Mr. Webster does not have a justifiable excuse for verbally abusing the officers present along the police line; pushing on the bicycle rack; using his flagpole to threaten Officer Rathbun; or in engaging in the unspeakable act of charging and tackling of Officer Rathbun to the ground.

But, why would an exemplary citizen such as Mr. Webster with no criminal history; propensity for violence; or ties to any political action groups commit such crimes against a brother officer? From the evidence at trial, Mr. Webster traveled from his home in New York to Washington, D.C. on January 5th alone. He attended the January 6th rally equipped only with his police issued vest. None of the photographs or information alluded to by the Government which was erased by the defendant after January 6th addressed any of the crimes to which the defendant was convicted. In fact, defendant's crimes were highlighted in detail by a multitude of video tape evidence exchanged by both the defense and the Government. To this end, defendant makes no attempt to mitigate or minimize his violent conduct on January 6th.

Citizens are free to disagree on public policies or the direction of our nation. These principles buttress on the promise that all citizens must agree on fundamental constitutional principles, the concepts of fairness, civility, and respect for the rule of law. While no single person was necessarily responsible for the events which culminated in the January 6th riot, every individual present that day- - in particular those individuals like Mr. Webster who engaged in acts of violence- - contributed to creating one of the darkest days in our nation's history. Borrowing the reasoning adopted by this Court in *United States of America v. Lolos*, 21-cr-243-APM (Exhibit "A" at Pg. 55-56), mitigation exists to the extent that individuals such as Mr.

Webster did not plan the events of January 6th. Mr. Webster certainly did not come to Washington, D.C. to storm the U.S. Capitol. "The fact remains that [Mr. Webster] and others were called to Washington D.C. by an elected official; he was prompted to walk to the Capitol by an elected official." (Exhibit "A" at Pg. 55) People like Mr. Webster were told lies, fed falsehoods, and told that our election was stolen when it clearly was not. Regrettably, good people like Mr. Webster, who certainly knew better, took such falsehoods and lies to heart and are now standing alone to suffer the consequences. Looking back, Mr. Webster and his family know all too well that he was duped and used as a pawn by senior elected officials he trusted. Defendant is no longer under any illusion that the 2020 election was stolen or that he was fighting for a just cause. Mr. Webster certainly acknowledges in retrospect that his actions seriously injured this country. As distorted as defendant's mindset was at the time, his heart was set on doing what he believed was right. He certainly now knows that he was wrong. He accepts that the 2020 Presidential Election was legitimate and that he had no right to interfere with the peaceful transference of Presidential power. While many of the people who participated in the Capitol riot will be held accountable for their crimes, the elected officials who incited this horrific event will never be held answerable for their crimes. Based on the foregoing, Mr. Webster prays that this Court consider the unique facts and circumstances surrounding the events that led to the January 6th riot in determining a fair and reasonable sentence.

### C. Need to Protect the Public

With the exception of January 6th, Mr. Webster has lived the last 56 years of his life peacefully without having been accused of any other crime(s). Although the defendant had a difficult childhood, he made the best of what was available to him, by graduating high school, serving his country in the United States Marine Corps, and completing 20 years with the New

York City Police Department with distinction. Even after retiring from the New York City Police Department, defendant successfully ran a private landscaping business. Mr. Webster was a living example of the "American Dream." Beyond being a devoted husband and father, Mr. Webster's peaceful and law abiding nature was well known by his family, friends, and members of his community. The 17 character letters attached as Exhibit "F" are testament to this incredibly decent man's peaceful nature. Not surprisingly, the media has casted defendant nationally as a violent villain, forever saddling him with the shame of participating in this dark moment of our country's history. Not allowing the truth or facts to get in the way of a good news story, the media has permanently casted the defendant with the false moniker "The Eye Gouger," serving to humiliate the defendant in perpetuity. Mr. Webster has served 127 days in Federal custody without incident or reprimand. Equally stated, over the course of 421 days of home confinement, there has not been one reported infraction. Notwithstanding defendant's thoughtless and momentary use of violence on January 6th, this defendant's exemplary conduct and high moral qualities should make it impossible for the Court to believe that defendant represents a danger to the public.

### D. The Need to Avoid Sentencing Disparities

The Supreme Court has long held that "[i]t has been uniform and constant in the Federal Judicial tradition for this sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Gall*, 552 U.S. at 52 (*quoting Koon v. United States*, 518 U.S. 81, 113 (1996)). The imposition of a sentence within the Guidelines range or even as recommended by the Government would result in a sentence far greater than that

imposed to date on any of the defendants who have been charged with similar offenses arising from the Capitol riot.

A comparison of Mr. Webster's relevant conduct and life history to the conduct and history of the other defendants who have been sentenced in connection to the Capitol riot would not justify the disparity and sentences that either the Guidelines or the Government's recommendation would create. Given Mr. Webster's history, his mindset at the time of the January 6th riot, and his peaceful surrender to authorities, the sentence of time served would be justified, taking into consideration the 127 days previously served in Federal custody together with the 421 days of home confinement under the supervision of pre-trial services. This sentence would be sufficient, but not greater than necessary to satisfy the purpose of 18 U.S.C § 3553.

## Conclusion

Based on the foregoing, Mr. Webster respectfully prays that this Honorable Court departs from the proposed advisory Guidelines and the recommendations made by the Government based upon the reasons set forth above and that it, likewise, considers the unique facts and circumstances that led to the January 6th riot and impose a sentence significantly below the adjusted advisory Guidelines range.

Respectfully submitted,

DUPEE & MONROE, P.C.
Attorneys for Defendant

BY: _____
JAMES E. MONROE, ESQ.
Office & P.O. Address
211 Main Street, Box 470
Goshen, New York 10924
Phone: 845-294-8900
Fax: 845-294-3619
Email: jim@dupeemonroelaw.com