UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 21-cr-208-APM |
| THOMAS WEBSTER, | |
| Defendant. | |

### GOVERNMENT'S RESPONSE TO COURT'S MINUTE ORDER

This memorandum addresses the Court's August 30, 2022, minute order instructing the parties to brief the applicability of the four-level enhancement for "use of body armor" under U.S.S.G. § 3B1.5(2)(B). Under U.S.S.G. § 3B1.5(2)(B), a four-level enhancement applies if the defendant was convicted of either a drug trafficking offense or a crime of violence,[1] and the defendant "used body armor during the commission of the offense, in preparation for the offense, or in an attempt to avoid apprehension for the offense." A violation of 18 U.S.C. § 111(b) is categorically a crime of violence under 18 U.S.C. § 16 because it has as an element the use, attempted use, or threatened use of physical force against the person or property of another. *See United States v. Quaglin*, 851 Fed. App'x 218, 218-19 (Mem.) (D.C. Cir. 2021) (per curiam) (citing cases); *United States v. Klein*, 533 F. Supp. 3d 1, 10 (D.D.C. 2021). "Body armor" is "any product

---

[1] The Court's minute order notes that neither the government nor the Probation Office recommended a body-armor enhancement for Reffitt. That is because none of Reffitt's four counts of conviction qualify as a crime of violence. The same is true in *United States v. Robertson*, 21-cr-24. Although the defendants in *United States v. Palmer*, 21-cr-328, and *United States v. Ponder*, 21-cr-259, were convicted of the same crime of violence as Webster, namely 18 U.S.C. § 111(b), there is no evidence suggesting either defendant wore or otherwise used body armor. This is also true in *United States v. Thompson*, 21-cr-461, and *United States v. Languerand*, 21-cr-353, the only other Capitol Riot defendants convicted of and sentenced for a crime of violence. The government is seeking a four-level enhancement under U.S.S.G. § 3B1.5(2)(B) in *United States v. Denney*, 22-cr-70, currently set for sentencing on September 28, 2022, as discussed in more detail *infra*.

1

sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire, regardless of whether the product is to be worn alone or is sold as a complement to another product or garment." Here, Webster's NYPD-issued body armor was manufactured by Second Chance Armor, Inc., a Michigan-based manufacturer, and, as its label confirms, is designed to protect against gunfire but not knives, sharp-edged, or pointed instruments. *See* Exhibit A (Trial Exhibit 614).

A defendant "uses" body armor within the meaning of § 3B1.5 when he wears it as protection against gunfire, regardless of whether gunfire is actually directed at the defendant. *United States v. Johnson*, 913 F.3d 793, 803 (9th Cir. 2019) (enhancement properly applied where defendant was wearing body armor during a traffic stop while he possessed drugs; although mere possession is insufficient, "[t]here is no reasonable way to construe this language that would exclude wearing body armor from the definition of 'use'"), *cert. granted, judgment vacated on other grounds*, 140 S. Ct. 440 (2019).

As a twenty-year NYPD veteran and a firearms instructor, Webster knew that officers guarding the Capitol on January 6 would be armed with guns. Indeed, Webster testified that one of the reasons he put his hands on Officer Rathbun's gas mask was because he did not want Officer Rathbun to think that he was reaching for Officer Rathbun's gun. *See* Trial Transcript, Apr. 28, 2022, Morning Session (149: 7-9) (Testimony of Thomas Webster) ("[N]ot knowing where [an attacker's] hands are [is] scary, and feeling a tug on your gun belt or something like that, I kind of just, like, wanted him to see my hands."). Furthermore, Webster's internet searches in the weeks and days leading up to January 6 show that he expected, and was personally preparing for, violence, including potential gunfire, in Washington D.C. on January 6th. *See* Exhibit B. On

December 10, 2020, for example, just a couple days after researching "stop the steal rally" and "washington dc shit areas," Webster visited www.bulletsafe.com, a website whose homepage advertises an assortment of bulletproof vests and gear.  Exhibit B at 163-64.[2]  On December 30, 2020, Webster visited a website titled "GUIDE TO YOUR JAN 6th Trip INCLUDES D.C. gun laws . . ."  Exhibit B at 178; Trial Exhibit 312.  That same day, Webster searched "retired leo carry dc" on DuckDuckGo, which led him to three different websites outlining the laws for carrying, possessing, and registering a firearm in Washington D.C.  Exhibit B at 179-80.  On December 31, 2020, Webster entered the following search terms into DuckDuckGo: "monroe ny gun shop," "davis gun shop sloatsburg ny," "10 round magazine for 5946,"[3] "5946 10 rd mags," "cdnn firearms," "magazines," "magazine 5946," "10 round magazine 5946," "mec-car magazines," "S&W Magazines," "Smith and Wesson."  Exhibit B at 181-92.  He may have even purchased a holster for his Smith & Wesson 5946.  Exhibit B at 192-95 (showing that Webster visited the express checkout page after searching the "BuyMyMags" website for "holster 5946" and "Smith & Wesson (S&W) Model 59 10 round magazine").  Finally, the evening of January 5, 2021, Webster received a text message from his wife stating, "There are propane tanks knives and 2 by 4s around city strategically placed by antifa.  Be careful."  Exhibit C.  Webster's web searches and text messages indicate that he (correctly) anticipated extreme violence, including gunfire, in Washington D.C. on January 6, making it reasonable to infer that he brought his bulletproof vest and firearm in order to protect himself from this threat.

