# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | **Case No. 1:21-cr-00208-APM-1** |
| v. | : | |
| | : | **Judge Amit P. Mehta** |
| THOMAS WEBSTER, | : | |
| | : | |
| Defendant. | : | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S
## PETITION FOR WRIT OF ERROR CORAM NOBIS

The United States of America, represented by the United States Attorney for the District of Columbia, respectfully opposes defendant Thomas Webster's Petition for Writ of Error Coram Nobis. ECF No. 135.

Webster asserts that the Court should grant his petition based on three grounds for relief: (1) the government deprived Webster of his Fifth Amendment due process right; (2) he received ineffective assistance of trial counsel when Counsel failed to impeach the victim with the victim's "repeated inconsistencies and of the government's efforts to coach" the victim; and (3) he received ineffective assistance of trial counsel when Counsel "acquiesced to the Government's motion to exclude video of [the victim's] assault of a female protester shortly before Mr. Webster's appearance on the scene." *Id*.

But Webster is not entitled to coram nobis relief. First, Webster failed to plead any adverse consequence stemming from his convictions and likely could not satisfy this burden based upon his specific claims. He therefore lacks standing to sue. Second, Webster failed to provide any valid reason for not raising his claims sooner—despite having the opportunity and ability to so— than in the present petition. And third, Webster's constitutional claims establish no fundamental error warranting extraordinary coram nobis relief. The Court should deny the petition.

1

## FACTUAL AND PROCEDURAL HISTORY

Webster, a retired police officer, was convicted of various offenses committed during the January 6, 2021 Capitol riot. *United States v. Webster*, 102 F.4th 471, 477 (D.C. Cir. 2024). In the second superseding indictment, the District of Columbia grand jury charged Webster with five felonies and one misdemeanor. ECF No. 76. The felonies included (1) Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, (2) Civil Disorder, (3) Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, (4) Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, and (5) Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon. *Webster*, 102 F.4th at 478. The misdemeanor charged Webster with committing an "Act of Physical Violence in the Capitol Grounds or Buildings." *Id.*

### I.    Pretrial Litigation

The parties conducted extensive litigation prior to trial. As relevant here, the government filed motions in limine to (1) exclude Webster from raising a self-defense claim and (2) exclude footage depicting the interaction between Webster's victim—Metropolitan Police Officer Noah Rathbun—and an unidentified female rioter to prevent Webster from impugning Officer Rathbun's character and support Webster's self-defense claim with this unrelated, earlier encounter. *See generally* ECF No. 58, 60. Webster conceded to the government's argument to exclude the female-rioter evidence, ECF No. 63, Pages 1-2, but opposed the motion to exclude his self-defense claim. ECF No. 68. This Court granted the government's motion regarding the female-rioter footage as conceded and denied without prejudice the government's motion to exclude Webster's self-defense claim. ECF No. 75, Page 2.

Further, the government moved to bar Webster from cross-examining Officer Rathbun about an administrative investigation into Officer Rathbun's use of force "while responding to an alleged kidnapping" that occurred five months after the Capitol riot. *Webster*, 102 F.4th at 484-85. The government declined prosecution for this incident, but the police department had not completed its investigation before trial. *Id*. at 485.

At a pretrial conference, Webster's counsel said that he wanted to ask Officer Rathbun at trial whether there was "a pending investigation against [him] regarding [his] use of force as a police officer." *Id*. This Court barred Webster from diving into "the substance and the nature of the investigation" but stated it would allow cross-examination about "the fact of a pending investigation[.]" *Id*.

However, just before Officer Rathbun testified at Webster's trial, the government received information that the administrative investigation had concluded and cleared Officer Rathbun. ECF No. 117, Pages 4-5. The decision "actually issued" on April 6, 2022, but "Officer Rathbun [had] just learned of it." *Id*., Page 5. Thus, the government renewed its request that Webster be barred from cross-examining Officer Rathbun about "any pending investigations, as there no longer [was] a pending investigation." *Id*. Webster's counsel "thought the government's position [was] right here" although "it's a detriment to the defense[.]" *Id*. In response, the Court said, "[a]ll right[,]" before proceeding to other matters. *Id*.

## II.    Trial

### A.  The Government's Case

The government called several law enforcement witnesses at trial. Chief among them was Officer Rathbun, who encountered Webster as the rioter flying a Marine Corps flag from a flagpole as Officer Rathbun maintained the police line behind "[a] single row of bicycle racks." ECF No.

117, Page 25; *Webster*, 102 F.4th at 477.  Webster "recognized that the bicycle racks were meant to keep people back.  But he tried to get past them nonetheless."  *Webster*, 102 F.4th at 477. Webster confronted the "overwhelmed" Officer Rathbun, hurling insults and telling the officer to "take [his] shit off," which both Webster and Officer Rathbun acknowledged were fighting words. *Id*.; ECF No. 117, Pages 23, 25-26; ECF No. 116, Pages 18-19.  Officer Rathbun tried to "wave [Webster] off" with a "visible signal" that he could not go past the bike rack.  ECF No. 117, Pages 28-29.  Officer Rathbun used this gesture to get Webster "to back up because he had reached over the perimeter of the bike rack."  *Id*., Page 29.  Officer Rathbun then pushed Webster away from the bike rack "to create some distance between he and the perimeter."  *Id*.

Webster did not stop though.  *Id*., Page 30.  He snatched at and pushed the bike rack towards Officer Rathbun.  *Id*.  Webster pushed the rack into Officer Rathbun a second time, which concerned Officer Rathbun "that that portion of the perimeter would have been compromised[.]" *Id*., Page 31.  Webster's actions prompted Officer Rathbun to "incidentally" contact Webster's face with an open hand that Officer Rathbun was "taught" to use in crowd control situations.  *Id*., Pages 31-32.  Officer Rathbun did not punch Webster, did not use a closed fist, contacted Webster only once, and used no baton or other riot control equipment against Webster.  *Id*., Pages 32-33. It would "have been a mistake" if Officer Rathbun encouraged or engaged in a fight with Webster and the other rioters because it "would have compromised" the "bike rack perimeter."  *Id*., Page 39.

Webster responded to the incidental contact by swinging his flagpole "in a chopping motion" towards Officer Rathbun and the other officers, causing them to "step back."  *Id*., Pages 33, 35.  Because of this pole chop, the perimeter dissolved, and rioters surged past it.  *Id*., Pages 34-35.  Officer Rathbun grabbed Webster's flagpole during this "chaotic" moment.  *Id*., Page 34.

Immediately after the officers' retreat and the rioters' surge, Webster tackled Officer Rathbun after "squar[ing] up" with his "arms up and his fists clenched" at his chest. *Id.*, Pages 35-36. Officer Rathbun tried to stand back up, but Webster grabbed Officer Rathbun's helmet, "pulling" him forward and choking him with the helmet's chin strap. *Id.*, Page 36. He then partially pulled Officer Rathbun's gas mask off which exposed Officer Rathbun to the gas deployed to disperse the crowd. *Id.* And "all that gas remained" in the mask once Officer Rathbun reset it. *Id.*, Page 37. Webster knocked Officer Rathbun to the ground again "and got on top of" him; Officer Rathbun recalled "feel[ing] like [he] was being kicked while" Webster was on him, likely by other rioters streaming past. *Id.* Officer Rathbun eventually ejected Webster but "was in pretty bad shape because [Officer Rathbun] was having a hard time breathing[.]"[1] *Id.*, Page 38.

## B.  The Defense Case

The defense called Webster and three character witnesses at trial. *See generally* ECF No. 116, 118-19. When testifying, Webster told a self-defense tale. A former police officer, he knew how to "de-escalate" tense situations and how to "take it" when being "verbally abused[.]" ECF No. 118, Page 84. Webster had stood "countless hours" "on the law enforcement side of a bike rack[.]" *Id.*; ECF No. 116, Page 35.

For January 6, Webster packed and wore his personal police vest for warmth and because, "it being [his] first protest" as a "citizen[,]" he was concerned for his safety. ECF No. 118, Pages 98-99, 114; ECF No. 116, Page 35. He marched to the Capitol "to . . . petition [his] government" to "relook" at the election results and to "sing patriotic songs as close as" he could to the building. ECF No. 118, Page 114; ECF No. 116, Pages 33, 36. Webster arrived at the Capitol around two p.m. and heard that officials were "just letting" people inside. ECF No. 118, Pages 116-17. So,

---

[1] The jury viewed videos, including Officer Rathbun's body camera footage, of the altercation while Rathbun commented on the depictions being presented. *See generally* ECF No. 117.

