RECEIVED
Mailroom

OCT 27 2025

AngelaD.Caesar,Clerk of Clerk
'J.S.District Court.District of Columbia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
    Plaintiff/Respondent,

v.                                    Case No.  1:21-cr-00208-APM-1

THOMAS WEBSTER,
    Defendant/Petitioner

---

ANSWER TO THE UNITED STATES'
OPPOSITION TO THE PETITION FOR
WRIT OF ERROR CORAM NOBIS

---

Thomas Webster, Defendant/Petitioner in the above styled action, acting
in his propia Persona, respectfully submits this Answer to the Opposition
[Dkt. 141] filed by the United States to his Petition for a Writ of Error
Coram Nobis [Dkt. 135].

In so doing, Mr. Webster states that this Court has jurisdiction over
the instant Petition whereas the collateral consequences of his felony
conviction would be obviated by a favorable ruling on this matter, that the
evidence supporting his first claim for relief could not have been obtained
earlier through Mr. Webster's acts of due diligence, that the evidence he
presented supports his claims for relief, and that he suffered prejudice from
the claimed errors in that the outcome of the proceedings would have been
different otherwise.

I. STATEMENT OF THE FACTS

January 6, 2021 was a date of excitement and violence, a day to step outside the boundaries of the law without fear of legal repercussions, for Metropolitan Police Department (MPD) Officer Noah Rathbun ("Rathbun"). While he was on duty as a bicycle officer that day, he was called to assist Capitol Police on the grounds of the U.S. Capitol Building. Dkt. 117 at 12.

Rathbun had been cited for violations in the past, including body-worn camera (BWC) violations and using obscene language before tackling a suspect:

| Date | Infraction |
|------|-----------|
| 11-21-18 | Rathbun did not have a full two minute BWC buffer with his associated BWC video during a forced entry investigation. |
| 8-6-18 | Rathbun violated General Order 201.16 Part V, (c)(3) which states that officer are to "Refrain from harsh, violent, coarse, profane, sarcastic, or insolent language" during use of force. |

Att. 1, pg 4.

Shortly after his arrival, a public source video was taken of Rathbun standing on the bottom of the bike rack, holding his body worn camera above his head and making a gesture that looked like he was pulling the pin from a grenade. Att. 2 pg 1.

---

1. References to the docket on Case No. 2024-CAB-004681 in the United States District Court for the District of Columbia are cited as Dkt. # at # and reflect the docket and page numbers respectively. Attachments to this pleading will be cited as "Att. #" and will be numbered in the order they appear herein.

Approximately ten minutes before Mr. Webster arrived at the scene, a middle-aged woman approached the barricade, holding a flag and pole close to her chest that had been disassembled into its component pieces. Rathbun attempted to extract the flag from the woman, pushing her to the ground twice. When the crowd reacted in anger to this actions, Rathbun made a gesture in front of his BWC resembling the old Pac-Man arcade character, taunting the crowd with the implication that they were 'all talk, no action.' See, Dkt. 58, 63.

A few minutes later, Rathbun saw a man making his way through the crowd. The man was carrying a marine flag and yelling. He pointed at Rathbun and directed his verbal insults towards him. Rathbun responded with several hand waves, then motioned for the protester to move closer.[2] Dkt. 117 at 77; Dkt. 118 at 127.

Thomas Webster, a retired New York City Police Officer was one of thousands of people who travelled to Washington, D.C. to hear President Trump give his last public speech before leaving office after the 2020 election. Dkt. 118 at 83-113. He arrived on the day before the speech, spending the day walking around D.C., and arrived to hear President Trump speak shortly after noon on January 6th. Id.

At the conclusion off President Trump's speech, Mr. Webster began walking with the crowd toward the Capitol to exercise his First Amendment right to express his displeasure with the election and the way it had been conducted. Id. While Mr. Webster was still a distance away form the Capitol, around 1:20

---

2. During trial, defense counsel referred to the video as defendant's Exhibit 17. That was incorrect, Exhibit 17 was a video entitled "Patriots at the Capitol." The Video shown during this portion of the trial was a blown-up, or enhanced, portion of the security camera, Government's Exhibit 205.

p.m., Officers of the Metropolitan P.D. Special Operations Division began using chemical sprays, batons, and tazers on protesters after eight munitions containing a mix of projectiles and pepper balls has been shot into the crowd. Att. 3.

When Mr. Webster arrived at the back of the crowd who were already on the grounds of the Capitol, he witnessed elderly people and women being led away, bleeding from lacerations caused by the very people who had taken an oath to protect them. Dkt. 118 at 119-121.