---

[2] The pincites for Exhibit B refer to the page number on the bottom right corner of the exhibit.

[3] Open-source research indicates that a Smith & Wesson 5946 was once issued as a service weapon by the NYPD.  *See, e.g.*, Smith & Wesson Forum, "NYPD 5946," *available at* http://smith-wessonforum.com/smith-wesson-semi-auto-pistols/179004-nypd-5946-a.html (last visited Aug. 30, 2022).

Webster did not just anticipate violence on January 6; he instigated it. In so doing, he knew that he was risking a violent confrontation with someone armed with a gun who would have been authorized to use force, including potentially deadly force, against attacking rioters. Indeed, Webster's decades of training and experience would have led him to believe that at least some officers might resort to using gunfire to protect themselves and those they were guarding during a violent confrontation with a large mass of rioters—as happened inside the Capitol when one rioter tried to jump through a window in the Speaker's Lobby.

Webster's trial testimony also shows that he feared potential gunfire, if not from police, then from counterprotesters. He testified that he wore his NYPD vest "as a safety precaution, me being down there by myself, you know concerns about maybe some type of counterprotests. I wanted to avoid that in the *worst way*." Trial Transcript, Apr. 28, 2022, Morning Session, 114: 8-11 (emphasis added). The phrase "worst way" should be understood to include gunfire, especially where Webster was already under the belief that Antifa had planted other deadly and dangerous weapons across the city. That Webster donned his NYPD-issued body armor to protect against gunfire—and not only against knives or stab wounds—is all the more compelling given that is precisely what the body armor is designed to accomplish.[4]

An appropriate comparator case, where the government is seeking the four-level body armor enhancement, is *United States v. Denney*, Case No. 1:22-cr-00070-RDM, ECF No. 46,

---

[4] As the Court's minute order notes, most of the cases applying the four-level enhancement have arisen in the context of drug transactions or bank robberies where at least one person is carrying a firearm. But the indicators of violence are just as strong in this case, where Webster believed there to be heavily armed counterprotesters eager to engage in violence and where he could reasonably have anticipated what was an escalating melee between rioters and armed police—one in which he aggressively joined and in which the police deployed less-than-lethal munitions to no avail. In other words, to the extent cases applying the body-armor enhancement are concerned with accounting for the way in which a defendant uses body armor to enable unlawful conduct in a potentially violent setting, that concern applies with full force here.

where the defendant (also convicted under Section 111(b)) appeared to be wearing a protective vest underneath his shirt. Prior to January 6th, the defendant had engaged in discussions regarding purchasing vests "with the armor plating" for him and his associates to wear. While Denney, the son of a veteran police officer who himself served in the military police and who violently engaged with armed police officers protecting the Capitol, professed to need the vests to "protect from being stabbed," the government has argued that he (like Webster) reasonably anticipated the possibility of gunfire on January 6.

Applying the enhancement here is also consistent with cases recognizing that it applies where a defendant used the body armor both to protect against gunfire and for some other purpose, such as for display or warmth. *See United States v. Barrett*, 552 F.3d 724, 727-28 (8th Cir. 2009) (holding, in a case where defendant claimed that he wore body armor as part of his Halloween costume, that "[t]he ability of body armor to serve dual purposes does not make § 3B1.5 inapplicable where the facts show one purpose could be to protect the wearer from gunfire"); *United States v. Haynes*, 582 F.3d 686, 712 (7th Cir. 2009) (finding, in the context of a police officer involved in "rip offs" of narcotics trafficker who claimed that he wore his bulletproof vest in order to indicate to victims that he was a law enforcement officer, that "[t]he court drew the reasonable inference that the body armor was being used for its primary purpose—for protection"), *abrogated on other grounds*, *United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012). The Court should therefore apply the four-level enhancement.

By: /s/ Hava Mirell
Hava Arin Levenson Mirell
Assistant United States Attorney (CA Bar No. 311098)
601 D Street NW
Washington, D.C. 20530
Phone: 213-894-0717
Email: Hava.Mirell@usdoj.gov