Webster moved closer, encountering "thicker" crowds, "flash bangs," and "some gas" despite knowing police disperse crowds with these less-lethal means.  *Id*., Page 118; ECF No. 116, Page 42.

As he approached the West Terrace, he became "really upset" seeing injured people, "kids crying," and a bloodied elderly woman.  ECF No. 118, Pages 118-19, 121.  Webster pressed on because he "want[ed] to see what's going on" although he never mentioned this to investigators. *Id*., Pages 121-22; ECF No. 116, Pages 39-40.  He would have left the Capitol grounds if an officer told him to leave, saw a sign to leave, or heard an announcement.  ECF No. 118, Pages 120-21.

Passing "literally thousands of people," Webster arrived at the police line and saw officers with their hands "pretty much on the bicycle rack."  *Id*., Page 124.  Webster began "yelling" at Officer Rathbun about how "upset" he was that officers were "attacking Americans[.]"  *Id*., Pages 123-26.  In response, Officer Rathbun "wave[d] his hand" to show that Officer Rathbun "wanted [Webster] to come over that police barrier" so Officer Rathbun could "do something" to him.  *Id*., Pages 127-28.  "It was an obvious taunt[,]" a "challenge to a fight."  *Id*., Page 128.  Webster later explained that he told Officer Rathbun to "take his shit off" in a "rhetorical" way, not that he wanted to "go old school."  ECF No. 116, Pages 18-19.

Officer Rathbun then stepped back, saw Webster's Marine Corps flag, and pushed Webster twice.  ECF No. 118, Page 130.  So, Webster shoved and "was just rattling" the bike rack at Officer Rathbun "[o]ut of just pure frustration."  *Id*., Pages 134-36.  In Webster's words, Officer Rathbun then struck Webster so hard in the face Webster felt like a "freight train" hit him, causing him to feel concussed.  *Id*., Pages 135-38.

Webster decided to "defend" himself and started "swinging [his] pole" to "let [Officer Rathbun] know he's not going to hit [Webster] again like that" and to "draw attention" to himself

"in case [Officer Rathbun] does hit [Webster] again." *Id.*, Page 137. The flagpole struck the bike rack. *Id.*, Page 141. After swinging it, Webster saw Officer Rathbun moving the bike rack to take the flagpole and to attack Webster again. *Id.*, Pages 140-42, 144. Webster let the pole go after "a little struggle" although he "could have done things to really fend [Officer Rathbun] off[.]" *Id.*, Pages 144-45.

The police line dissolved, and the crowd surged forward, pushing Webster along. *Id.*, Pages 146-47. Armed with the flagpole, Officer Rathbun stood "in a ready, en garde position" that "threatened" Webster. *Id.*, Page 147. Since he was being pushed forward, Webster "felt like [he] needed to do something this time to protect [himself], but to do it in a way that doesn't hurt" Officer Rathbun. *Id.*, Page 148. So, Webster raised his hands "and went towards" Officer Rathbun, and the men "ran into each other[,]" causing Officer Rathbun to fall down with Webster on top. *Id.*; ECF No. 116, Page 72.

On the ground, Webster grabbed ahold of Officer Rathbun's helmet and gas mask because he "wanted him to see [Webster's] hands . . . and let [Officer Rathbun] know, [he was] not going to hurt" Webster again. ECF No. 118, Page 149. Webster claimed Officer Rathbun punched him again, "loosen[ing] up" teeth and cutting his mouth. *Id.*, Page 150. Webster let Officer Rathbun up from this "stupid," "schoolyard thing" and Officer Rathbun "went back to the police line where he should have been[.]"[2] *Id.*, Page 151.

## C. The Verdict

The jury convicted Webster as charged. ECF No. 86; *Webster*, 102 F.4th at 478. This Court sentenced Webster to concurrent 120-month terms of imprisonment for four felonies, a 60-month term of imprisonment for the fifth felony, and a six-month term of imprisonment for the

---

[2] The jury viewed videos of the men's altercation, and Webster's commentary consistently reflected his prior testimony that day. ECF No. 116, Pages 3-12, 15-26.

misdemeanor.  ECF No. 110, Page 3; *Webster*, 102 F.4th at 478.  The Court further ordered Webster to serve thirty-six months of supervised release and pay a special assessment.  *Webster*, 102 F.4th at 478.

## III.    Direct Appeal

Webster unsuccessfully appealed his convictions and sentences.  ECF No. 132-33.  One argument he advanced posited that the Court violated Webster's confrontation right by excluding evidence of the investigation into Officer Rathbun's unrelated use of force.  *Webster*, 102 F.4th at 484-87; *see* ECF No. 117, Pages 4-5.

The Court of Appeals first held that "Webster forfeited any objection to the district court's initial restrictions on questioning Officer Rathbun about the use-of-force investigations."  *Webster*, 102 F.4th at 486.  Recounting the claim's litigation history, the Court of Appeals noted how this Court initially permitted Webster to cross-examine Officer Rathbun about the pending investigation "as long as he did not [dive] into the merits of the investigation[.]"  *Id*.  But once the investigation cleared Officer Rathbun, Webster "expressly agreed" with the government that he was barred from cross-examining Officer Rathbun about this investigation.  *Id*. (emphasis omitted).  "With the parties apparently having resolved the matter themselves, the district court responded with only an '[a]ll right.'"  *Id*.  This response was neither an "express[]" nor "implicit[]" bar "from cross-examining Officer Rathbun about the prior investigation."  *Id*.  Webster's counsel simply dropped the issue, leading to forfeiture.  *Id*.

But the Court of Appeals still conducted plain-error review and held that Webster showed none for two reasons.  *Id*. at 486-87.  First, he could point to no adverse ruling by the Court barring him from this cross-examination because the Court "never stopped Webster from pursuing" this questioning.  *Id*. at 486-87.  Webster "stopped himself."  *Id*. at 487.  Second, he could not establish

prejudice due to the "overwhelming evidence" of his guilt.  *Id.* at 487.  This evidence included "at least four videos of the assault" that prevented Webster from establishing any "reasonable probability" of acquittal even if he had cross-examined Officer Rathbun about the investigation.  *Id.* at 484, 487.

Although Webster indicates that he filed a petition for a writ of certiorari in the Supreme Court, ECF No. 135, Page 4, a docket search reveals that no petition was filed.[3]

## IV.    Pardon and Petition for a Writ of Error Coram Nobis

President Donald Trump granted "a full, complete and unconditional pardon" to Webster for his convictions "of offenses related to the events that occurred at or near the United States Capitol on January 6, 2021[,]" releasing Webster from custody "immediately."  Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021, 90 FR 8331 (Jan. 20, 2025).

Webster filed the present petition for a writ of error coram nobis on August 26, 2025.  ECF No. 135.  The Court ordered the government to respond to Webster's petition.  Sept. 3, 2025 Min. Order.  Thus, this response is properly before the Court and respectfully requests the Court deny the petition.

## <u>ARGUMENT</u>

The Court may grant a petition for a writ of error coram nobis under the All Writs Act.  *United States v. Lee*, 84 F. Supp. 3d 7, 8 (D.D.C. 2015) (citing 28 U.S.C. § 1651(a)).  But the writ is "extraordinary" and available only for compelling circumstances necessary to achieve justice.  *Id.* at 9 (quoting *United States v. Morgan*, 346 U.S. 502, 511 (1954)).  It is "an equitable tool . . . to fill the interstices of the federal post-conviction remedial framework" so that a court may "set

---

[3] The United States Court of Appeals for the District of Columbia Circuit issued its mandate on July 23, 2024, signaling the conclusion of Webster's appeal.  ECF No. 133.

aside an underlying conviction and sentence which, for a valid reason, should never have been entered." *U.S. v. Hansen*, 906 F. Supp. 688, 692 (D.D.C. 1995) (internal quotation marks omitted) (quoting *Morgan*, 346 U.S. at 506; *United States v. Ayala*, 894 F.2d 425, 427-28 (D.C. Cir. 1990)).

> The writ issues only if the defendant shows that
>
> (1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character.

*Lee*, 84 F. Supp. 3d at 9 (quoting *Hansen*, 906 F. Supp. at 692-93). The defendant "bears the burden of overcoming a presumption that the challenged judicial proceedings were correct." *United States v. Williams*, 630 F. Supp. 2d 28, 32 (D.D.C. 2009) (citing *Morgan*, 346 U.S. at 512). Given these burdensome showings, "it is difficult to conceive of a situation in a federal criminal case today where a writ of coram nobis would be necessary or appropriate." *Carlisle v. United States*, 517 U.S. 416, 429 (1996) (cleaned up) (quoting *United States v. Smith*, 331 U.S. 469, 475 n.4 (1947)).