Visibly upset and enraged, Mr. Webster made his way through the crowd until he reached a position around 2:30 p.m. where he could see a bicycle rack, indicating the limit of the protest area. Dkt. 118 at 125. He walked up to the line, verbally expressing his displeasure at the violence that had been perpetrated against American citizens by uniformed Police Officers. Such language included profanity and accused the officer of perpetrating acts of communism. He stopped roughly one to two feet from the bicycle rack. See, Defendant's Exhibit 17. Dkt. 118 at 126, 132.

Rathbun held up his left hand and motioned Mr. Webster to step closer: the back of his hand was towards the crowd as he pulled it towards his body and upward to avoid the body camera recording of his quick finger movements. Dkt. 118 at 127, Defendant's expanded version of Gov't Exhibit 205.

While Mr. Webster remained standing away from the bicycle rack, Rathbun

leaned back and looked up to see what flag was on the pole – movement that was visible on a security camera video taken approximately 100 yards away – then looked back into Mr. Webster's eyes. Without uttering a word, Rathbun reached out more than a foot past the bicycle rack and shoved Mr. Webster on the chest. Dkt 118 at 130. In contrast, the other officers showed no emotion and were not interacting with the crowd.   Dkt. 118 at 131.   Visible on security camera footage, Rathbun reached across the bicycle rack several more times in rapid succession after the shove. Gov't Exhibit 205.

Rathbun's BWC shows that this is the moment when he removed his hand form the bicycle rack to signal again for Mr. Webster to move closer. Although the BWC only caught a portion of the movement, the entire hand motion was captured on the "Patriots at the Capitol" video. Dkt. 117 at 30, Defendant's Exhibit 17. In response to the gesture, and out of frustration, Mr. Webster put his hand on the bicycle rack and pushed it. Id.

Rathbun put his bare hand on top of Mr. Webster's and then struck him in the face hard enough that the security camera shows Mr. Webster stumble almost to the ground.[3] See, Defendant's Exhibit 17, Gov't Exhibit 205.

Mr. Webster regained his footing and slammed his flagpole onto the bicycle rack three times, until it broke, and then he backed up. Dkt. 188 at 140, Dkt. 117 at 92.

As the main group of Police moved back, Rathbun went through the bicycle

---

3. N.R. had been holding his bare hand outside the view of the BWC following his altercation with the middle-aged woman that caused him to lose his glove. see, Gov't Exhibit 205.

racks, unfurled another protester's flag, and continued on to the take the broken portions of the flagpole out of Webster's hands. Mr. Webster released the remainder of the flagpole without incident. Dkt. 118 at 140, Defendant's Exhibit 17.

When Rathbun returned to the bicycle rack, the crowd went with him, and continued to move closer to the Capitol building. As the crowd moved along, Mr. Webster followed. Without any weapons in the his hand or on his person, Webster and was involved in a second altercation with Rathbun. Although he did not throw any punches or any kicks to Rathbun's body, Webster did attempt to remove Rathbun's gas mask, so they both could experience the results of tear-gas cannisters that had been fired into the crowd. Because Rathbun's chin strap held all of the headgear firmly in place, however, Webster abandoned the attempt. Dkt. 118 at 149.

Rathbun returned to the reestablished Police Line, ultimately ending up at an area of the Capitol known as the Rotunda where he wrestled with another person who also carried a flag. The flagpole broke and caused a laceration in Rathbun's finger. Because of the injury, Rathbun sought medical care and filed an injury report related to the wound (PD-42). Rathbun did not, however, file a use of force report with respect to this interaction with the middle-aged woman or Mr. Webster. Att. 4, Dkt. 117 at 70.

Page 6

The Follow-Up

Detective Jonathan Lauderdale ("Lauderdale") of the D.C. Metropolitan Police Department was one of the individuals tasked with reviewing PD-42 forms, filled out by officers who were injured during the January 6th incident. Dkt. 122 at 60. Because Rathbun filed an injury report with respect to his hand, Lauderdale was tasked on January 9, 2021 with processing the incident. In so doing, he viewed the footage of Rathbun's BWC for the day of January 6th and took note of the altercation between Rathbun and Mr. Webster. Att. 5.

After reviewing the footage, Lauderdale then contacted Rathbun, who claimed no recollection of any incident matching the detective's description. Lauderdale then gave Rathbun a copy of his BWC to review before making a formal statement, in violation of MPD policy. See, Att. 15.

After he received a copy of the BWC video, however, Rathbun stated that "given the stressful events, he may have forgotten about the subject." Att. 6. He then made his first statement on January 14, 2021 falsely claiming that Mr. Webster "started striking him on or near his head and upper body area." Rathbun also claimed that he felt as if he was being kicked by numerous unknown subjects as he was laying on the ground and engaged with Mr. Webster. Although Rathbun's version of the events as he relayed them in this first statement was completely invalidated by multiple video recordings, he assured Lauderdale that he "immediately recalled" the incident when he reviewed his BWC.[4] Id.