Webster has not satisfied his burden. First, he lacks standing to sue because he failed to plead any adverse consequence that he suffers from his convictions (and likely could not satisfy this showing based upon his specific claims and convictions). Second, Webster has failed to establish any valid reason for not raising his coram nobis claims sooner. And third, his due process and ineffective-counsel claims establish no fundamental error warranting extraordinary relief.

## I.    Webster Has Not Pleaded Any Adverse Consequence and Therefore Lacks Standing to Seek Coram Nobis Relief.

Webster has not identified any "adverse consequences" he is suffering from his convictions "sufficient to satisfy the case or controversy requirement of Article III[.]" *U.S. v. Faison*, 956 F. Supp. 2d 267, 269 (D.D.C. 2013). The Court therefore should deny coram nobis relief for this reason alone. Moreover, Webster cannot satisfy this coram nobis requirement because his claims

challenge only his Rathbun-related convictions.  So, even if Webster properly identified an adverse

consequence and satisfied the other coram nobis requirements, any encumbrances arising from his

other felony convictions would still stand.  In other words, Webster "cannot show that a favorable

decision would redress his alleged injuries."  *United States v. Verrusio*, No. 09-cr-64, 2017 WL

2634638, at *2 (D.D.C. June 19, 2017).

To obtain coram nobis relief, Webster must prove "adverse consequences exist from the

conviction sufficient to satisfy the case or controversy requirement of Article III."  *Id*. at *3.

Article III limits federal courts to deciding only cases and controversies.  *Id*. (quoting *In re Navy

Chaplaincy*, 534 F.3d 756, 759 (D.C. Cir. 2008)); U.S. Const. art. III, § 2.  Thus, this coram nobis

requirement is jurisdictional because the All Writs Act, which permits courts to issue the writ,

recognizes that a federal court's power to grant relief "is contingent on that court's subject-matter

jurisdiction over the case or controversy."  *Verrusio*, 2017 WL 2634638, at *3-4 (quoting *United

States v. Denedo*, 556 U.S. 904, 911 (2009)).

A litigant establishes Article III standing by pleading an "injury in fact" that is "concrete

and particularized," "actual or imminent," and "fairly traceable" to another's act that is likely

redressable by a favorable federal court decision.  *Id*. at *3 (internal quotation marks omitted)

(*quoting Navegar, Inc. v. United States*, 103 F.3d 994, 998 (D.C. Cir. 1997)).  "[N]ebulous" or

abstract injuries do not suffice.  *Id*.

Moreover, merely identifying "adverse consequences" does not satisfy the Article III

standing requirement for coram nobis relief.  *Id*. at *5.  Rather, the defendant must show that

granting the writ would redress the identified adverse consequence.  *Id*. (citing *Lujan v. Defs. of

Wildlife*, 504 U.S. 555, 560-61 (1992)).  Without showing redressability, Article III standing is

unsatisfied, and a court lacks subject-matter jurisdiction.  *Id*.  In *Verrusio*, the defendant failed to

prove that "certain civil disabilities under State and Federal law stemming from his felony convictions" constituted "adverse consequences." *Id*. at *3-5. This is because another one of that defendant's felony convictions "would remain intact" even if he successfully proved his coram nobis claim, which would invalidate only two of his three felony convictions that led to his "encumbrances." *Id*.[4] *Id*. Since a favorable court decision would not alleviate these "encumbrances," the defendant failed to satisfy the adverse-consequence showing. *Id*. at *5.

Webster failed to allege any adverse consequence. He simply listed his convictions, described his case's procedural and substantive history, pleaded his claims, and requested that the Court "vacate the conviction." *See generally* ECF No. 135. Thus, Webster did less in his pleading than the *Verrusio* defendant. That defendant at least attempted to plead sufficient adverse consequences. If the *Verrusio* defendant failed with his attempt, Webster surely does too.

It is also unlikely Webster could satisfy this prong even if he attempted. Like the *Verrusio* defendant, Webster's claims challenge his convictions only insofar as they involve Officer Rathbun. *See* ECF No. 135, Pages 6-11. Only Counts One and Two charge Webster with committing crimes against Officer Rathbun; the remaining counts have nothing to do with those crimes or otherwise do not name Officer Rathbun. *See generally* ECF No. 76. At minimum, his Count Three conviction for "Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon" would remain intact even if Webster established an adverse

---

[4] Verrusio stood convicted of conspiracy to receive an illegal gratuity, receipt of an illegal gratuity, and making a false statement. *Verrusio*, 2017 WL 2634638, at *1. In his coram nobis petition, Verrusio argued that a new precedent "narrowed the definition of what qualifies as an 'official act[,]'" meaning his conspiracy and receipt convictions must be vacated. *Id*. at *1-2. But if his argument succeeded, it would have no effect on his false-statement conviction. *Id*. So, Verrusio could not satisfy the adverse-consequence requirement since a felony conviction would remain along with "all its encumbrances" Verrusio cited as satisfying the adverse-consequence requirement. *Id*. at *3-5. In plain terms, short of each felony and its accompanying "encumbrances" falling, Verrusio was entitled to no coram nobis relief.

consequence and successfully proved the other coram nobis requirements.  Webster brandished a flagpole, a "Deadly or Dangerous Weapon," and certainly, with knowledge, entered and remained in a restricted building, the Capitol Grounds.  Webster thus "would remain encumbered by" any "civil disabilities" he may later allege, "because a favorable decision" on his claims would not "eliminate the adverse consequences" flowing from his felony conviction on Count Three. *Verrusio*, 2017 WL 2634638, at *5.

To conclude, Webster failed to allege any adverse consequence required for coram nobis relief.  *Faison*, 956 F. Supp. 2d at 269.  The Court should deny his petition for this reason alone. But even if Webster alleged an adverse consequence traceable to his convictions, he likely could not satisfy the redressability requirement for standing because at least one of his felony convictions would remain even if he satisfied the other three coram nobis requirements.  "Thus, a favorable decision vacating" the Rathbun-related counts "would not 'eliminate the claimed consequence[s] and bring about the relief sought.'"  *Verrusio*, 2017 WL 2634638, at *2.  Accordingly, coram nobis relief must be denied.

## II.    Coram Nobis Relief Is Barred Because Webster Failed to Offer Any Valid Reasons for Not Raising his Claims Earlier.

A court may grant coram nobis relief only if the defendant proves that "valid reasons exist for not challenging the conviction earlier."  *Faison*, 956 F. Supp. 2d at 270 (quoting *Hansen*, 906 F. Supp. at 692).  The defendant must show, for example, "why he did not seek to appeal the conviction directly" with his claims, *id.*, and why "relief under 28 U.S.C. § 2255 was unavailable or would have been inadequate."  *U.S. v. Payne*, 644 F.3d 1111, 1112 (10th Cir. 2011).  The Court must "inquir[e] into the circumstances surrounding the petitioner's failure to raise the issue" previously and examine whether he could have discovered the "facts supporting his motion" earlier

by exercising due diligence. *Gonzalez v. United States*, 981 F.3d 845, 850 (11th Cir. 2020) (citations omitted).

Here, Webster failed to articulate a valid reason for his failure to litigate his due process claims during his trial and direct appeal proceedings. He merely argues, without proof, that the "evidence did not come available until after [his] appeal concluded." ECF No. 135, Page 6. But by not advancing this supposed new evidence, Webster has not established a valid reason for failing to litigate the claim sooner. He knew about the facts concerning the investigation into Officer Rathbun's unrelated use of force that underlie his current due process claims prior to trial, during trial, and on direct appeal, since the parties litigated an issue related to these facts before and during trial. *Webster*, 102 F.4th at 484-87. Without evidence establishing his asserted valid reason for declining to bring these claims earlier, he lacks one, and the Court must deny his claims on this basis. *See, e.g.*, *U.S. v. Riedl*, 496 F.3d 1003, 1006 (9th Cir. 2007) (claims "that could have been raised by direct appeal are outside the scope of" coram nobis) (quoting *United States v. Keane*, 852 F.2d 199, 202 (7th Cir. 1988)); *U.S. v. Lester*, 557 F. App'x 788, 791-92 (10th Cir. 2014) (defendant alleging a *Brady* claim did not show why he could not have raised claim on direct appeal where the information was "readily available" and "in no way 'withheld' by the government"); *Stanbridge v. Scott*, 791 F.3d 715, 720 n.3 (7th Cir. 2015) (although defendant did not request coram nobis relief, "in any event, the fact that he had the opportunity to raise this issue both at this criminal trial and on direct appeal would likely preclude the use of this writ").