---

4. An MPD officer is actually prohibited from reviewing his own BWC footage before completing an initial report because it would enable the officer to tailor his report of an incident based on the actions that were captured (or missed) by the BWC. see, Att. 15.

Page 7

Approximately one month later, on February 17, 2021, Rathbun gave a statement to Agents Riley Palmertree and Jon Comotor of the Federal Bureau of Investigations.   In so doing, Rathbun stated only that Mr. Webster (who he identified as a middle aged man holding a Marine Corps flag) got on top of him and tried to take his helmet off.  Att. 7.  No mention waas made of any assault prior to that incident.

On February 19, 2021, despite Rathbun's repudiated initial statement, the Assistant United States Attorney filed a Complaint against Mr. Webster, charging assault on an MPD Officer.  Dkt. 1.

On March 12, 2021, a formal Indictment was lodged in the instant case, charging Mr. Webster on seven (7) Counts: Count One charged Webster with assaulting Officer Rathbun with a deadly weapon, and each subsequent Count, save one, contained the added element of the flagpole as a "deadly weapon."  Dkt 6.

On May 24, 2021, a D.C. Metropolitan Police Officer, later identified by the MPD as Officer Noah Rathbun, was involved in a shooting that resulted in the death of a suspect.  Att. 8.

Following Mr. Webster's self-surrender to authorities at the FBI field office in New York, he appeared for a bond hearing on June 29, 2021.  Dkt. 29. Prior to the hearing, AUSA Hava Mirell filed a document purported to have been typed by Officer Rathbun   Dkt. 28.  The letter, however, was neither dated nor signed.  Att. 9.

The letter began with the statement, "I vividly remember the circumstances in which I came in contact with Mr. Webster on January 6, 2021." This, despite the fact that Rathbun initially admitted to Lauderdale he did not recall the event at all until he reviewed the BWC footage and then proceeded to provide a totally false narrative of his purported recollection.   The letter then continued to present a version of the events that had not been directly relayed by Rathbun at any point prior to trial. Id.

On December 9, 2021, the office of the AUSA issued a Press Release stating that they would not prosecute Rathbun for the shooting of a suspect on May 24, 2021. An investigation into the matter was still ongoing through the Office of the D.C. Metropolitan Police Department Internal Affairs, who were discussing their investigation with the AUSA. Att. 11; April 21, 2022 Pretrial conference at 43, 44.

On or about the second week of February, 2022, the Government provided the defense with a copy of internal investigations related to Rathbun for the previous year.   The report indicated that he had been reprimanded on at least two occasions, as noted, supra.

On March 14, 2022, the prosecution filed a number of motions designed to limit Mr. Webster's avenues of defense and evidence that could be used to demonstrate his innocence of one or more charges lodged against him. Dkt. 56-60.   Among those pleadings, the Government sought to deny Mr. Webster the ability to claim that his actions were justified or that they were performed out

of self-defense, necessity, or duress.  Dkt. 60.  The Government also sought to prevent the defense from showing videos of Rathbun pushing a middle-aged woman to the ground.  Dkt. 58.

Mr. Webster's attorney responded approximately one week later, abandoning all of the earlier claims except for the assertion that Webster's action were the product of self defense.  Dkt. 68.  Further, although the Government's objection to the middle-aged woman's video was based solely on its use to establish character, defense counsel agreed to refrain from using the video for any reason.  Dkt. 63.

On March 30, 2022, Rathbun met with AUSA Brian Kelly, AUSA Katherine Nielsen, and FBI Agent Riley Palmertree; AUSA Hava Mirell joined the discussion by phone.  Att. 2.  Notes of the meeting were provided as part of the final release of discovery materials on April 20, 2022.  Att. 12, Pretrial Conference April 21, 2022 at 57, 59.

The first topic of discussion between the participants was a still photo taken of an unidentified MPD Officer.  The photo was not provided to the defense at any time.  Id.

A video that was discussed after the photo, however, was one that Mr. Webster discovered and had been provided to the prosecution.  In the footage, Rathbun is seen standing on the bottom rung of the bicycle rack making a gesture to the crowd that looks like he is pulling the pin on a hand grenade or other

incendiary device.   The Officers near Rathbun in the video are not interacting with the Protesters in the same manner.  After a review of the video, Rathbun is quoted as saying, "Oh yeah that's me holding up my BWC to record the man throwing the boards."  Id.

It is worthy of note that the video was not provided to the defense by the prosecution, but rather obtained by the defense from a third party.  This, even though the notes indicate that the footage was "from out photographer."  Id.