Moreover, Webster failed to assert a valid reason for not raising his ineffective assistance of counsel claims in Grounds Two and Three in a motion to vacate his convictions under 28 U.S.C. § 2255 while he was in custody before being pardoned. "Coram nobis relief is generally not available to those in custody." *Cherys v. U.S.*, 552 F. App'x 162, 167 (3d Cir. 2014) (internal

quotation marks omitted) (quoting *United States v. Rhines*, 640 F.3d 69, 71-72 (3d Cir. 2011)). This is because an incarcerated defendant may move to vacate a conviction under § 2255 so long as he is in custody. *Id*. "[W]hat matters for the 'in custody' requirement is whether the petitioner was in custody at the time his habeas petition was filed. As long as the petitioner was in custody when he filed his petition, a subsequent release from custody . . . will not divest the court of jurisdiction." *Id*. (emphasis omitted) (quoting *Kumarasamy v. Attorney Gen. of U.S.*, 453 F.3d 169, 173 n.7 (3d Cir. 2006)); *see also Spencer v. Kemna*, 523 U.S. 1, 7 (1998).

Thus, a defendant retains an available remedy under § 2255 even if he is later released from custody so long as he filed the motion before release. *Cherys*, 552 F. App'x at 167 (district court "erred in converting Cherys's § 2255 motion to a petition for a writ of error coram nobis" because, despite removal, Cherys filed his motion while in custody before release and removal); *Miller v. United States*, No. 19-cv-3289, 2021 WL 3576688, at *3 (C.D. Ill. Aug. 21, 2021) (despite petitioner receiving compassionate release, the court retained jurisdiction and petitioner retained a remedy through a § 2255 motion that he filed before his release). "[I]t is the infirmity of the § 2255 remedy itself, not the failure to use it or to prevail under it, that is determinative." *Prost v. Anderson*, 636 F.3d 578, 589 (10th Cir. 2011).

Webster's direct appeal was decided in May 2024, ECF No. 133, and, contrary to his claim, he did not file a petition for a writ of certiorari. Thus, his convictions became final in late July 2024 when the Court of Appeals issued its mandate. *Id*. Webster then remained in custody for approximately six months before being pardoned.[5] But he does not argue anything about why he

---

[5] Considering Webster failed to further appeal the panel's May 2024 decision, he technically had almost eight months to file a § 2255 motion while he remained in custody. He also does not explain why he waited an additional eight months following his pardon to file the present petition.

failed to file a § 2255 motion alleging these claims before his pardon.  The claims are not novel, and Webster knew about the "facts supporting his motion" long ago.  *Gonzalez*, 981 F.3d at 850.

Webster's explanation that these claims "are properly raises [sic] for the first time on collateral review" misses the mark.  ECF No. 135, Pages 8, 12.  He assumes that the present petition is the "first time" he could have raised these claims.  ECF No. 135, Pages 8, 12.  It is not. Webster had the ability and a months-long opportunity to raise these claims in a § 2255 motion while he remained in custody, but he declined to do so.  *Compare Cherys*, 552 F. App'x at 167; *Miller*, 2021 WL 3576688, at *3.  Therefore, he has not shown why "relief under 28 U.S.C. § 2255 was unavailable or would have been inadequate" under these circumstances.  *Payne*, 644 F.3d at 1112; *United States v. Miles*, 923 F.3d 798, 804 (10th Cir. 2019) ("[A] claim pressed through a coram nobis petition is ordinarily barred if the petitioner . . . simply failed to pursue the claim under § 2255 when petitioner could have.").

"[P]risoners are able to challenge their convictions while in custody through direct appeal or a petition for a writ of habeas corpus."  *Riedl*, 496 F.3d at 1007.  Webster's reason for not raising his due process claims on direct appeal falls flat as a conclusory allegation lacking evidentiary support.  Moreover, he has not provided a valid reason for his delay in raising his ineffective-counsel claims in a § 2255 motion.  Webster had months to file a motion, he knew the facts underlying the claims at the end of trial, and "nothing prevented" him from raising the claims "through more usual channels."  *Id*. at 1006-07; *United States v. Frank*, No. 24-4021, 2024 WL 4164254, at *3-4 (10th Cir. Sept. 12, 2024) (affirming denial of coram nobis petition where defendant "failed to avail himself" of § 2255 motion when it was available to raise his claims).  In sum, Webster has come nowhere near establishing that valid reasons exist for not challenging his convictions earlier, and the Court should thus deny coram nobis relief.

III.    **The Court Must Deny Relief Because Webster Has Not Established Fundamental Error.**

A fundamental error is "an error of fact" that was "unknown at the time of trial" and "of a fundamentally unjust character which probably would have altered the outcome of the challenged proceeding if it had been known." *Faison*, 956 F. Supp. 2d at 271 (quoting *United States v. Johnson*, 237 F.3d 751, 755 (6th Cir. 2001)). A defendant may present a fundamental error based on a deprivation of due process, *United States v. Castano*, 906 F.3d 458, 464-67 (6th Cir. 2018), or ineffective assistance of counsel. *Faison*, 956 F. Supp. 2d at 271.

Webster cannot establish any fundamental error for multiple reasons. First, he failed to provide evidence of a due process violation, and the record reflects both that he knew the use-of-force investigation involving Officer Rathbun had concluded favorably and that the jury did not hear any testimony about this investigation. Thus, Webster cannot establish a due process violation under the two relevant precedents through which he asserts his claims. Second, Webster's first ineffective-counsel claim fails because his allegation regarding Counsel's lack of impeachment of Officer Rathbun with unidentified "repeated inconsistencies" is too vague to establish Counsel's deficient performance, and Webster cannot establish prejudice because of the overwhelming evidence of his guilt. And this overwhelming evidence of guilt and the lack of deficient performance bars any fundamental error showing on the ineffective-counsel claim alleged in Ground Three.

A. **Ground One Does Not Establish a Fundamental Due Process Error Where Webster Fails to Provide Evidence Showing that the Government Suppressed Exculpatory Information or Solicited False Testimony.**

Webster alleges that he has new evidence showing that Officer Rathbun lied when Officer Rathbun "advised the prosecution and this Court that the investigation" into his unrelated use of

force in which he was involved had "concluded and that [Officer Rathbun] had been exonerated." ECF No. 135, Pages 6-7.  Thus, Webster claims a Fifth Amendment due process violation.[6]  *Id*.

As a threshold matter, the Court must construe the *pro se* petition liberally.  *Sturdza v. UAE*, 658 F. Supp. 2d 135, 137 (D.D.C. 2009) (*citing Haines v. Kerner*, 404 U.S. 519, 520 (1972)). This means the Court must examine the "entire pleading . . . to determine if any legally cognizable claim can be found."  *Spence v. U.S. Dep't of Veterans Affairs*, 109 F.4th 531, 538 (D.C. Cir. 2024).  Applying a liberal construction to Ground One, Webster pleaded two similar but distinct claims.  First, he alleges a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), by claiming Officer Rathbun and, by extension, the government, suppressed exculpatory information about the use-of-force investigation.  ECF No. 135, Pages 6-7.  Second, Webster alleges a claim under *Napue v. Illinois*, 360 U.S. 264 (1959), accusing the government of knowingly presenting Officer Rathbun's "untruthful statement" about the investigation.  *See id*.  Both claims fail.