While the participants viewed Rathbun's BWC, he provided a narrative stating:

° [Mr. Webster] was trying to separate the gates to get in

° [Rathbun had] no baton

°then [Mr. Webster's] flagpole

° hit the person next to him

°swang such that he hit other person

° [Rathbun:] "without helmet I'd have been seriously injured"

°Didnt' say anything to him

ˣ didn't gesture to him

ˣWould be a huge mistake to engage with him.  It would instigate.

Id.[5]

As with each of Rathbun's interview statements, and suspiciously different in tone and verbiage from the unsigned, undated typed victim impact statement

---

5. The bullet points and "x"'s are taken from the notes as written.

filed by the prosecution during the bond hearing, the majority of Rathbun's statements were factually incorrect and invalidated by numerous videos: Mr. Webster was not trying to separate the gates, his flagpole did not hit Rathbun nor any person next to him, and with or without a helmet Rathbun would not have been seriously injured by the flagpole; Rathbun did gesture to Webster and did instigate the confrontation.  See e.g., Defense Exhibit 17.

When Mr. Webster reviewed the notes, he pointed out to defense counsel that Rathbun's statements, both in this session and ones that preceded it, were mostly fabrications and intentional falsehoods.  He also asked defense counsel to confirm that lying to a federal officer is a criminal offense.  Defense counsel acknowledged that it was indeed a federal crime to provide false statements.  Counsel promised Mr. Webster clearly and on more than on occasion that he would not only confront Rathbun with his statements under cross-examination, he would also advise Rathbun of his Fifth Amendment protection against self-incrimination before doing so.[6]

Moments before the final pretrial hearing, defense counsel jokingly suggested to the AUSA that they should interview Rathbun several more times because he dug a deeper hole for himself each time.

Prior to trial, the government moved to bar Mr. Webster from cross-examining Rathbun about the officer-involved shooting that occurred on May 24, 2021.

---

6. By executing this document, Mr. Webster swears under penalty of perjury that the statements and factual assertions herein are true and correct. see, Conclusion.

At that conference, Webster's counsel questioned whether Officer Rathbun's "role as an important witness" for the U.S. Attorney's Office "c[a]me into play in their ultimate decision in clearing him" during their review. J.A. 226. He noted the pending Metropolitan Police Department investigation and proposed that the district court delay Webster's trial until that investigation closed in case it uncovered any dishonesty or wrongdoing. He then informed the district court about the type of questioning he wished to pursue: "[I]sn't it true, sir, that there's a pending investigation against you regarding your use of force as a police officer[?]" J.A. 232.

The district court ruled that Webster could not cross-examine Officer Rathbun about "the substance and the nature of the investigation" because that would be "highly prejudicial" and "inflammatory[.]" J.A. 230. But the district court agreed that cross-examination about "the fact of a pending investigation" was "certainly fair game." J.A. 230; See J.A. 234 ("So the existence of the investigation is okay. And, you know-and I don't know whether you're going [to] follow up with that in terms of bias, et cetera, but I think that's about it. And if there's more, you'll let me know, though.")

United States v. Webster, 102 F.4th 471, -- (D.C. Cir. 2024)

Counsel also confirmed his promise to Mr. Webster that he would cross-examine N.R. on his false statements:

I was served last night with additional discovery, and in there was some handwritten notes from an interview of Officer N.R. So I anticipate adding that as a Defendant's I'm sorry, court reporter, I'm trying to keep my mouth in front of the microphone -- Exhibit 50. Again, it wouldn't be something we would be looking to put into evidence, but, if needed, we would use it to cross-examine the officer as an additional inconsistent statement as to the events that transpired on January the 6th

Pretrial Conference, April 21, 2022 at 57, 58.

While reviewing the final discovery materials that had been provided by the prosecution on April 21, 2022, a paralegal working for defense counsel noted that they had been provided a video for the first time that was taken by one of the Capitol's security cameras.

"Well look what we have here. Please review ... this video. Lower right hand side - you can clearly see N.R. wave for Tom to fight him and then smash him in the face."

Att. 13.

Because the video was provided less than a week before trial, defense counsel was unable to synchronize the video with any other footage or determine whether the video had been edited in any way. The video had a "glitch" where N.R. raises his hand and the image jumps to after he replaced it on the bike rack. The omitted portion contained the much-disputed hand gesture.

Trial

The first witness to take the stand on behalf of the prosecution was Det. Jonathan Lauderdale. Dkt. 122 at 55-99. While on the stand, he made three assertions of fact that were blatantly incorrect.

After detailing the process that led him to review N.R.'s BWC, Id. at 68-69, Detective Lauderdale provided a narrative of the altercation between Mr. Webster and N.R. as it was captured on the BWC. His version of the video, however, changed the sequence of the events in an attempt to make Mr. Webster appear as the aggressor from the moment he arrived on the scene.