The Fifth Amendment protects the right to due process in two ways relative to Webster's arguments.  First, the "'fair trial guarantee' requires the prosecution to timely turn over any information in the government's possession that is materially favorable to a criminal defendant[.]" *United States v. Sitzmann*, 893 F.3d 811, 826 (D.C. Cir. 2018) (quoting *United States v. Straker*, 800 F.3d 570, 602 (D.C. Cir. 2015)); *Brady*, 373 U.S. at 87.  This requirement also extends to evidence that would impeach government witnesses.  *Sitzmann*, 893 F.3d at 826 (citing *Giglio v. U.S.*, 405 U.S. 150, 153-54 (1972)).  To establish a *Brady* claim, a defendant must show that the

---

[6] Webster also claims a deprivation of his "Fifth Amendment right to confront his accuser."  ECF No. 135, Page 7.  This statement is legally incorrect.  The Sixth Amendment protects Webster's confrontation right, not the Fifth Amendment.  U.S. Const. amend. VI.  It is plausible that Webster cited the wrong protection in this statement considering his Fifth Amendment due process citation in Ground One's heading.  ECF No. 135, Page 6.  But if the Court construes this erroneous citation as a Sixth Amendment confrontation claim, the issue was previously decided as forfeited and lacking any merit on direct appeal.  *Webster*, 102 F.4th at 484-87.

government "either willfully or inadvertently" suppressed "exculpatory" or "impeaching" evidence that prejudiced the defendant. *Id*. (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). "Prejudice" is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Second, the Fifth Amendment protects a defendant from the prosecution knowingly presenting or failing to correct false trial testimony. *Napue*, 360 U.S. at 269. A defendant proves a *Napue* violation if he shows "the government introduce[d] false or misleading testimony or allow[ed] it to go uncorrected, even though the government knew or should have known that the testimony was false." *Sitzmann*, 893 F.3d at 828 (quoting *Straker*, 800 F.3d at 603). "If a defendant makes that showing, a new trial is required [only] if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id*. (internal quotation marks omitted) (quoting *Straker*, 800 F.3d at 603).

Here, both the *Brady* and *Napue* claims fail. Relevant to both, despite Webster's assertion that he had new evidence proving his accusation, Webster produces nothing beyond a conclusory allegation that Officer Rathbun lied about the conclusion of the investigation. ECF No. 135, Pages 6-7. Conclusory allegations without evidentiary support provide no post-conviction relief. *See Prince v. Straub*, 78 F. App'x 440, 442 (6th Cir. 2003). Webster, a retired police officer, knows "evidence makes a case[,]" and he fails to produce any to make his. *Boult v. Maryland Cas. Co.*, 111 F.2d 257, 259 (5th Cir. 1940).

In view of this lack of evidence, the Court can decide the claims based only on the record, which refutes both. Indeed, Webster's Counsel not only acknowledged that the use-of-force investigation concluded by clearing Officer Rathbun, but also "expressly agreed" with the

government's position that impeachment about this investigation "was off the table." *Webster*, 102 F.4th at 485-86 (emphasis omitted); ECF No. 117, Pages 4-5. Without persuasive evidence to the contrary, the Court should be satisfied with this established fact that the investigation into Officer Rathbun had concluded and cleared him. It was sufficient for Webster's Counsel to explicitly accept and acknowledge this fact on the record. And there can be no false testimony where there is no testimony about the subject at all, like here, where Officer Rathbun never testified about this investigation during Webster's trial. *See generally* ECF No. 117, Pages 8-102.

Thus, no matter the claim, Webster cannot establish a due process violation. Regarding *Brady*, Webster knew the use-of-force investigation cleared Officer Rathbun. *Id.*, Pages 4-5. And he has no "evidence" that purportedly became "available" after his direct appeal that contradicts the record. ECF No. 135, Page 6. Webster must prove the three *Brady* elements. *United States v. Driscoll*, 984 F.3d 103, 109 (D.C. Cir. 2021). That Webster disagrees or fails to appreciate that the record refutes his baseless assertion that the government suppressed favorable evidence is inconsequential. *Cf. Wayne v. Benson*, 89 F.3d 530, 533-34 (8th Cir. 1996) (no relief on *Brady* claim where petitioner "produced no evidence as to the identity of the police officer" who allegedly took a favorable statement from witness before trial, which would have contradicted state's argument that "it did not know about her statement until after Wayne's trial").

Moreover, the government lacked any strategic reason to suppress or withhold the fact that Officer Rathbun was cleared. Disclosure of this information allowed the government to renew its argument that the Court should bar Webster from cross-examining Officer Rathbun about the investigation. *Webster*, 102 F.4th at 485-86. Therefore, disclosure benefitted the government, especially considering Webster's Counsel "expressly agreed" with its position after disclosure.

Finally, Webster cannot establish materiality under *Brady*. "[S]trictly speaking, there is never a real *Brady* violation unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have provided a different verdict." *Strickler*, 527 U.S. at 281 (internal quotation marks omitted). Not only has Webster failed to prove the existence of favorable undisclosed evidence, but he also has failed to prove a "reasonable probability" of a different result "even if he had asked Officer Rathbun" about the use-of-force investigation due to "the overwhelming evidence against [Webster]." *Webster*, 102 F.4th at 487; *compare U.S. v. Celis*, 608 F.3d 818, 837 (D.C. Cir. 2010) (defendant could not establish *Brady* materiality because of the "overwhelming evidence"). The *Brady* claim fails on all fronts.

Webster's *Napue* claim also fails. Importantly, Webster cannot successfully maintain a *Napue* claim since Officer Rathbun never testified about the use-of-force investigation at trial. *See Webster*, 102 F.4th at 485 ("Webster's counsel chose not to ask Officer Rathbun about any use-of-force investigation at trial."). There cannot be false testimony about a subject where there is no testimony about the subject at all.[7] *Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025) (quoting *Napue*, 360 U.S. at 269).

Nevertheless, Webster cannot show that Officer Rathbun's investigation testimony would have been false even if it were elicited by the government. That is because the record reflects that the investigation cleared Officer Rathbun before he testified at trial, *Webster*, 102 F.4th at 485, and Webster provides nothing substantial to rebut this point. "The touchstone of a *Napue* violation

---

[7] Beyond this point, Webster's claim rests on a bed of assumptions. For example, the Court would have to assume that Officer Rathbun lied about being cleared, an accusation Webster levies without proof. The Court then would have to assume the government "knowingly solicited [this] false testimony" or "knowingly allowed it to go uncorrected[.]" *Glossip*, 604 U.S. at 246. Considering Webster, not the government, sought this investigation testimony, his assumption that the government would have elicited the testimony is questionable at best. *See, e.g.*, *Glossip*, 604 U.S. at 246-48 (discussing how the state's key witness's "testimony was false and that the prosecution knowingly failed to correct it").

is that the testimony must be false." *United States v. Borda*, 848 F.3d 1044, 1069 (D.C. Cir. 2017) (emphasis omitted); *accord Hampton v. Shinn*, 143 F.4th 1047, 1068 (9th Cir. 2025) ("*Napue* claim never succeeds if the defendant cannot prove actual falsity" of the testimony).  Webster cannot even prove the existence of testimony about this investigation to start.  And any testimony about the existence of the use-of-force investigation would have been immaterial considering the "overwhelming evidence" of Webster's guilt, as the Court of Appeals observed.  *Webster*, 102 F.4th at 487; *Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019) (petitioner failed to establish *Napue* materiality in view of the State's "powerful case of Panah's guilt, with substantial evidence linking him to Parker's murder and sexual assault").  Webster's *Napue* allegation fails in every way.

In sum, both due process claims "stumble[] at the starting gate."  *Webster*, 102 F.4th at 486.  Although claiming to have evidence of Officer Rathbun's "perjury," Webster supports Ground One with only self-serving assertions that are fatal to his claims.  Indeed, they cannot refute the record that shows his Counsel's acknowledgment that Officer Rathbun was cleared before testifying.  And Webster's baseless accusation of new evidence certainly does not refute the fact that Officer Rathbun never testified about the investigation, meaning it never factored into the verdict.  Finally, the "overwhelming evidence" introduced against Webster prevents him from establishing materiality under both *Brady* and *Napue*.  Webster has failed to establish a fundamental error in Ground One.

### B. Because Counsel Was Not Ineffective, Webster Has Not Established Any Fundamental Error in Grounds Two and Three.

Webster alleges two claims of ineffective assistance of counsel in Grounds Two and Three. To establish a claim of ineffective assistance of counsel, a defendant must make two showings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "First, the defendant must show that

counsel's performance was deficient." *Id*.  "Second, the defendant must show that the deficient performance prejudiced the defense." *Id*.  If the defendant fails to satisfy both showings, he cannot establish ineffective assistance of counsel under the Sixth Amendment.  *Id*.

A defense attorney must provide a defendant "reasonably effective assistance." *Id*.  To satisfy the performance prong of a *Strickland* claim, the defendant must identify counsel's acts or omissions that "fell below an objective standard of reasonableness" when "considering all the circumstances." *Id*. at 688, 690.  The reviewing court must then examine "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id*. at 690.  The court's review "must be highly deferential" to counsel's performance, requiring the elimination of the "distorting effects of hindsight," the reconstruction of "the circumstances of counsel's challenged conduct," and the evaluation of "the conduct from counsel's perspective at the time." *Id*. at 689.  Thus, counsel's performance enjoys "a strong presumption" of reasonableness.  *Id*.