Page 14

Then he kind of points to the officers to the left and right of Officer Rathbun, then tells him to take his shit off, which is like when they say take your gun and badage off so we can fight. After that occurred, out of the group that's in front of him, he was clearly aggressive. He's getting closer. Officer Rathbun put his hand out initially to keep him back, which when you're on a CDU line, you're trying to prevent further people from getting inside the Capitol.

Dkt. 122 at 71.

According to Lauderdale, it was after Mr. Webster made this statement that N.R. pushed him on the chest, and that N.R. did so to prevent Mr. Webster from attempting to enter the Capitol, contradicting N.R.'s statement that he did so "to create space." Id. compare to Dkt. 117 at pg 29. Further, this statement is incorrect because it was only after he was physically accosted by N.R. that Mr. Webster offered a one-on-one confrontation. See, Gov't Exhibit 205.

Once he set the stage by incorrectly narrating the sequence of events, Lauderdale then continued his intentionally false narrative by claiming that Mr. Webster "takes the flagpole with the Marine Corps flag on it and strikes Officer Rathbun multiple times." Dkt. 122 at 71 (emphasis added).

In his third act of perjury, Detective Lauderdale reasserted his false claim on re-direct, stating once again that Mr. Webster "pushed back, and then he pushed again and started striking the officer." Id. at 98 (emphasis added).

Following Detective Lauderdale's misleading testimony, Officer Noah Rathbun was placed on the Stand. Before he was placed under oath, however, AUSA Kelly

issued the following statement:

> Mr. KELLY: As to an outstanding administrative investigation concerning Officer Rathbun, it turns out that the final decision was actually issued by the Metropolitan Police Department on April 6th. Officer Rathbun just learned of it last week after our pretrial conference, and the information was just provided to our office late this past Sunday night. So given the fact oh, and I should note, it was closed and found justified
>
> THE COURT: Okay.
>
> MR. KELLY: with no recommended action. So given that, the government would request that defense not be permitted to engage in any cross-examine inquiry into any pending investigations, as there no longer is a pending investigation.

Dkt. 117 at 4, 5.

For the remainder of the trial, the jury was presented with descriptions of the altercation and narratives of the videos that captured the incident from the perspectives of N.R. and Mr. Webster.

The closing arguments made by defense counsel provided the rationale of the defense for a not-guilty version, and took special note that a conviction required a finding that Mr. Webster used the flagpole when he assaulted N.R.:

> Folks, sometimes a flagpole and a flag is all that is. That's all it was. At best, if you listed to Mr. Webster's testimony and observe his conduct, he's at best, reluctantly there. He's only responding to the abuse he's seeing perpetrated against other civilians; he wants to see what's happening. But when he gets to that police line, that flag in his hand is only used for his own protection. And just as soon as Officer Rathbun reaches out on that flagpole, Mr. Webster lets it go.
>
> And that whole altercation where they go down to the ground, do you see my client punch Officer Rathbun? Do you see him kick him? Do you see him get the pole back

from him?   No.   He get's him down on the ground, to a
place where he feels as though he's not going to hurt
him again, and he lets him back up.   Officer Rathbun
goes his way, Mr. Webster goes his.

Dkt. 121 at 84.

After approximately two hours of deliberation, the jury returned a guilty

verdict on all counts.  Dkt. 87.

On October 22, 2024, in an unrelated matter, Brandynn Reaves of the D.C.

Metropolitan Police Department executed an affidavit, sworn to under penalty of

perjury.  Att. 15.  The pertinent sworn statements read as follows:

> 5. On or about June 16, 2023, MPD's FOIA Office received
> a FOIA request from Plaintiff Thomas Webster seeking:
> All investigation notes and documentation regarding
> Officer Noah Rathbun, Metro Police Department,
> concerning any and all incidents occurring on May 24,
> 2021.
>
> 6. The request was assigned FOIA Request Number 2023-
> FOIA-06900.
>
> 7. The FOIA Office determined that the request was
> related to an ongoing investigation of an officer-
> involved shooting involving Officer Noah Rathbun.  More
> Specifically, on May 24, 2021, Officer Rathbun responded
> to a call for an alleged kidnapping.  On arrival, the
> suspect produced and aimed a rifle at Officer Rathbun,
> who drew his service pistol and discharged the service
> pistol, striking and killing the suspect.

## II. Discussion

The Respondent urges this Court to deny the instant Petition and asserts a number of grounds in support of the request. Each of the Respondent's arguments are discussed below in the order that they appear in the Opposition.

### 1. Adverse Consequences

The Respondent argues that, whereas the grounds for relief raised by Mr. Webster deal specifically with his Rathbun-related convictions, "any encumbrances arising from his other felony convictions would still stand." Opposition at 11. This, however, is not accurate.