But an unreasonable error by counsel "does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691.  Pointing to "some conceivable effect" on the proceeding's outcome is not enough to prove defense prejudice.  *Id*. at 693.  Instead, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome" of the proceeding.  *Id*.

When determining prejudice, the court "should presume . . . that the judge or jury acted according to law[,]" meaning "reasonably, conscientiously, and impartially applying the standards that govern the decision[,]" excluding the "idiosyncrasies of the particular decisionmaker." *Id*. at

694-95. The reviewing court "must consider the totality of the evidence" when determining prejudice. *Id*. at 695. After all, some "factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways." *Id*. Some errors "alter[] the entire evidentiary picture, and some will have had an isolated, trivial effect." *Id*. at 695-96. So, a court examining prejudice stemming from counsel's deficient performance must take "the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings," must see whether "the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id*. at 696.

Webster claims he received ineffective assistance of counsel in two ways. In Ground Two, Webster alleges Counsel should have impeached Officer Rathbun about unidentified "repeated inconsistencies" and the "government's efforts to coach Rathbun and altar [sic] his narrative[.]" ECF No. 135, Pages 8-9. In Ground Three, he alleges Counsel should have introduced a video depicting Officer Rathbun's altercation with a female rioter "to show absence of mistake" under Federal Rule of Evidence 404(b). As explained below, neither claim has merit under *Strickland*.

### 1. Webster Has Not Proven a Fundamental Error in Ground Two's *Strickland* Claim.

Webster alleges that Counsel was ineffective because he failed to impeach Officer Rathbun about "repeated inconsistencies" of Officer Rathbun's recollection of the assault with the depictions "in surveillance videos." ECF No. 135, Pages 8-9. Although Webster failed to identify any inconsistency, he contends that, but for Counsel's "constitutionally deficient performance," the trial outcome was "altered . . . to Mr. Webster's detriment." *Id*.

Webster cannot establish any fundamental error warranting coram nobis relief. First, his failure to pinpoint the "repeated inconsistencies" upon which Counsel allegedly failed to impeach Officer Rathbun are "vague and conclusory allegations" of deficient performance that "cannot

support a finding that [C]ounsel's performance fell below an objective standard of reasonableness." *U.S. v. Oladokun*, 905 F. Supp. 2d 310, 315 (D.D.C. 2012) (cleaned up and collecting cases). Webster's inadequate performance pleading "is alone sufficient to defeat" this claim. *Id*.

While Webster has not identified any inconsistency upon which Counsel should have cross-examined Officer Rathbun, the record reflects Counsel cross-examining Officer Rathbun about inconsistencies in his reporting and description of his altercation with Webster. Officer Rathbun testified it was "possible" that his "memory of these events were a little fresher back then than they, perhaps may be today[.]" ECF No. 117, Pages 85-86. Officer Rathbun further conceded during cross-examination that he did "not initially" remember "this incident with" Webster and that Officer Rathbun did not "recall reporting the bruises" he sustained during the assault to investigators. *Id*., Pages 86-87. Officer Rathbun also described speaking to an FBI agent about the assault footage, but not the "perspective" shown during trial by Webster. *Id*., Pages 88-89. Counsel later cross-examined Officer Rathbun with a text message conversation between Officer Rathbun and Rathbun's brother, eliciting Officer Rathbun's statement that he "never told" his brother "the whole story by text." *Id*., Pages 95-98. This colloquy then dovetailed into questioning showing that, while Officer Rathbun did not tell his "lieutenant the whole story of what happened on January 6th," Officer Rathbun told Detective Lauderdale and the FBI agent "[e]verything [he] could remember[.]" *Id*., Page 98.

Based on the record, Counsel did what Webster accuses him of not doing—adequately cross-examining Officer Rathbun about "repeated inconsistencies" in his descriptions of his altercation with Webster and "the government's efforts to coach" and "altar [sic] his narrative." ECF No. 135, Page 11. Counsel thoroughly cross-examined Officer Rathbun about the delay in

his reporting the assault and about how he did not tell "the whole story" to each person to whom he communicated about the assault. Beyond Webster's vague deficient performance allegation, he offers "no facts to contradict" the record. *Compare Oladokun*, 905 F. Supp. 2d at 315-16 (dismissal appropriate for vague allegations of deficient performance that were nevertheless contradicted by the record).

Regardless, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland*, 466 U.S. at 692. Considering the "overwhelming evidence against [Webster]—including at least four videos of the assault—there is no 'reasonable probability' that the jury would have acquitted him even if he had asked Officer Rathbun" about these unidentified "inconsistencies" that appear to have been asked about anyways. *Webster*, 102 F.4th at 487; *United States v. Green-Ramache*, 97 F.4th 30, 35 (D.C. Cir. 2024) ("'overwhelming' evidence . . . undercuts any claim that, but for [C]ounsel's alleged errors, the outcome of the trial would have been different"). Officer Rathbun's trial testimony about Webster's assault cements this point.

"Vague and conclusory allegations . . . may be disposed of without further investigation by the District Court." *U.S. v. Schwartz*, 925 F. Supp. 2d 663, 671 (E.D. Pa. 2013). This is especially true where the record shows Counsel seemingly performed in the manner Webster accuses him of not performing. *Compare Lujan v. Scribner*, No. C 04-1154, 2008 WL 2225710, at *7 (N.D. Cal. May 29, 2008) ("Because [counsel] complied with petitioner's wishes, he cannot now claim that trial counsel rendered a deficient performance by failing to act in accordance with his wishes."). These points, combined with Webster's overwhelming guilt, prevent him from successfully showing a fundamental error through this claim. *Lee*, 84 F. Supp. 3d at 9. Coram nobis relief must be denied on Ground Two.

### 2. Webster Cannot Establish a Fundamental Error on Ground Three's *Strickland* Claim.

Webster alleges that Counsel was ineffective by not moving to admit a video depicting Officer Rathbun's "assault of a female protester shortly before Mr. Webster's appearance" to "show absence of mistake" under Federal Rule of Evidence 404(b)(2).  ECF No. 135, Pages 10-11.  He argues the video would have contradicted the government's claim that Officer "Rathbun did not signal Mr. Webster with any provocative hand gesture and that Rathbun's strike to Mr. Webster's face was unintentional, or a mistake."  *Id*.  Liberally construed, Webster seems to argue that Counsel should have moved to introduce this video to impeach Officer Rathbun during his cross-examination and that prejudice resulted by his not doing so because it would have greatly supported Webster's self-defense claim.[8]  *Id*.

The government's motion in limine reveals the following facts about the female-rioter video.  Approximately ten minutes before Officer Rathbun's altercation with Webster, Officer Rathbun used an open hand to push an unidentified female rioter "back away from [a] barricade" after telling her to "get back" many times.  ECF No. 58, Pages 1-2.  The female rioter "fell onto the ground" but stood up, "again approached the barricade" and "began pulling it toward her and away from the police line."  *Id*., Page 2.  Officer Rathbun tried to stop the female rioter "by pushing

---

[8] Before trial, the government moved to exclude the female-rioter video under Rule 404(b) "[i]nsofar as Webster [sought] to introduce evidence regarding the incident with the female rioter to prove his own state of mind when he assaulted Officer [Rathbun.]"  ECF No. 58, Pages 4-5. Because Webster lacked knowledge of Officer Rathbun's interaction with the female rioter, the government argued he could not use this video evidence to establish his self-defense claim.  *Id*. The government further argued that, even if admissible, the probative value of the female-rioter video was "substantially outweighed by the dangers of unfair prejudice, confusing the issues, and misleading the jury."  *Id*., Pages 5-6.  Webster conceded, then and now, that "the video could not be used to assert it was provocation of [his] actions."  ECF No. 135, Page 11; ECF No. 63, Pages 1-2.

her back away again," causing her to fall a second time.  *Id.*  In response to the motion, Counsel conceded this issue without pressing an absence-of-mistake argument.  ECF No. 63, Page 2.

As explained below, Webster cannot establish ineffective assistance of counsel.  The "totality of the evidence" prevents him from establishing prejudice, while Counsel had more than enough justification to refrain from seeking admission of the female-rioter video as an "absence of mistake."  Indeed, showing the jury additional riot footage could have hurt, rather than helped, Webster at trial.  Further, Webster has not explained why the Court would have admitted the female-rioter footage considering it would have caused a confusing, "collateral mini-trial" within the trial.