Counts One and Two dealt directly with Officer Rathbun. Absent a conviction on these counts, Mr. Webster would have been convicted of misdemeanor offenses on the remaining counts, absent a conviction on these counts, Mr. Webster would have been convicted of misdemeanor offenses on the remaining counts, absent the element of a deadly weapon. See, 18 U.S.C. §§ 1752(a)(1), (a)(2), and (a)(4); 40 U.S.C. § 5104(e)(2)(F). It is the felony aspect of the convictions that carry collateral consequences. As a consequence of felony convictions, Mr. Webster "cannot engage in certian businesses; he cannot serve as an official of a labor union for a specified period of time; he cannot vote in any election held in New York State; he cannot serve as a juror." Carfas v. LaValle, 391 U.S. 243, 237, 88 S. Ct. 1556, 20 L. Ed. 2d 554 (1968). With

Page 18

convictions for misdemeanor offenses, Mr. Webster would not suffer any collateral consequences. For this reason, the Petitioner "has a substantial stake in the judgement of conviction which survives the satisfaction of sentence imposed on him." ID.

In support of their position, the Respondent points to an unpublished case out of this district in the matter of United States v. Verrusio, No. 09-CR-64, WL 2634638 at \*2 (D.D.C. June 19, 2017). In that case, however, the defendant was convicted on three counts of an indictment, two of which he challenged in a coram nobis petition. Because the third count was unrelated and unchallenged, this Court determined that Verrusio could not "show that a favorable decision would redress his alleged injuries." Id. The same cannot be said of the instant matter. On each Count that was unrelated to Rathbun, the jury was given the option to find Mr. Webster guilty of a lesser misdemeanor charge that did not include a dangerous weapon, and without a conviction on Count One, there would have been no finding of a dangerous weapon.

2. Issues raised for the first time on a coram nobis petition.

It is the Respondent's next argument that the instant Petition should be dismissed or denied because the grounds raised for relief were not previously raised on appeal or in a motion under 28 U.S.C. § 2255.

As his first Ground for relief, Mr. Webster asserts that Noah Rathbun

made a fraudulent statement (or outright perjury) before this Court when he claimed that the investigation related to his shooting of a suspect had been completed. The Petitioner further claimed that the prosecution knew or should have known that Rathbun was less than truthful. The Respondent argues that this issue should have been raised on appeal and therefore is not cognizant under collateral review. Opposition at 13-14.

Mr. Webster's direct appeal was decided by published decision on May 28, 2024. See, United States v. Webster, 102 F.4th 471 (D.C. Cir. 2024). It was not until October 22, 2024 that Brady nn Reaves, FOIA Officer of the D.C. Metropolitan Police Department, issued a sworn affidavit attesting that an investigation into the Rathbun shooting was still open as of June 23, 2023 and remained open until some time before October 16, 2024. Att. 14 at ¶¶ 12, 17. Accordingly, it was impossible for Mr. Webster to raise this issue on appeal.

With respect to Grounds Two and Three of the Petition, the respondent asserts that these grounds should be denied because they were not raised while Mr. Webster was still incarcerated under 28 U.S.C. § 2255. The Respondent asserts that Mr. Webster was incarcerated for six months after his conviction became final and that he forfeited his right to seek collateral review on a coram nobis petition when he did not file a § 2255 motion while he was still incarcerated. Opposition at 14-16. This assertion is unsupported in this or any other circuit. Each of the cases cited by the Respondent; mostly unpublished decisions from district courts in other circuits, referred to defendants who awaited years after completion of their sentence to seek coram,

Page 20

nobis review.

The most salient factor overlooked by the Respondent is the fact that Mr. Webster filed his coram nobis petition within one year of the date that his sentence became final. If he were still in custody at the time of filing, the Petition (which was submitted using the standard § 2255 form) would have been timely under the strictures of the AEDPA. "A Petition for Writ of coram nobis provides a way to collaterally attack a criminal conviction for a person... who is no longer in custody' and therefore cannot seek relief under 28 U.S.C. § 2255 pr 2241." Chadiz v. United States, 568 U.S. 342, 133 S. Ct. 1103, 1106 n.l, 185 L. Fd. 2d 1235 (2009). See Also, United States v. Newman, 805 F.3d 1143, 1146 (D.C. Cir. 2015).