### a.  Webster Cannot Establish Prejudice.

"[T]he totality of the evidence" introduced against Webster prevents him from proving prejudice.  *Strickland*, 466 U.S. at 695.  According to Webster, if the jury viewed the female-rioter video, there was a reasonable probability of a different trial outcome "[b]ecause the jury's verdict relied on the belief that any provocative gesture by Rathbun, and the strike by him to Mr. Webster's face, were unintentional."  ECF No. 135, Page 11.  Webster thus contends that the jury would have credited his self-defense claim if it had compared Officer Rathbun's altercation with the female rioter with his own altercation with Officer Rathbun.

This argument is unpersuasive because "overwhelming evidence" showed Webster was not engaged in self-defense when he brutally assaulted Officer Rathbun.  *Webster*, 102 F.4th at 487.  A valid self-defense claim can provide a complete defense to criminal charges.  *United States v. Celentano*, 126 F.4th 680, 687 (D.C. Cir. 2025).  To succeed on a self-defense claim involving a police officer, "the jury must find that the defendant actually and reasonably believed the officer was using excessive force."  *Id.*  Of course, an initial aggressor cannot later claim self-defense

from the response of the recipient party. *Cf. U.S. v. Peterson*, 483 F.2d 1222, 1231 (D.C. Cir. 1973); *Murphy-Bey v. U.S.*, 982 A.2d 682, 691 (D.C. 2009) (citing *Peterson*).

Self-defense "principles must accommodate a citizen's duty to accede to lawful government power and the special protection due federal officials discharging official duties." *Celentano*, 126 F.4th at 687. Thus, police may use force to carry out their duties so long as the force is not excessive. *Id*. at 686 (citing *Wardlaw v. Pickett*, 1 F.3d 1297, 1302 (D.C. Cir. 1993)). Circumstances surrounding an incident dictate the amount of force a reasonable officer may use to "achieve the needed restraint[.]" *Id*. at 687.

Here, Webster joined "an unruly mob" at the Capitol. *United States v. Alford*, 89 F.4th 943, 947 (D.C. Cir. 2024). Despite being a retired police officer who understood that bike racks created a police line "to keep people back," Webster "tried to get past them nonetheless." *Webster*, 102 F.4th at 477. Webster confronted the "overwhelmed" Officer Rathbun as he stood behind the bike racks, telling him to "take [his] shit off." *Id*.; ECF No. 117, Pages 23, 25-26; ECF No. 116, Pages 18-19. Officer Rathbun gave Webster "a visible signal, that that was a perimeter he was not supposed to pass[.]" ECF No. 117, Pages 28-29. Webster needed "to back up because he had reached over the perimeter of the bike rack." *Id*., Page 29. Officer Rathbun then pushed Webster away from the bike rack "to create some distance between he and the perimeter." *Id*.

That did not deter Webster. *Id*., Page 30. He snatched the bike rack and pushed it towards Officer Rathbun twice, prompting Officer Rathbun to "incidentally" contact Webster's face with an open hand that Officer Rathbun was "taught to do" in crowd control situations. *Id*., Pages 30-32. Officer Rathbun neither punched Webster with a closed fist nor used a baton or other riot control equipment against Webster. *Id*., Pages 32-33. The circumstances here dictated Officer

29

Rathbun use this force to "achieve the needed restraint"—maintaining the perimeter from Webster's and the rioters' incursions.

Yet, Webster then swung his flagpole "in a chopping motion" towards Officer Rathbun and other officers, forcing them to "step back." *Id.*, Pages 33, 35. Because of Webster's pole chop, the bike racks came apart, and rioters moved forward. *Id.*, Pages 34-35. Amidst this chaos, Officer Rathbun seized Webster's flagpole. *Id.*, Page 34. Webster then blitzed Officer Rathbun, knocking Officer Rathbun to the ground and grabbing at his helmet, choking him with the chin strap. *Id.*, Pages 35-37. And Webster exposed Officer Rathbun to riot gas by trying to remove Officer Rathbun's gas mask. *Id.* Webster knocked Officer Rathbun to the ground one last time "and got on top of" Officer Rathbun before the altercation ended. *Id.*, Pages 35-38.

Notably, this case is one where the jury also heard and considered Webster's testimony about the altercation, where he attempted to justify his actions as self-defense. Like Officer Rathbun, Webster commented on the altercation videos as the jury watched. *See generally* ECF No. 118, Pages 126-50. So, by the end of trial, the jury had considered videos, pictures, and both men's accounts of the altercation. Its verdict was a decision between the two differing accounts, and it credited Officer Rathbun's over Webster's, which was the jury's prerogative.

Given the "totality of the evidence," Webster cannot establish a "reasonable probability" of a different trial outcome. *Strickland*, 466 U.S. 694-95. The jury heard both men testify, and the various video footage allowed the jury to experience the incident with the two men as they recalled their fight. Indeed, Officer Rathbun's body camera footage allowed the jury to place themselves in Officer Rathbun's shoes during the altercation. *See* ECF No. 117, Pages 27-38; *see, e.g.*, *United States v. Ortiz*, No. 8:23-cr-53, 2024 WL 418622, at *6 (C.D. Cal. Feb. 5, 2024) (court decided reasonable-suspicion issue after viewing officer's bodycam footage showing "that the area

where the Officers stopped the Toyota was a high crime area, that Ortiz was wearing baggy clothing, and that Ortiz's gang tattoo was clearly visible").

This extensive evidence—certainly the body camera footage—also allowed the jury to evaluate and reject Webster's self-defense claim.  To successfully prove self-defense, Webster had to convince the jury that he did "not use any greater force than he actually and reasonably believe[d] to be necessary under the circumstances to prevent the harm he reasonably believe[d] is intended[.]"  ECF No. 121, Page 38.  He also had to show that he was not the initial aggressor. *Id*., Page 37.  Given the riotous circumstances Officer Rathbun faced that day, in no way did his reasonable contacts upon the already aggressive Webster, used to maintain the perimeter, justify Webster swinging a flagpole at Officer Rathbun before tackling and assaulting Officer Rathbun as he retreated.  *Celentano*, 126 F.4th at 686-87.

"Taking the unaffected findings as a given, and taking due account of the effect" the female-rioter video would have "on the remaining findings," Webster can establish no reasonable probability of a different trial outcome.  *Strickland*, 466 U.S. at 696.  At most, the female-rioter video would have had only "an isolated, trivial effect" given the sheer unjustified force the jury witnessed Webster using against Officer Rathbun.  *Id*.  Webster, a retired police officer who had stood "[c]ountless hours . . . behind that metal barricade" during protests and other large events, knew better.  ECF No. 118, Pages 82-90.  Without prejudice, his *Strickland* claim fails.  466 U.S. at 691.

### b.  Webster Cannot Prove Counsel Performed Deficiently.

Webster cannot establish deficient performance.  First and most importantly, he cannot "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Strickland*, 466 U.S. at 689.  This is because Counsel easily could

have, and likely did, conclude that showing the jury additional riot footage outweighed whatever probative value the female-rioter video had concerning absence of mistake. Webster risked prejudicing the jury against him by having it view and consider this video. Admission therefore could have been "a Pyrrhic victory," and this "type of judgment call is not deficient performance." *Chong v. United States*, 112 F.4th 848, 864 (9th Cir. 2024).

Second, Webster has not shown that the Court would have admitted the video if Counsel had moved for its admission to show absence of mistake. ECF No. 135, Pages 10-11. Federal Rules of Evidence 608(b), 403, and 404(b) govern this claim, which is predicated on cross-examination about prior conduct. *United States v. Young*, No. 12-cr-00042, 2013 WL 12430555, at *3-4 (D.D.C. Apr. 22, 2013) (illustrating the interplay between these rules). Rule 608(b) bars extrinsic evidence "to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). But this bar on extrinsic evidence is inapplicable when the evidence is "offered for other grounds of impeachment[.]" *Young*, 2013 WL 12430555, at *3 (citing *United States v. Mahdi*, 598 F.3d 883, 893 n.11 (D.C. Cir. 2010)). Admissibility of this extrinsic evidence is left to Rules 402 and 403, meaning the evidence is admissible if "relevant and not otherwise prescribed by law or rule." *Mahdi*, 598 F.3d at 893 n.11 (quoting *United States v. Fonseca*, 435 F.3d 369, 375 (D.C. Cir. 2006)).