## Fundamental Errors: Grounds for Relief

"[W]e consider grounds for issuance of a writ of coram nobis as coterminus with the grounds for § 2255 relief of the grounds for issuance of a writ of habeas corpus." United States v. McCord, 509 F.2d 334, 340 n.6 (D.C. Cir. 1974) "In particular, and central to this case, coram nobis may be used to redress' fundamental error[s]' in criminal proceedings, such as violations of the Sixth Amendment right to counsel." United States v. Newman, 805 F.3d 1143,1146 (D.C. Cir. 2015) (citing United States v. Denedo, 556 U.S. 904, 911, 129 S. Ct. 2213, 173 L. Ed. 2d 1235 (2009)). This follows from the fundamental precept of collateral relief that such relief "is not now and never has been a static, narrow, formalistic remedy; its scope has grown to

achieve its grand purpose -- the protection of individuals against the erosion of their right to be free from wrongful restraints upon their liberty." McCord, supra, (quoting Jones v. Cunningham, 371 U.S. 236, 243, 9 L. Ed. 2d 285, 83 S. Ct. 373 (1963)), quoted in Dhiab v. Trump, 852 F.3d 1087, 1101 (D.C. Cir. 2017).

The respondent does not dispute that each of the grounds cited by Mr. Webster for relief are cognizant on coram nobis review, but asserts individualized arguments for each ground of the merits.    Each of those arguments are addressed respectively below.

A. Due Process

On Mr. Webster's First Ground for relief, he asserts that Noah Rathbun was untruthful when he advised the Court that the investigation into an officer-involved shooting wherein he was the subject of the investigation had been officially closed, preventing the defense from pursuing significant line of questioning during trial.

Although Mr. Webster alleged that the fraudulent statement violated his "Fifth Amendment right to confront his accuser," the Respondent correctly noted that the confrontation right is actually protected under the Sixth Amendment.    Opposition at 18, n.6.    The Respondent further noted that Mr. Webster's claim also implicated the Fifth Amendment right to due process in two ways: the suppression of exculpatory evidence and presentation of false

Page 22

statements. Id.

To be clear, after a lengthy legal battle with the D.C. Metropolitan Police Department, Mr. Webster was able to obtain confirmation that, although Rathbun was was exhonorated for the death of an alleged kidnapping suspect on or about March 25, 2022, investigations into his actions on that date were ongoing long after the trial in the instant case had concluded. This admission by the MPD confirms that, although Rathbun had been exonerated for the shooting, he was not truthful when he advised that the investigation had been closed.

The Respondent acknowledges that claiming the investigation was closed "allowed the government to renew its argument that the Court should bar Webster from cross-examining Officer Rathbun about the investigation," Opposition at 20, and that the "disclosure benefited the government, especially considering Webster's Counsel' expressly agreed' with its position after disclosure." Id.

Even so, the Respondent argues that the existence of favorable undisclosed evidence would not have produced a different result because of the "overwhelming evidence against [Webster]." Opposition at 21 (quoting United States v. Webster, 102 F. 4th 471, 487 (D.C. Cir. 2024). The Respondent, however, glosses over the actual significance of the prohibited line of cross-examination that stemmed from this Fifth and Sixth Amendment violation.

Page 23

The "overwhelming evidence" consisted of the perjured testimony of Jonathan Lauderdale and a number of videos, none of which clearly established the events in question. Because of this, the most crucial component of the government's case against Mr. Webster was Rathbun's first-hand interpretation of the videos, and the only way they could obtain a conviction on Count One was to convince the jury that the moment Mr. Webster broke his flagpole on the bicycle racks constituted an assault with a dangerous weapon.

The prohibited line of questions posed by defense counsel would have demonstrated that Rathbun, an individual who initially did not remember the event at all and then provided multiple fabricated statements to investigators before trial, was himself the subject of an investigation and highly motivated to alter his testimony to conform with the prosecution's wishes.

With Rathbun's credibility thus brought into question, there can be no confidence in the ultimate verdict rendered by the jury.

B. Ineffective Assistance of Counsel

Mr. Webster has no objection to the Resopondent's recitation of the standard for review of claims related to counsel's constitutionally deficient performance. Simply put, the onus is on the Petitioner to demonstrate that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, the result of the proceedings would have been different. Strickland v. Washington, 466 U.S. 668, 688-90

Page 24

(1984). A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome" of the proceeding. Id. see, Opposition at 22-24.

### 1. Failure to Raise Rathbun's Repeated Inconsistencies

Noah Rathbun, after being cited on numerous occasions for his unprofessional interactions with the public, prompted an altercation with a former U.S. Marine by waiving him closer, leaning back and pointedly looking at his flag, and then striking him in the face. For good reason, he did not mention the incident on any report in the following days.

When Rathbun was contacted by an investigating officer, he claimed that he could not recall the event. He was then provided with a copy of his own body-worn camera prior to making an official statement (in violation of Metropolitan Police Policy), after which he made outlandish claims of physical abuse that were disproven by the emergence of other videos. This, despite the claim that he now recalled the event clearly.