Rule 404(b)(1) prohibits litigants from introducing evidence of "other crimes, wrongs, or acts . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But this evidence may be introduced to show an "absence of mistake" among other permitted uses. Fed. R. Evid. 404(b)(2). Rule 404(b)(2) is an inclusive rule and prohibits "only evidence which lacks any purpose but proving character." *United States v. Wilkins*, 538 F. Supp. 3d 49, 69-70 (D.D.C. 2021) (emphasis

and internal quotation marks omitted) (quoting *United States v. Bowie*, 232 F.3d 923, 929-30 (D.C. Cir. 2000)).

Rule 404(b) evidence must satisfy a two-part analysis for admission. *Id*. at 70 (citing *United States v. Miller*, 895 F.2d 1431, 1435 (D.C. Cir. 1990)). The proffered evidence must be "probative of a material issue other than character." *Id*. (quoting *United States v. Clarke*, 24 F.3d 257, 264 (D.C. Cir. 1994)). If "probative," a court must then see whether its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *United States v. Moore*, 75 F. Supp. 3d 444, 451 (D.D.C. 2014). A court has "broad discretion to weigh the extent of potential prejudice against the probative force of relevant evidence." *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 633 (D.C. Cir. 2010).

Webster argues that he wanted to use the female-rioter video to contradict Officer Rathbun's testimony that "his strike to Mr. Webster's face was unintentional, or a mistake." ECF No. 135, Page 11. Assuming Webster would seek the video's admission during cross-examination, it would have to satisfy Rules 402 and 403. *Young*, 2013 WL 12430555, at *3.

Webster has not shown that "the trial court would have admitted" the female-rioter video had Counsel moved for its introduction to show absence of mistake. He instead advances a mere "speculative and conclusional assertion" that admission for this permissible purpose would have occurred, which "is not sufficient to establish an ineffective-assistance claim." *Carmona v. Johnson*, 182 F.3d 913 (5th Cir. 1999) (per curiam) (citing *Lincecum v. Collins*, 958 F.2d 1271, 1279-80 (5th Cir. 1992)).

While Webster has neither shown nor pleaded why the Court would have admitted the female-rioter video, its admission seems uncertain at best in view of Rule 403. This is because

admission likely would have resulted in a mini-trial concerning Officer Rathbun's unrelated use of force against the female rioter. *Compare Holmes v. Miller*, 768 F. App'x 781, 783 (9th Cir. 2019) ("inquiry into Ortiz's prior disciplinary history and/or into allegations that he lacked candor" was barred under Rule 403 because it would have "resulted in a series of mini-trials concerning the prior events" that would have "unduly complicated the issues"). If the female-rioter video was admitted during cross-examination, Counsel would presumably cross-examine Officer Rathbun about this interaction to support Webster's self-defense claim while the government would then presumably reexamine Officer Rathbun about that interaction. This resulting "collateral mini-trial" to compare Officer Rathbun's encounters with the female rioter and Webster would have wasted time for little benefit, given the lack of prejudice, while "unduly complicating" the case and "confusing the jury." *Id.*; *United States v. Jackson*, No. 4:14-cr-135, 2015 WL 13344068, at *2 (D.N.D. Nov. 19, 2015) (citing *United States v. Waloke*, 962 F.2d 824, 830 (8th Cir. 1992)).

Webster also does not explain how the female-rioter footage would not encourage a verdict based on "the improper basis of an emotional response." *Langenbau v. Med-trans Corp.*, 167 F. Supp. 3d 983, 993 (N.D. Iowa 2016). Webster seeks the video's admission to prove Officer Rathbun did not mistakenly strike him in the face by showing Officer Rathbun pushing the female rioter away from him and the police barricade twice, causing her to fall. ECF No. 135, Pages 10-11. Webster would then use this "absence of mistake" evidence to support his self-defense claim. But Webster's likely "true purpose" of this request was to prejudice the jury against Officer Rathbun by presenting evidence that Webster hoped would be "so inflammatory on its face as to divert the jury's attention from the material issues in the trial." *Langenbau*, 167 F. Supp. 3d at 992 (brackets omitted).

34

Given the "slight evidentiary value" the video contained about absence of mistake, the Court would have appropriately exercised its discretion by denying admission of the female-rioter video under the circumstances Webster now claims as deficient performance. Of course, Webster has not argued anything either supporting his admission argument or rebutting these considerations that would have stood against admission. *Compare Rat v. Shinn*, No. 20-cv-81, 2021 WL 5505789, at *7 (D. Ariz. Nov. 24, 2021) (denying claim because where "assertions about the relevance of this evidence is conclusory, there remains a substantial question whether the Court would have admitted it"), *certificate of appealability denied by* No. 22-15016, 2022 WL 16643117 (9th Cir. July 25, 2022), *cert. denied sub nom. Rat v. Brnovich*, 143 S. Ct. 598 (Jan. 9, 2023).

Counsel's performance is not judged by "best practices" but by whether it was incompetent under "prevailing professional norms[.]" *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690). "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Id*. at 110 (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 687). Here, Counsel easily could have concluded that any value of seeking admission of the video to show an absence of mistake could unduly prejudice the jury against Webster by exposing them to additional riot footage. Even assuming the video was admissible to show absence of mistake, Webster failed to justify its introduction under the second step in the Rule 404(b)(2) analysis—that the probative value of the evidence is not "substantially outweighed by a danger of" jury confusion, wasting time, or being too inflammatory. Thus, Webster failed to satisfy the performance prong, and Ground Three fails to establish a fundamental error.

Because none of Webster's claims succeed, he has failed to show errors "of the most fundamental character" that rendered his trial "irregular and invalid." *Lee*, 84 F. Supp. 3d at 10 (citing *United States v. Addonizio*, 442 U.S. 178, 186 (1979)).

## <u>NO HEARING IS NECESSARY</u>

Finally, the Court should not hold a hearing on Webster's petition.  The files and records of the case conclusively show that Webster is not entitled to relief.  Although there is a preference for an evidentiary hearing on claims of ineffective assistance of counsel, not every such claim, no matter how conclusory or meritless, automatically entitles a party to an evidentiary hearing.  *Sitzmann*, 893 F.3d at 831-32.  An evidentiary hearing is not required where (1) the claims are "vague, conclusory, or insubstantial," (2) "the record conclusively shows the defendant was not prejudiced because no factual development could render the claim meritorious," or (3) the record conclusively shows counsel's performance was not constitutionally deficient.  *Green-Remache*, 97 F.4th at 34.  Similarly, "[i]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007); *United States v. Olvera*, No. H-09-300, 2013 WL 2289961, at *1, *7 (S.D. Tex. May 22, 2013).  Here, the record conclusively shows that each of Webster's claims is meritless.  Thus, the Court should deny the petition without a hearing.

## **CONCLUSION**

The Court should summarily deny Webster's petition for a writ of error coram nobis.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

KACIE M. WESTON
Assistant United States Attorney
Chief, Special Proceedings Division

THOMAS STUTSMAN
Assistant United States Attorney
Deputy Chief, Special Proceedings Division
Minnesota Bar Number 0392603

By:    */s/ Nicholas S. Bolduc*
NICHOLAS S. BOLDUC
Assistant United States Attorney
Special Proceedings Division
Tennessee Bar No. 035050
601 D Street NW
Washington, D.C. 20530
(202) 252-7572
nicholas.bolduc@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused service of the foregoing to be made through the Court's Electronic Case Filing system on October 3, 2025. I further certify that I caused a copy of the foregoing to be posted for delivery by first-class mail to Mr. Thomas Webster, #31135-509, 1501 W. Jackson Avenue, Suite 113, Box 108, Oxford, Mississippi 38655,[9] on October 3, 2025.

*/s/ Nicholas S. Bolduc*
NICHOLAS S. BOLDUC
Assistant United States Attorney

---

[9] Because coram nobis proceedings are quasi-criminal and quasi-civil in nature, "the denomination of the nature of a given petition calls for a functional analysis rather than for doctrinal rigidity." *Trenkler v. U.S.*, 536 F.3d 85, 94 (1st Cir. 2008) (holding that coram nobis petitions are appealable "civil matters"). This distinction matters because Webster is not listed on the docket as representing himself in this proceeding. Thus, the government has looked to the Federal Rules of Civil Procedure and served him at the last known address that Webster used in this proceeding, meaning "service is complete upon mailing." *See* ECF No. 139; Fed. R. Civ. P. 5(b)(2)(C). His trial attorneys that are listed on the docket but appear to have terminated representation will nonetheless be served through the Court's Electronic Case Filing System.