Perfectly aware that Rathbun was unable to accurately describe his altercation with Mr. Webster, the prosecution submitted an unsigned, undated victim impact statement (claiming that Rathbun had perfect recollection) that summarized the governments's case as the prosecution intended to present it to the jury. The problem is that this statement did no match any version of the altercation that was relayed to investigators by Rathbun, either before or after.

On a conference call with investigators and the prosecution just days before trial, Rathbun was asked to recount his altercation with Mr. Webster. Once again, he provided a fanciful account that was largely discredited by videos taken of the day's event.

Counsel was well aware that Rathbun either had no actual memory of his altercation with Mr. Webster, or that the government's star witness had been tailoring his statements to conform with the prosecution's wishes. This is evident not only through his statement made to the prosecution in front of Mr. Webster to the effect that Rathbun's own statements were his client's best defense, but also in counsel's statement to the Court that he received notes from the conference call and intended to use them during cross examination.

The Respondent notes that Rathbun stated during cross examination that his "memory was a little fresher back then than it was today," and that he told the investigator "[e]verything [he] could remember[.]" Opposition at 25 (alterations in original). Yet, armed with those incorrect statements made when Rathbun's memory was "fresher," defense counsel did nothing.

Counsel's failure to present impeaching evidence when he was perfectly aware that the government's case depended on the credibility of Noah Rathbun was not strategic by any stretch of the imagination, and it undermines the confidence in the jury's verdict as a result.

Page 26

2. Failure to introduce video of Rathbun's assault on a female protester.

After he provoked Mr. Webster to move closer to the bicycle rack, Rathbun struck him in the face hard enough to cause Mr. Webster to stumble nearly to the ground. During the trial, Rathbun claimed that his contact with Mr. Webster's face was accidental, despite the fact that he had stretched his arm to its full extent and had to lean partially over the barracade to accidentally strike the ex-marine.

Approximately ten minutes before this purportedly accidental strike, Rathbun was making provocative hand gestures to the crowd in front of him and pushed a female protestor to the ground twice.

Although defense counsel had conceded earlier that the video of Rathbun's assault on the female could not be used to assert that it was provocative of Mr. Webster's actions, there is no justification for counsel's failure to move for introduction of the video under Rule 404(b)(2) to demonstrate that Rathbun's strike was not a mere mistake, nor the gestures simply incidental.

The Respondent does not dispute that the evidence would be admissible under Rule 404(b), but argues instead that Webster suffered no prejudice from counsel's failings.

As the Third Ground for relief, Mr. Webster states that the outcome of

the trial have been different "[b]ecause the jury's verdict relied on the belief that the provacative gesture by Rathbun, and the strike by him to Mr. Webster's face, were unintentional." The Respondent attempts to reword this claim as a comparison between Rathbun's altercation with the female to the altercation between Rathbun and Mr. Webster. Opposition at 28. This is incorrect.

As an initial matter, the Respondent is fully aware that Mr. Webster was not convicted of "brutally assualt[ing]" Rathbun. see, Id. Mr, Webster was convicted of assault with a deadly weapon: the flagpole. Since Mr. Webster never actually struck Rathbun with the flagpole, the assault would only have occurred when Mr. Webster struck the bicycle rack several times, evidently in the furtherance of another felony. If that particular act was done in self-defense, Mr. Webster could only have been convicted of misdemeanor assault for the second altercation after the barrier had parted, but that incident did not involve a dangerous weapon of any sort. the question for the jury, then, was whether the act of striking the bicycle rack was an aggravated assault or the instinctual reaction to an intentional aggressive strike by Rathbun.

The claims that Mr. Webster was present with thousands of other protesters, that he walked up to the front of the crowd and shouted insults at the officers are all both true and irrelevant. The only question is whether or not Webster struck the bicycle rack in an attempt to dissuade a rogue officer from intentionally striking him in the face. Again.

## III. CONCLUSION

Wherefore, for the foregoing reasons, the Defendant/Petitioner, Mr. Thomas Webster, respectfully Moves this Honorable Court to Overrule the Objections submitted by the Respondent and Grant the relief sought in this action.

I declare under penalty of perjury that the foregoing is true and correct (see 28 U.S.C. § 1746; 18 U.S.C. § 1621).

Date: 10-24-25

Respectfully Requested,

Tom Webster

Page 29

CERTIFICATE OF MAILING AND SERVICE

I hereby certify under penalty of perjury that the foregoing originally executed document was deposited with the U.S. Postal Service, appropriate postage prepaid and addressed to:

Office of the Clerk
United States District Court
333 Constitution Ave.,
Washington, DC 20001

and a true and correct copy of same was deposited with the U.S. Postal Service, appropriate postage prepaid and addressed to:

Office of the AUSA
601 D. Street NW
Washington, DC 20530

on this, the _24th_ day of _Oct_____, 2025.

Affiant _____