A T T A C H M E N T     1

Noah Rathbun - IS Cases

**CAD NAME:  10645- Noah Rathbun**
*IS Cases pending between 1/6/2021 and 2/8/2022*

**SUSTAINED/DISCLOSE and PENDING REPORT (Defense Copy)**    Last Uploaded:  2/6/2022 11:50 pm    Print Date:    2/8/2022 4:22:01 PM

| IS No. | Dates | Incident Type/ Allegations | Disposition/ Discipline | Case Description | Additional Information |
|---|---|---|---|---|---|
| 21003520<br><br>**PENDING - Closed** | **Incident:** 12/6/2021<br><br>**Disposition:** 12/16/2021<br><br>**DRB:** | MPD Accident<br><br>Accident: Non-Preventable | **Case:** Non-Preventable<br><br>**Member Disposition:** Vehicle Related Incidents -- Accidents : Non-Preventable<br><br>**IAD Discipline:** No Action Taken<br><br>**DRB Disposition:**<br><br>**DRB Discipline:** | **Synopsis:** On the listed date and time, Officer Rathbun was utilizing MPD marked van 9666 and driving west bound in the 100 block of Chesapeake Street, SW. Officer Rathbun reported that while driving in the above listed location, Driver of the silver color Escalate was driving east bound in the 100 block of Chesapeake Street, SW. MPD marked van 9666 driver side rear view mirror and silver color Escalate is driver side rear view mirror was sideswiped.<br><br>**Investigative Notes:** On 12/16/2021, IAB forwarded the investigation to CRB. GP | **IS-Related Documents:** |
| 21002338<br><br>*Sustained/Disclose* **PENDING - Closed** | **Incident:** 9/12/2021<br><br>**Disposition:** 10/21/2021<br><br>**DRB:** 1/12/2022 | MPD Accident<br><br>Accident: Non-Preventable | **Case:** Preventable<br><br>**Member Disposition:** Vehicle Related Incidents -- Accidents : Preventable<br><br>**IAD Discipline:** No Action Taken<br><br>**DRB Disposition:** No Discipline<br><br>**DRB Discipline:** mitigating | **Synopsis:** On the listed date and time both MPD members were involved in an MPD accident with one another. No injuries reported.<br><br>**Investigative Notes:** | **IS-Related Documents:** IS21002338.pdf<br><br>IS21002338 - Rathbun.pdf<br><br>IS21002338 - ▓▓▓▓ pdf<br><br>IS21002338 - CRB Rathburn.pdf<br><br>IS21002338 - CRB ▓▓▓▓ df |

**CAD NAME: 10645- Noah Rathbun**
*IS Cases pending between 1/6/2021 and 2/8/2022*

**SUSTAINED/DISCLOSE and PENDING REPORT (Defense Copy)**    Last Uploaded: 2/6/2022 11:50 pm    Print Date: 2/8/2022 4:22:01 PM

| IS No. | Dates | Incident Type/ Allegations | Disposition/ Discipline | Case Description | Additional Information |
|---|---|---|---|---|---|
| 21001259 <br><br> *secured* <br><br> **\*\*PENDING - Open** | **Incident:** 5/24/2021 <br><br> **Disposition:** <br><br> **DRB:** | Use of Force <br><br> Officer Involved Shooting - MPD - fatality | **Case:** <br><br> **Member Disposition:** <br><br> **IAD Discipline:** <br><br> **DRB Disposition:** <br><br> **DRB Discipline:** | **Synopsis:** <br> On 05/24/2021, Seventh District Officer Noah Rathbun was involved in a Use of Force (Glock 17) <br><br> **Investigative Notes:** <br> -IAB received declination letter on 11/29/21 for A/C review. Noted CLA | **IS-Related Documents:** |
| 21003630 <br><br> *secured* <br><br> **\*\*PENDING - Open** | **Incident:** 5/24/2021 <br><br> **Disposition:** <br><br> **DRB:** | Orders/Directives Violation <br><br> Body Worn Camera Policy Violation | **Case:** <br><br> **Member Disposition:** <br><br> **IAD Discipline:** <br><br> **DRB Disposition:** <br><br> **DRB Discipline:** | **Synopsis:** <br> On May 24, 2021, Officer Rathbun failed to activate his BWC prior to engaging a suspect in a kidnapping investigation. Officer Rathbun activated his BWC late and after making contact with the suspect. <br><br> **Investigative Notes:** | **IS-Related Documents:** |

**CAD NAME:  10645- Noah Rathbun**
*IS Cases pending between 1/6/2021 and 2/8/2022*

**SUSTAINED/DISCLOSE and PENDING REPORT (Defense Copy)**     Last Uploaded:  2/6/2022 11:50 pm     Print Date:    2/8/2022 4:22:01 PM

| IS No. | Dates | Incident Type/ Allegations | Disposition/ Discipline | Case Description | Additional Information |
|---|---|---|---|---|---|
| 21001013<br><br>**PENDING - Closed** | Incident:<br>4/7/2021<br><br>Disposition:<br>6/15/2021<br><br>DRB: | Citizen Complaint, OPC<br><br>Failure to Take Proper Police Action, OPC - Jurisdiction Referral | Case:<br>Unfounded<br><br>Member Disposition:<br>Misconduct Allegations - - All Other Misconduct Allegations Not Listed : Unfounded, OPC -- Jurisdiction Referral : OPC Dismissed<br><br>IAD Discipline:<br>No Action Taken<br><br>DRB Disposition:<br><br>DRB Discipline: | Synopsis:<br>Jurisdiction Referral: On April 18, 2021, the OPC received an e-form from ███. Mr. ███ alleges that on April 7, 2021, A guy named ███, threatened him in front of MPD officers and they refused to arrest him. Mr. ███ also alleges that officers refused to include the full name of ███ in the police report because he works as an informant for MPD.<br><br>*Mr. ███ has video of the incident<br><br>Investigative Notes:<br>04/28/2021 Jurisdiction Referral: KB | IS-Related Documents: |
| 20003033<br><br>**PENDING - Closed** | Incident:<br>10/3/2020<br><br>Disposition:<br>1/23/2021<br><br>DRB: | OPC<br><br>OPC - Jurisdiction Referral, Orders/Directives Violation | Case:<br>Exonerated<br><br>Member Disposition:<br>OPC -- Jurisdiction Referral : OPC Dismissed, Misconduct Allegations -- Orders/Directives Violation : Unfounded<br><br>IAD Discipline:<br>Exonerated<br><br>DRB Disposition:<br><br>DRB Discipline: | Synopsis:<br>Jurisdiction Referral: The complainant, ███, alleged that on October 3, 2020 unidentified officers at the intersection of 17th and Euclid Streets N.W. did not wear masks. The complainant provided photographs of the officers, which showed that they were primarily group of bike cops.<br><br>Investigative Notes:<br>10/15/2020 Jurisdiction Referral:TC<br><br>-IAB received notification from the IAD on 11/17/20 referring investigation to 7D to handle. Noted CLA<br><br>-IAB received Final Investigation, AC reviewed/signed on 1/23/21. Noted CLA | IS-Related Documents:<br>IS20003033 - OPC Formal Complaint.pdf<br><br>IS20003033 - Jurisdiction Referral.pdf |

**CAD NAME: 10645- Noah Rathbun**
*IS Cases pending between 1/6/2021 and 2/8/2022*

### SUSTAINED/DISCLOSE and PENDING REPORT (Defense Copy)     Last Uploaded: 2/6/2022 11:50 pm          Print Date:  2/8/2022 4:22:01 PM

| IS No. | Dates | Incident Type/ Allegations | Disposition/ Discipline | Case Description | Additional Information |
|---|---|---|---|---|---|
| 18004618 <br><br> *Sustained/Disclose* | Incident: 11/21/2018 <br><br> Disposition: 1/8/2019 <br><br> DRB: | Orders/Directives Violation <br><br> Body Worn Camera Policy Violation | **Case:** Sustained <br><br> **Member Disposition:** Misconduct Allegations - - Body Worn Camera Orders/Directives Violation : Sustained <br><br> **IAD Discipline:** P.D. 750 Dereliction Report <br><br> **DRB Disposition:** <br><br> **DRB Discipline:** | **Synopsis:** During a review of BWC footage related to a Forced Entry investigation at ▇ Yuma St SE on 11/21/2018, Sgt. ▇ observed that Officer Rathbun does not have a full two minute BWC buffer with his associated BWC video in an apparent violation of G.O. 302.13. <br><br> **Investigative Notes:** | **IS-Related Documents:** IS18004618.pdf |
| 18002844 <br><br> *Sustained/Disclose* | Incident: 8/6/2018 <br><br> Disposition: 11/8/2018 <br><br> DRB: | Use of Force <br><br> Tactical Takedown - No Injury or Complaint of Pain | **Case:** Justified - Within Department Policy <br><br> **Member Disposition:** Use of Force -- Any Use of Force Not Included Above : Justified - Within Department Policy, Misconduct Allegations -- Orders/Directives Violation : Sustained <br><br> **IAD Discipline:** No Action Taken <br><br> **DRB Disposition:** <br><br> **DRB Discipline:** | **Synopsis:** Officers responded to a family disturbance at ▇ Newcomb St.  While escorting the subject of the disturbance outside, the subject turned and slapped the hand of Officer ▇. Officer ▇ and Officer Rathbun conducted a tactical takedown to place subject under arrest.  There was no complaint of pain or injury by subject <br><br> **Investigative Notes:** On August 8, 2018, Lieutenant ▇ authorized Reverse Garrity based on the evidentiary  material available at the time. <br><br><br> On 11/16/2018, Officer ▇ - Orders and Directives - Sustained. Officer ▇ alleged Excessive Force - Unfounded. GP | Use of Force for Officer Rathbun was Justified. Order and Directives violation was Sustained. Officer Rathbun was found to have used Insolent Language in violation of General Order 201.16, Part V, (c)(3) which states members shall "Refrain from harsh, violent, coarse, profane, sarcastic, or insolent language." Officer Rathbun was cited for Corrective Action in the form of Education-Based Development, policy review. <br><br> **IS-Related Documents:** IS18002844.pdf |

**CAD NAME: 10645- Noah Rathbun**
*IS Cases pending between 1/6/2021 and 2/8/2022*

**SUSTAINED/DISCLOSE and PENDING REPORT (Defense Copy)**     Last Uploaded: 2/6/2022 11:50 pm         Print Date:  2/8/2022 4:22:01 PM

| IS No. | Dates | Incident Type/ Allegations | Disposition/ Discipline | Case Description | Additional Information |
|---|---|---|---|---|---|
| | | | | On 11/16/2018, Officer ▓▓▓▓▓▓ - Use of Force Tactical Take Down - Justified, within Departmental Policy. GP | |
| | | | | On 11/16/2018, Officer Noah Rathbun - Use of Force Tactical Take Down - Justified, within Departmental Policy. Officer Rathbun - Orders and Directives Violation - Sustained. GP | |
| | | | | On 11/16/2018, Officer ▓▓▓▓▓▓▓▓ Alleged Excessive Force - Unfounded. GP | |
| | | | | On 11/16/2018, Officer | |
| 17002190  *Sustained/Disclose* | **Incident:** 7/9/2017  **Disposition:** 7/27/2017  **DRB:** 11/14/2017 | MPD Accident  Accident: Non-Preventable | **Case:** Preventable  **Member Disposition:** Vehicle Related Incidents -- Accidents : Preventable  **IAD Discipline:** Referred DRD Discipline  **DRB Disposition:** Corrective Action  **DRB Discipline:** Member was on leave so no COR was held. PD 750 was served at residence | **Synopsis:** On Sunday, July 9, 2017, Officer Rathbun, Noah #3855, responded to an aggravated assault call at ▓▓▓▓▓▓▓. While canvassing for individuals that were involved in this incident he drove his cruiser, 7081, to the rear of the location. He did not locate a complainant or any individuals who were actively fighting. While clearing the call he discovered that the exit he was going to take was not adequate for his patrol car to fit. He then decided that he would exit from where he came from. To do this he had to reverse his vehicle in the grass, and then drive forward to get there. He reversed without incident, put his vehicle in drive, drove forward and struck a low lying cement lamp post that had no lamp affixed to it. This caused the engine light to come on, and it appears that it may have damaged the exhaust manifold. Officer Rathbun also reported that the engine began to make a noise as well. Photos were taken of the scene and vehicle by Officer ▓▓▓▓ ▓ #3056. | **IS-Related Documents:** IS17002190.pdf  IS17002190 - Rathbun.pdf |

**CAD NAME:  10645- Noah Rathbun**
*IS Cases pending between 1/6/2021 and 2/8/2022*

**SUSTAINED/DISCLOSE and PENDING REPORT (Defense Copy)**     Last Uploaded:  2/6/2022 11:50 pm     Print Date:   2/8/2022 4:22:01 PM

| IS No. | Dates | Incident Type/ Allegations | Disposition/ Discipline | Case Description | Additional Information |
|---|---|---|---|---|---|
| | | | | There were no witnesses located to this incident.<br><br>**Investigative Notes:** | |

# OFFICER SUPPLEMENT

**CAD NAME:  10645 - Noah Rathbun**
*(Defense Copy)*

Print Date:  2/8/2022 4:22 PM

| Type/Identifier | Notes – To Be Disclosed | Linked Documents |
|---|---|---|
| **Miscellaneous**<br><br>**Last Updated:**<br>**02/08/2022 12:00 AM** | 6/1/17  No entries in PPMS. | |

A T T A C H M E N T   2


Notes of March 3, 2022

KN
NR
R?

3/30/2022

? ▫ Unidentified MPD Officer.jpg

▫ 12:36 Never-before-seen January 6 Footage
from our photographs
  ° Oh yeah. Tells me holding up my
BWC to record the man throwing the
boards.

▫ full BWC NR ° approx 1:30 pm

▫ Jan 6 2021 West Terrace Video - TByEv.Mov
Screenshot ° 00.01 ↓ 01:07
  ° ID'd himself

▫ You commented before lakeview that
but off
  ° indicative of someone who means to
  get physical
  ° was trying to separate the gates, to
  get in
  ° no baton
  ° ten his flag pole
  ° hit person next to him  (from BWC)
  ° Flagpole hit top of NR helmet
    ⨯ hit blue suit
  ° swung such that he hit other person
  ° "without helmet I'd have been seriously
  injured"

- Remember flag coming off

- Didn't say anything to him
x Didn't gesture to him
x Would be a huge mistake to engage
  with him it would instigate ??

° GRU earlier in the day

☒ BWC  14.28 22

       14:29:38

☒  0944 West Rot

☐  Taylor video
  ☒ 0835  2nd buckle

☐ Patients at the Capital

☐ Socialize time on inj plate

2

A T T A C H M E N T    3


Investigate J6 - Timeline



*website* ✓

*Investigate J6.org*

Home    Use of Force Timeline    Videos    Articles    Change of Venue    Lawsuit

# WHAT REALLY HAPPENED ON JANUARY 6?

FOUR DEATHS AT THE CAPITOL

THE JANUARY 6 TIMELINE          DC PROTEST LAW

THE JAN 6 PROSECUTIONS



*WATCH: **J6: A True Timeline.** The GROUNDBREAKING new film released 01/01/2024 at* <u>open.ink/J6</u>

**1:18pm**

Waldow's third order to fire into the crowd came at the request of DC MPD Sgt Daniel Thau, who had been frantically requesting explosive munitons to throw into the crowd. Thau then turned his attention to Waldow and the Less Lethal team perched above, and demanded they "fucking shoot" while pointing into the crowd. Waldow gave the order seconds later.

The Less Lethal team fired at least eight munitions into the crowd consisting of a mix of pepperball and other projectile munitions.



*The USCP Less Lethal Team's 1:18pm Shots.*

Meanwhile, in between Waldow's second and third shots, DC Metropolitan Police Department officers from the Special Operations Division began arriving on the scene, and immediately began escalating force with chemical sprays, batons, and tasers on protesters standing on the West Plaza.

The SOD is DC's most sued and criticized police force for their unlawful use of police brutality and excessive force. It's officers are known for commonly using illegal tactics against protesters and are known to be trigger happy with munitions, violating laws and civil rights. Officers arriving on the West Plaza are defendants in civil rights lawsuits for their use of munitions against protest crowds in previous years.



THE EPOCH TIMES

*DC MPD Arrives on the Capitol's West Plaza.*

Sgt Thau of the DC SOD began calling for munitions immediately after his arrival, and got them minutes later.

**At 1:24pm**, with no warning before escalating to explosive munitions, DC MPD Commander Robert Glover authorized escalation of force and ordered the deployment of stingball grenades and 40mm mortars.

This is when the protest devolved into chaos. Robert Glover declared the protest to be a riot 25 minutes later; and



*The First Police Grenades on January 6th by MPD [A Clip from J6: A True Timeline]*

hundreds of explosive, chemical, and impact projectiles were fired into the crowd.

**At 2:18pm**, DC MPD Sgt Thau and Sgt Edwards make an admission to their commander recorded on bodycam footage that their munitions are hitting innocent people, and are inciting ten people for every one they hit.



*DC MPD Officers Admit Hitting and Inciting Innocent People [A Clip from J6: A True Timeline]*

Even after recognizing this fact, they continue unimpeded and bombard the crowd with further munitions until est 2:30pm.

DC Police exhaust all of their munitions and continued to resupply until authorizing CS gas, against officer's advice.

The DC police force finally attempts adequate warnings in accordance with the First Amendment Assemblies Act (DC protest clearing law), and uses the LRAD for this final escalation of force, but the one speaker was inaudible mere feet away due to the crowd noise and size, and therefore inadequate.



*The First Warnings Given with LRAD Amplification Device*

# DC PROTEST LAW

A T T A C H M E N T   4


Metropolitan Police Department
Injury or Illness Report

PD 42 Rev. 4/96 xxxxxx xx

| ☒ INJURY - ON DUTY ☐ INJURY - OFF DUTY ☐ ILLNESS - ON DUTY ONLY | METROPOLITAN POLICE DEPARTMENT Washington, D.C. INJURY OR ILLNESS REPORT | TYPE OF REPORT ☒ ORIGINAL ☐ SUPPLEMENTARY | | COMPLAINT NUMBER 21002555 DATE THIS REPORT PREPAR |

| NAME OF MEMBER (Last, First, MI) R█████ N█ | SSN# On File | RANK Ofc. | BADGE NO. | MED. DIST | ELEMENT 7D | CURRENT ASSIGNMENT PSA 706 |

NATURE OF INJURY / ILLNESS: (List your injuries specifying area on body, in case of illness list symptoms. If this is a supplementary report, describe present problems).

Laceration to middle finger on right hand

DATE OF ORIGINAL INJURY / ILLNESS
01/06/2021

DATE ORIG'NAL REPORT PREPARED
01/07/2021

CAUSE: (List the known or suspected cause of your injury or illness)

An unknown suspect assaulted Officer R█████ with a pole.

| DATE & TIME REPORTED SICK 01/06/2021 1530 | DATE LAST WORKED 01/06/2021 | TOUR OF DUTY Evenings | DAYS OFF Thurs/Fri/Sat | SICK LEAVE BALANCE 836 | HOUR |

STATEMENT OF FACTS: (Describe the Nature and Circumstances of your Injury or Illness. Specifying Location(s) of the Injury on the Body and how and where the Injury Occurred. Include Names, Addresses and Phone Numbers of all Witnesses at the end of the Statement. Use Reverse Side if Necessary)

> Entered by Certifying Official

On Wednesday, 01/06/2020, at approximately1500 hours, the aforementioned injury occurred during th siege on the Capitol Building where multiple assailants assaulted multiple officers who were attempting combat the civil disturbance. While inside the Capitol, after the rioters had stormed, an unknown suspe struck Officer N████R█████ in the hand with a pole, causing a deep laceration to the right hand. In particular, the wound required sutures on Officer R█████ middle finger located on the right hand.

| HOSPITAL TREATMENT RECEIVED ☒ Yes ☐ No | ☐ Yes ☐ Admitted ☒ Released | NAME OF HOSPITAL Howard University Hospital |

| NAME OF DUTY OFFICIAL NOTIFIED Lieutenant Palete | DATE & TIME 01/07/2021 1530 | WATCH COMMANDER NOTIFIED (or Designee) Lt. Ellen Bader | DATE & TIME 01/07/2021    010 |

| ARE YOU ENGAGED IN OUTSIDE EMPLOYMENT? If Yes, enter Occupation and all duties worked | Yes  X No | COMMUNICATIONS NOTIFIED (NAME) (Two emergency personal treatment + ser) • Ofc. Hobbs | DATE & TIME 01/06/2020 2 |

| SIGNATURE OF MEMBER OR OFFICIAL PREPARING REPORT (if MEMBER IS UNABLE *Mull**  # L221* | SIGNATURE OF COMMANDING OFFICER | DATE 1/7/2021 |

| > Board of Surgeons Use Only < | > Board of Surgeons Use Only < |

BOARD OF SURGEON RECOMMENDS THE ABSENCE FROM DUTY BE

| ☐ APPROVED | ☐ DISAPPROVED (State reasons in remarks) | TYPE OF S CK LEAVE APPROVED ☐ PERFORMANCE OF DUTY  ☐ NON-POD | NO. OF HRS. | CURRENT BAL |

| SIGNATURE OF ATTENDING PHYSICIAN  MEMBER, BOARD OF SURGEONS & DATE | APPROVED BY | DATE | DATE RETURNED TO DU |

INSTRUCTIONS:    Prepare an original and make five (5) Photostat Copies. The original and 3 Copies shall be forwarded directly to the Police Clinic Division. Forward 1 Copy to the Identification and Records Division. Retain 1 Copy for the Element File.

NOTE    PD Form 42 must be submitted within 24 hours from the time of such illness/injury. Certification by officials pertaining to POD (illness / injury) shall be made within 72 hours. Non-POD (illness / injury) shall be certified within 5 business days

CONTINUATION – Statement of Facts

If necessary, continue on plain bond paper and attach.

OFFICIAL'S CERTIFICATION

COMMENTS     (Have member identify his complaints and describe the injury and factors such as condition of clothing, etc. Indicate if there is no visible injury interview of witnesses).

The circumstances surrounding the reported on-duty injury to Officer N████ R████████ of the Seventh District were investigated by Lieutenant Valerie Patete of the Seventh District. Lieutenant Patete's investigation revealed the following:

On Wednesday, 01/06/2021, at approximately 1500 hours, the aforementioned injury occurred during siege on the Capitol Building where multiple assailants assaulted multiple officers who were attemptin combat the civil disturbance. While inside the Capitol, after the rioters had stormed, an unknown susp struck Officer N████ R████████ in the hand with a pole, causing a deep laceration to the right hand. In particular, the wound required sutures on Officer R████████ middle finger located on the right hand

Officer R████████ was transported to Howard Univesity Hospital by the District of Columbia Fire and Emergency Services (DCFEMS). Officer R████████ was treated, and subsequently released, under the care of Dr. Edhuh

Officer R████████ notified Lieutenant Patete of the injury. Officer R████████ was directed to respond to th Police and Fire Clinic on 01/07/2021 for the morning sick call.

Based on the facts presented within, it is the recommendation of the investigating official that this repo be forwarded to the Police & Fire clinic for their review and consideration.

If necessary, continue on plain bond paper and attach.

| SIGNATURE OF CERTIFYING OFFICIAL | DATE AND TIME OF CERTIFICATION |
|---|---|
| Nall ███ # L221 | 01/07/21    0430 hours |

REMARKS (Board of Surgeons Only)

If necessary, continue on plain bond paper and attach.

A T T A C H M E N T   5


Lauderdales Notes

Case # OTHE-2021-000176 Case Packet

Metropolitan Police Depart

## OTHE-2021-000176 – BWC footage for Complainant reviewed - tagged with correct CCN: 21-003-68

CASE STATUS
NACT VE

LEAD INVESTIGATOR
JONATHAN LAUDERDALE (#8347)

AUTHOR
JONATHAN LAUDERDALE (#8347)

TAGS

LOCATION TAG

CASE TYPE
Other Cr mes

CASE SUPERVISOR[S]
N COLE COPELAND (#9430)

DATE / TIME MODIFIED
Jan 09, 2021 19:16

CCN: 21-003-686

Date: January 9th, 2021

Classification: APO / Injured Officer

Prepared by: Detective Jonathan Lauderdale

Subject: BWC footage CCN's updated

Th s w ter updated the Comp a nant s BWC footage by add ng the correct CCN s wh ch are 21 003 686.

Rev ew of BWC footage for Comp a nant (Off cer N▓ F▓▓▓▓)

On Saturday January 9th, 2021 th s w ter rev ewed the BWC footage for Off cer F▓▓▓ from January 6th, 2021 when Off cer F▓▓▓ was at the Un ted States Cap to dur ng the r ot. Be ow s a breakdown of what th s w ter observed dur ng the rev ew. The be ow sted t mes s footage mark va ue n Ev dence.com. The arge gaps n the t mes sted be ow s due to footage of no va ue (runn ng around the Cap to bu d ng or unab e to c ea see what s occurr ng).

**13:30:21** Off cer F▓▓▓ and add t on a Off cers arr ve at the Un ted States Cap to and beg n wa k ng towards the arge group of protesters to ass st the Off cers that were a ready on scene, prov d ng secur ty for the Un ted States Cap to .

**14:28:21** An unknown wh te ma e, who appears to be wear ng a red, wh te and b ack jacket w th b ue jeans wa ks over to Off cer F▓▓▓ and be shout ng "You fuck ng p ece of sh t" d rect y at Off cer F▓▓▓. The unknown subject cont nues to be verba y abus ve towards Off cer F▓▓▓ f few seconds onger wh e cont nu ng to po nt at the Off cer.

**14:28:30** The unknown wh te ma e cont nues to get c oser to the make sh ft barr er that Off cer F▓▓▓ s stand ng beh nd caus ng Off cer F▓ to extend h s eft arm to attempt to create d stance from the aggress ve subject. The subject then te s Off cer F▓▓▓ to "take that sh t off" an come on"

**14:28:34** Same subject v o ent y pushes the barr er nto Off cer F▓▓▓ and a br ef strugg e ensues. The Subject then appears to str ke or atter to str ke Off cer F▓▓▓ w th the po e the subject s carry ng wh ch appears to have a f ag on the end of t. The subject cont nues to try and str k Off cer F▓▓▓ numerous t mes. Off cer F▓▓▓ then tr es to ga n contro of the meta po e the subject has possess on of.

**14:28:53** Same subject runs at Off cer F▓▓▓ a so referred to as a "bu rush".

**14:29:00** Off cer F▓▓▓ fa s and the same subject sted above appears to get on top of the Off cer. The Off cers r ght hand appears to be on subjects face, try ng to push the subject off from the top of Off cer F▓▓▓

**15:02:00** Off cer F▓▓▓ ass st an unknown MPD Off cer (fema e) appears to have a mount an b ke he met on, s he ped down the sta rs by Of F▓▓▓. The unknown fema e Off cer appears to have troub e wa k ng, appears ncoherent, unsure of what occurred pr or or what caused the fer Off cers cond t on.

**15:02:43** Off cer F▓▓▓ wa ks unknown Off cer outs de to s ther on the sta rs. The Off cers name tag s dep cted. Off cer M. B▓▓▓ who s ass gned to the S xth D str ct. A query of PRT shows the Off cer s FULL DUTY status. The Off cer appears to say "everyth ng" when asked ghad to w and ment ons her back.

**15:07:02** Phys ca a tercat on beg ns wh ch s dep cted on BWC nvo v ng MPD Off cers and Off cer F▓▓▓.

**15:08:10** Ass st w th handcuff ng an unknown subject ns de of the Cap to bu d ng a ong w th Cap to Po ce.

A T T A C H M E N T   6


Lauderdale Notes
N.R. forgets events

Case # OTHE-2021-000176 Case Packet                                          Metropolitan Police Depar

## OTHE-2021-000176 – Officer contacted - interviewed

| CASE STATUS | CASE TYPE |
|---|---|
| NACT VE | Other Cr mes |
| LEAD INVESTIGATOR | CASE SUPERVISOR(S) |
| JONATHAN LAUDERDALE (#8347) | N COLE COPELAND (#9430) |
| AUTHOR | DATE / TIME MODIFIED |
| JONATHAN LAUDERDALE (#8347) | Jan 14, 2021 16:11 |
| TAGS | |

LOCATION TAG

**CCN:** 21-003-686

**Date:** January 14th, 2021

**Classification:** APO / Injured Officer

**Prepared by:** Detective Jonathan Lauderdale

**Subject:** Officer contacted / interviewed

Th s wr ter was contacted by Off cer R█████ v a phone (phone number on f e) regard ng the events / cr m na offenses that occurred on January        2021.

Off cer R█████ stated he s not back to fu  duty status and added that he susta ned an njury that requ red approx mate y 6 st tches on h s r ght        ndex f nger.

Off cer R█████ stated that he has, s nce be ng out on njury, rev ewed h s BWC footage from January 6th, 2021. Off cer R█████n stated that h s n       occurred wh e n the rotunda area of the US Cap to  wh e hav ng a phys ca  a tercat on w th protesters. Off cer R█████ stated dur ng the phys ca        a tercat on, a subject had a sma  er f ag po e wh ch "shattered" or "sp ntered" dur ng the a tercat on wh ch th s wr ter noted s dep cted on the BW      footage.

Off cer R█████ stated that he was surpr sed when he saw the other subject who th s wr ter observed on BWC footage, bu   rush Off cer R█████       get on top of the Off cer and start assau t ng the Off cer.

Off cer R█████ stated that the subject (who  s dep cted on the  eft s de of the BOLO) was actua  y chok ng the Off cer by pu  ng on the Off cers (      he met and due to the ch n strap of the he met be ng secured. Off cer R█████ stated as the subject cont nued to pu  on h s CDU he met, the stra       was chok ng the Off cer to the po nt he thought he was go ng to pass out. Off cer R█████ stated the subject appeared very enraged and wh e th      Off cer was be ng choked, the subject a so started str k ng the Off cer on or near h s head and upper body area. Off cer R█████ stated that he a s       ke he was be ng k cked by numerous unknown subjects  n the crowd as he was  ay ng on the ground and engaged w th the subject who was on top       h m and phys ca  y assau t ng the Off cer.

Off cer R█████ stated he be  eves that g ven the chaos and stressfu  events, he may have forgotten about the subject who was chok ng h m and        assau t ng h m but  mmed ate y reca  ed t when he rev ewed h s BWC.

Off cer R█████ stated that he has not rev ewed or seen any of the BOLOs that have been prepared and d ssem nated dep ct ng the Suspects and        subjects  nvo ved  n the events from January 6th but once he  s ab e to rev ew the BOLOs and st   mages he w   contact th s wr ter back w th any       add t ona  nformat on he can prov de.

Off cer R█████ stated he due back at the PFC on Sunday January 17th, 2021 and see  f he w   be a  owed to return to fu  duty status. Pr or to en      the fo  ow up, th s wr ter ensured that Off cer R█████ had th s wr ters comp ete contact  nformat on.

ATTACHMENT   7


F.B.I. Notes

FD-302 (Rev. 5-8-10)

# FEDERAL BUREAU OF INVESTIGATION

Date of entry    02/19/2021

METROPOLITAN POLICE DEPARTMENT (MPD) Officer (Ofc.) ▮▮▮▮
▮▮▮▮ (▮▮▮▮▮), badge number 10645, mobile telephone number ▮▮▮▮▮▮
▮▮▮ work email ▮▮▮▮▮▮▮▮▮▮▮▮ was interviewed via telephone by FBI
Special Agent (SA) RILEY PALMERTREE and SA JON COMOTTOR. After being advised
of the identities of the interviewing Agents and the nature of the
interview, ▮▮▮▮▮▮ provided the following information:

On January 6, 2021, ▮▮▮▮▮▮ was on duty with MPD Civil Disturbance Unit
(CDU) 74. After the speech, between approximately 1:00 p.m. and 2:00 p.m.,
Inspector GLOVER requested CDU 74 respond to the West Front of the CAPITOL.
While on the West Front of the CAPITOL, ▮▮▮▮▮▮ was assaulted by a middle-
aged man holding a MARINE CORPS flag who charged the gate, got on top of
▮▮▮▮▮▮, and tried to push ▮▮▮▮▮▮'s helmet off, which caused ▮▮▮▮▮▮ to
be choked by his (▮▮▮▮▮▮'s) chinstrap. ▮▮▮▮▮▮ could not breathe.
▮▮▮▮▮▮ was able to get back to and behind the line.

Later, while inside the Rotunda, ▮▮▮▮▮▮'s hand was injured by what
looked to be a fiberglass tent pole or flag pole held by an unknown
individual. The pole broke while ▮▮▮▮▮▮ was performing crowd control
duties, which led to ▮▮▮▮▮ seeking medical attention and eventually
getting seven stitches in his right index finger. ▮▮▮▮▮▮ left work after
the aforementioned incident with the pole, and did not return to work until
January 18, 2021.

| | | |
|---|---|---|
| Investigation on | 02/17/2021 | at Washington, District Of Columbia, United States (Phone) |

File # 89B-WF-3368293-145_AFO                                        Date drafted  02/17/2021

by  PALMERTREE RILEY MARTIN, COMOTTOR JON C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

A T T A C H M E N T   8


Public media press release



TRENDING    Forecast    Holidays    Snow-Stick Challenge    Trump-Vance Transition...

# DC Mayor Will Not Release Video of Police Killing of Suspected Kidnapper

On Tuesday, as required by law, Bowser identified the police officer who killed Vedo Hall as Officer Noah Rathbun

By Mark Segraves, News4 Reporter • Published June 1, 2021 • Updated on June 1, 2021 at 9:19 pm



*DC Police*

The rifle D.C. police say a man was armed with when he was shot and killed by an officer.

For the first time since the District enacted a law requiring the release of body-worn camera footage any time a D.C. police officer uses lethal force, Mayor Muriel Bowser will not release video of the most recent police killing.

Police said a man identified as 26-year-old Vedo Hall was a suspect on May 24 in an armed kidnapping and pointed a rifle at officers. Police shot and killed him.

>📺 **Watch News4 now: Stream NBC4 newscasts for free right here, right now.**

Bowser said Hall's family objected to the release of the footage. The law allows the video to be withheld if the family objects and the mayor agrees, but Bowser has the authority to override the family's decision.



**MAY 24, 2021**
Police Fatally Shot Man Armed With Rifle, Wanted for Kidnapping



**MAY 31, 2021**
Woman's Car is Stolen Twice in 24 Hours, Once After Being Found by DC Police

*We've got the news you need to know to start your day. Sign up for the First & 4Most morning newsletter — delivered to your inbox daily. >Sign up here.*

In the past, she has released bodycam footage over the objections of family.

On Tuesday, as required by law, Bowser identified the Metropolitan Police Department officer who killed Hall as Officer Noah Rathbun.

A spokesperson for the mayor's office would offer no further comment beyond a letter sent to the D.C. Council Tuesday identifying Rathbun.

Rathbun is on administrative leave and joined the department in November 2015, officials said.

🕐 This article was published more than **3 years ago**



*Democracy Dies in Darkness*

**Public Safety**

# Officer who fatally shot man in Southeast Washington identified

June 1, 2021

🗨 0

By Peter Hermann

District officials on Tuesday identified an officer who fatally shot a man last month who authorities said was armed with a rifle and had held a woman against her will inside an apartment in Southeast Washington.

Officer Noah Rathbun, who joined the force in 2015, is on routine administrative leave pending the outcome of the investigation.

Police said Rathbun had activated his body-worn camera but that the family of the man killed, 26-year-old Vedo Hall of Southeast Washington, did not consent to make the video public.

The incident occurred May 24 when police were called to an apartment in the 1100 block of Mississippi Avenue SE to investigate a possible abduction. Police said a man inside the apartment indicated to officers that he had a gun and would shoot them.

Police said the officers retreated. As reinforcements arrived, police said, Hall fled from the apartment with the woman and was later seen by an officer with the woman near the apartment building in the 1300 block of Alabama Avenue SE, outside Malcom X Opportunity Center.

Authorities said Hall was holding an SKS semiautomatic rifle and pointed it at Rathbun, who they said fired in response. Police said Hall died at a hospital. Police said they seized 45 bullets and that the rifle had a drum magazine capable of holding 50 rounds of ammunition.

Police said the woman was not harmed.

Hall's family has declined to comment on the case. Efforts to reach Rathbun were not successful Monday. A representative from the police union did not respond to an interview request.

A T T A C H M E N T   9


Victim Impact Statement

*Victim Statement, Ofc. N.R., January 6, 2021, U.S. Capitol Riot*

I vividly remember the circumstances in which I came into contact with Mr. Webster on January 6, 2021 at the U.S. Capitol. It was evident Mr. Webster could, as I could, hear the explosions of ordinance, feel the burning sensation of defensive chemicals in the air burning his skin, eyes and lungs. Mr. Webster and his fellow rioters in the crowd screamed curses, insults, and taunts at me and my fellow officers as we stood guard in front of the U.S. Capitol. A mass of rioters continuously challenged the gates which created our perimeter while others made attempts to push past officers in order to further penetrate our temporary fortifications as they fought to breach the U.S. Capitol.

While experiencing this toxic and chaotic environment Mr. Webster, while holding a United States Marine Corps flag, took his turn as an active participant in the riot. Mr. Webster charged the gates, grabbed hold of them, and shoved them into me several times. He swung the metal end of his flagpole at me in a downward chopping motion. It was then that Mr. Webster charged me. I remember when Mr. Webster charged at me his fists were clinched and held close to his chest. He pushed me to the ground and attempted to violently tear away my gas mask and ballistic helmet. This caused me to choke and gasp for air before another participant of the riot helped me to my feet. While on the ground I looked up to observe the rage in Mr. Webster's face. Participants of the riot flowed past as Mr. Webster pinned me to the ground. I eventually was able retreat behind our failed police line as I struggled to catch my breath.

It has been reported that Mr. Webster is a former United States Marine and retired New York City Police Officer. This means that Mr. Webster trained for years to show restraint in times of chaos, ensure public safety and protect civil order. He deliberately chose to dishonor himself as well as his fellow officers and service members by attacking me for what are now known to be reasons motivated by political ignorance.

As a Metropolitan Police Officer and former Corpsman in the United States Navy, I have a great deal of respect for those who serve in law enforcement and the armed forces. I am still in shock and deeply disappointed that an individual who served in those honorable professions would conduct himself in the manner that Mr. Webster did that day. His actions, attack and targeted assault caused me to fear for my life and could have easily left my wife and two small children without a husband and father. Alternatively, he could have debilitated me and made me a target and victim of others in the crowd as happened to some of my colleagues that day.

Mr. Webster's actions that day, combined with his unique training and experience, make him a considerable risk to the public and other members of the law enforcement community. His actions are well documented and are now publicly available as recording in the footage of my department issue body camera.

A T T A C H M E N T    10


D.O.J. Press Release



PRESS RELEASE

# U.S. Attorney's Office Concludes Investigation Into Fatal Shooting in Southeast Washington

Thursday, December 9, 2021

**For Immediate Release**

U.S. Attorney's Office, District of Columbia

## No Charges to Be Filed Against Metropolitan Police Department Officer

WASHINGTON - The U.S. Attorney's Office for the District of Columbia announced today that there is insufficient evidence to pursue federal criminal civil rights or District of Columbia charges against the officer from the Metropolitan Police Department (MPD) who was involved in the fatal shooting, in May 2021, of Vedo Hall in Southeast Washington.

The U.S. Attorney's Office and the Metropolitan Police Department (MPD) conducted a comprehensive review of the incident. This included interviews of civilian and law enforcement witnesses as well as a review of physical evidence, recorded radio communications, Body Worn Camera (BWC) footage, medical reports, and reports from the Metropolitan Police Department.

According to the evidence, shortly after 11 a.m. on May 24, 2021, MPD Seventh District Officers were dispatched to an apartment in the 1200 block of Mississippi Avenue SE, to check on the welfare of a woman who reportedly was being held against her will by her ex-boyfriend, Mr. Hall. Additionally, Mr. Hall was reported to be armed with a firearm. Officers knocked on the apartment door and announced, "police!" Mr. Hall replied, "I'm about to shoot!" The woman was heard from inside the apartment stating, "Please don't! please don't!" Mr. Hall then opened the apartment door and again stated, "I'm about to shoot." Officers saw Mr. Hall was armed with a rifle, and Mr. Hall then closed the door to the apartment.

Members of MPD's Emergency Response Team (ERT) subsequently breached the door and entered the apartment. They determined that the apartment was empty. A rear window on the apartment was open and the screen had been pushed out. It appeared that Mr. Hall and his ex-girlfriend had fled the apartment before the officers set up a perimeter.

Hours later, at approximately 3 p.m., two other MPD officers responded to the 1300 block of Alabama Avenue SE after MPD developed information that the woman's cellphone was near that location. The officers exited their patrol vehicle and proceeded to walk westbound in the 1300 block of Alabama Avenue SE.

One officer entered a gate that led to the walkway of the breezeway on the south side of 1351 Alabama Avenue SE. He was immediately confronted by Mr. Hall at the entrance into the breezeway. Mr. Hall was holding a large cardboard box in front of him with both his right and left hands. The officer forced his way between the fence and the side of the building and made his way onto the breezeway. Mr. Hall began to back away from the officer and drew a rifle from the cardboard box he was holding. Mr. Hall's ex-girlfriend, who had been standing next to Mr. Hall, screamed and ran away. The officer drew his service pistol and backed away from Mr. Hall. The officer yelled, "Stop! Stop! Put it down!" Mr. Hall, with his right hand on the grip of the rifle, took up a shooting stance and pointed his rifle at the officer. The officer then discharged two rounds from his service pistol, striking Mr. Hall once in the face and once in the left leg.

Mr. Hall, 26, died from a gunshot wound to the head.

After a careful, thorough, and independent review of the evidence, federal prosecutors have found insufficient evidence to prove beyond a reasonable doubt that the officers used excessive force under the circumstances.

## Use-of-force investigations generally

The U.S. Attorney's Office reviews all police-involved fatalities to determine whether sufficient evidence exists to conclude that any officers violated either federal criminal civil rights laws or District of Columbia law. To prove such violations, prosecutors must typically be able to prove that the involved officers willfully used more force than was reasonably necessary. Proving "willfulness" is a heavy burden. Prosecutors must not only prove that the force used was excessive, but must also prove, beyond a reasonable doubt, that the officer acted with the deliberate and specific intent to do something the law forbids.

The U.S. Attorney's Office remains committed to investigating allegations of excessive force by law enforcement officers and will continue to devote the resources necessary to ensure that all allegations of serious civil rights violations are investigated fully and completely. The Metropolitan Police Department's Internal Affairs Division investigates all police-involved fatalities in the District of Columbia.

A T T A C H M E N T    11

Pre-trial Hearing - Page 43 - Page 44
April 21, 2022

1      And so what that means is that, A, you ought to be

2   prepared to -- ought to be ready to prepare such a list;

3   and, two, that that list exhibit -- the description of the

4   exhibit is fairly neutral, and that one that won't draw an

5   exhibit.  I looked through the exhibit list; I think, for

6   the most part, they're neutral.

7      The reason I do this is because I've had jurors

8   say, look, it would be nice to have had the list so we can

9   identify what the exhibits are and find things.  I don't

10  think that's going to be as big of an issue here in this

11  case since the evidentiary record is fairly limited, but

12  I'll just give everybody a heads-up as to that practice,

13  okay?

14      All right.  The last thing I wanted to raise

15  was -- and maybe we don't need to do this now, but one of

16  the motions concerned cross-examination of officer N.R.

17  about sort of the ongoing administrative issues.  I don't

18  know whether there's any factual update as to that, and we

19  are on the public record, and to the extent we need to go

20  off, we can do that, but if you can be mindful of that.

21      MR. KELLY:  Yes, Your Honor.

22      Just being vague, I think the most recent

23  information the government has was included in our reply

24  brief, which was the most recent update where there is still

25  one final piece to the government's understanding of that

44

1    administrative investigation that is ongoing.

2              THE COURT:  Okay.

3         MR. KELLY:  It is actually possible, given the

4    timeline here, that sometime between now and next week, that

5    the final piece will be concluded.  We don't, sitting here

6    today, though, as of our most recent update this week, have

7    any further updates.

8              It does appear to still be open.

9         THE COURT:  Okay.

10        MR. KELLY:  But, of course, we will notify the

11   Court and defense counsel if that changes somehow in the

12   next several days.

13             THE COURT:  Okay.

14        Mr. Monroe.

15        MR. MONROE:  You know, Judge, on the day that I

16   got your short order in response to my mentioning of a

17   continuance, I was just about finishing a motion on that

18   point.  But I figured why belabor the Court with a motion

19   that the Court has already given some thought to and

20   considered.

21             But I just put this out to Your Honor from an

22   evidentiary standpoint:  N.R. is the government's key

23   witness.  What I expect the jury is going to hear is that

24   N.R. -- and I can speak with this on the record, or does the

25   government prefer I --

A T T A C H M E N T     12

Pre-trial Hearing - Page 57 - Page 58

April 21, 2022

57

```
 1    to know if the public line would be available during the
 2    trial?
 3              THE COURT:  No.
 4              Well, put it differently:  The courtroom will be
 5    open.
 6              MS. NIELSEN:  Oh, the courtroom will be open.
 7              THE COURT:  So it's not my intention to pipe in
 8    the public line.
 9              But the courtroom will be open, so this will, as
10    required, be a public proceeding.
11              MS. NIELSEN:  Perfect.  Those were my questions.
12    Thank you so much, Your Honor.
13              THE COURT:  Okay.
14              Mr. Monroe, anything you'd like to raise or ask?
15              MR. MONROE:  No, Judge.
16              I did provide your clerk with our binder with
17    defendant's exhibits, and I also provided a binder also for
18    the government.  I have a hard copy.
19              I was served last night with additional discovery,
20    and in there was some handwritten notes from an interview of
21    Officer N.R.  So I anticipate adding that as a Defendant's
22    I'm sorry, court reporter, I'm trying to keep my mouth in
23    front of the microphone -- Exhibit 50.  Again, it wouldn't
24    be something we would be looking to put into evidence, but,
25    if needed, we would use it to cross-examine the officer as
```

1    an additional inconsistent statement as to the events that

2    transpired on January the 6th.

3             THE COURT:  Okay.

4             All right.  Well, that's fine.  As I said, just as

5    long as I have the updated lists, and I understand there may

6    be additions, modifications during trial, that's fine, we

7    can -- we'll adjust.

8             Okay.  Anything else anybody wants to raise before

9    we adjourn?

10            MR. MONROE:  I was cut off.  And I was being as

11   diplomatic as I could, I didn't want to impede upon the

12   government's interest in keeping that part of the case

13   sealed.

14            THE COURT:  We've got to deal with that.  Yes, I

15   forgot about that.  Thank you for reminding me.  Sorry about

16   that.  Yeah, we'll take care of that in a moment.

17            Anything else?  Okay.

18            All right.  So at this point, I'm going to ask the

19   courtroom to be cleared so we can deal with an in-camera

20   matter.  And we do have the public line on right now;

21   that'll be disconnected as well, and this portion of the

22   transcript will be placed under seal.

23            (Sealed proceedings)

24   ███████████    █████████████████████

25   ████████████████████████████████████████

A T T A C H M E N T   13

Paralegal E-mail

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

FROM: Webster, ████████
TO: 31135509
SUBJECT: Email you requested
DATE: 02/24/2023 08:43:52 AM

Good afternoon again, ████████


Well look what we have here. Please review and give Jim and me a call about this video. Lower right hand side - you can clearly see N.R. wave for Tom to fight him and then smash him in the face.


Walter

-------- Forwarded message ---------
From: Walter ████████ <walter@dupeemonroelaw.com>
Date: Fri, Apr 22, 2022 at 1:53 PM
Subject: Surveillance Video from Gov't (Exhibit 205)
To: Jim Monroe <jim@dupeemonroelaw.com>


n:


s is the video that shows N.R. waving Tom for a fight and clearly smashing him with a punch in the face

lter

A T T A C H M E N T    14

Declaration of Brandynn Reaves

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION**

| | |
|---|---|
| THOMAS WEBSTER, | |
|     Plaintiff, | |
|     v. | Civil Action No. 2024-CAB-004681 |
| METROPOLITAN POLICE DEPARTMENT, | Judge Danya A. Dayson |
|     Defendant. | |

## DECLARATION OF BRANDYNN REAVES

I, BRANDYNN REAVES, hereby declare under penalty of perjury that the following is true and correct based on my personal knowledge, information, and belief:

1.    I am over the age of 18 and am competent to testify to the matters set forth in this declaration.

2.    I work for the Metropolitan Police Department (MPD) in its Freedom of Information Act (FOIA) Office as the FOIA Officer. I was assigned to this position on May 9, 2022.

3.    As part of my duties, I oversee the MPD FOIA Office. I supervise FOIA specialists in their review of FOIA requests submitted to the MPD FOIA Office, and I assist in the preparation of responses on behalf of MPD.

4.    I make this Declaration based on my personal knowledge, including as informed by documents and information provided to me by other District of Columbia (District) employees and/or available to me in the course of my official duties at MPD.

I.     **Plaintiff's FOIA Request and MPD's Response**

5.     On or about June 16, 2023, MPD's FOIA Office received a FOIA request from Plaintiff Thomas Webster seeking:

> All investigation notes and documentation regarding Officer Noah Rathbun, Metro Police Department, concerning any and all incidents occurring on May 24, 2021.

6.     The request was assigned FOIA Request Number 2023-FOIA-06900.

7.     The FOIA Office determined that the request was related to an on-going investigation of an officer-involved shooting involving Officer Noah Rathbun. More specifically, on May 24, 2021, Officer Rathbun responded to a call for an alleged kidnapping. On arrival, the suspect produced and aimed a rifle at Officer Rathbun, who drew his service pistol and discharged the service pistol, striking and killing the suspect.

8.     The FOIA Office also determined that the requester, Thomas Webster, had been convicted of assaulting Officer Rathbun during the January 6, 2021 Capitol riots. More specifically, Thomas Webster assaulted Officer Rathbun by striking at Officer Rathbun with a metal flagpole. *See, e.g., United States v. Webster*, 102 F.4th 471, 477–78 (D.C. Cir. 2024). Thomas Webster shortly thereafter knocked Officer Rathbun to the ground and pushed Officer Rathbun's gas mask into his face. *See, e.g., id.* at 478.

9.     The FOIA Office was unable to locate a signed release or waiver of personal privacy interests, signed by the referenced individual (Officer Rathbun), who had a personal privacy interest in the disposition of the requested records. An officer's personal privacy interest is heightened where, as here, a requester is seeking documents specific to that officer. In that instance, there is often no way for MPD to provide redacted records that would protect the officer's privacy. The investigatory records sought here contain personally identifying information, such as names, likenesses, dates of birth, addresses, phone numbers, and so forth.

2

In addition, whenever an MPD officer uses force, the Internal Affairs Division (IAD) opens an investigation—which starts off as a criminal investigation—and thus responsive records include investigations into Officer Rathbun as a potential suspect. Further, the records sought contain information on the specific details and tactics of a traumatic event to which Officer Rathbun and other MPD Officers responded.

10.     In addition, other individuals have privacy interests related to the records Mr. Webster requested. For example, the family of the decedent has privacy interests in the details of the circumstances surrounding the decedent's death. Additionally, the victim of the alleged kidnapping has privacy interests, including personally identifying information and the details of the events on May 24, 2021.

11.     On or about June 23, 2023, the FOIA Office determined that the release of the requested information would constitute a clearly unwarranted invasion of personal privacy, and that the information was therefore exempt from disclosure under D.C. Code § 2-534(a)(2) and (a)(3)(C). *See* Attachment 1, June 23, 2023 Denial Letter (Denial Letter) at 1.

12.     The FOIA Office also determined that the subject matter of the request was, at the time of the request and response, the subject of an open and ongoing investigation, and as such responsive records were exempt from release under D.C. Code § 2-534(a)(3)(A)(i) and (a)(3)(B), which protect investigatory records compiled for law enforcement purposes to the extent that the production of such records would interfere with enforcement proceedings by revealing the direction and pace of the investigations; lead to attempts to destroy or alter evidence; reveal information about potential witnesses who could then be subject to intimidation as part of an effort to frustrate future investigative activities; place any witnesses in danger; and, could deprive a person of a right to a fair trial or an impartial adjudication. *See* Denial Letter at 2.

3

13.     The FOIA Office did not interpret Mr. Webster's FOIA request for investigatory notes and documents to include public-facing reports such as Public Incident Reports.

14.     On or about June 23, 2023, MPD issued a response to the FOIA request, explaining that the requested information was exempt from disclosure under D.C. Code § 2-534(a)(2), (a)(3)(C), (a)(3)(A)(i), and (a)(3)(B). *See* Denial Letter.

## II.     MPD's Subsequent Search Efforts and Record Release

15.     On or about August 9, 2024, MPD was notified that the Complaint in this case had been filed. In the Complaint, Plaintiff Webster asks for nine categories of records, some of which MPD interprets as plainly outside the scope of his original requests. For example, "roll call assignments," are administrative records, not investigatory records. Likewise, "details of settings of N.R.'s body worn camera including 'Buffer time setting'" is merely information, not a record. Compl. at 3.

16.     After receipt of the Complaint, I contacted IAD regarding the existence of any records responsive to Mr. Webster's June 16, 2023 FOIA Request.

17.     On or about October 16, 2024, I received two CCN(s) (CCN #21068026; CCN #21068156) for the officer-involved shooting on May 24, 2021, and determined that the investigation was no longer open. As a result, any Public Incident Reports (also known as a PD-251) related to the incident are available to the public. Further, the records sought are no longer exempt from release pursuant to the investigatory records exemption in D.C. Code § 2-534(a)(3)(A)(i) and (a)(3)(B).

18.     On October 17, 2024, I identified additional records responsive to the documents requested in Plaintiff's Complaint, including body worn camera footage of the May 24, 2021 officer-involved shooting. However, I was unable to locate a signed release or waiver of

personal privacy interests, signed by Officer Rathbun, who continues to have a personal privacy interest in the disposition of such records, and further was unable to locate a signed release or waiver of personal privacy interests for others who appear in the footage. In fact, the decedent's family has specifically asked that body worn camera footage not be released.

19.    I determined that, apart from the Public Incident Report, six additional categories of records exist responsive to Plaintiff's request, but upon review, the following documents contain responsive material which is not reasonably segregable from exempted portions:

a.    **Body-Worn Camera Footage.** The body-worn camera footage Plaintiff seeks documents an officer-involved shooting which resulted in a death, as described above. The involved officer has a privacy interest in the specific details of this traumatic event. The officer's likeness has not been released, nor have details of the event beyond general descriptions of the event in news or media. Further, the deceased person's family members have personal privacy interests that must be protected, and the family did not consent to public disclosure of body-worn camera footage from this incident. Finally, the footage also shows a victim who had been kidnapped by the decedent, who was being held against her will, and she also has privacy interests. The incident involved a domestic violence incident, which is further exempt from disclosure under D.C. Code § 2-534(a)(2A)(B). There is no cognizable, countervailing public interest in the disclosure of this information.

b.    **Seventh District Roll-Call Sheets for May 24, 2021 (Day and Evening).** Roll-call sheets are not within the scope of Plaintiff's D.C. FOIA request, which sought investigatory records. Even so, the officers listed on the roll-call sheets have a substantial privacy interest in personally identifying information, such as his/her/their name, assigned vehicle numbers, where they were assigned to patrol on May 24, 2021, and which officials or

leadership were on duty on May 24, 2021. There is no cognizable, countervailing public interest in the disclosure of this information.

     c.    **Record Management System (RMS) Internal Police Reports.** RMS Internal Police Reports contain additional data points beyond publicly available Public Incident Reports (often referred to as PD-251s). The relevant reports here include substantially more information about the decedent; the victim; the property involved; witness information including names, dates of birth, and contact information; profiles about each involved person, which may include likenesses in addition to other identifying information; and a long-form narrative that contains additional data points about individuals that are not included in the Public Incident Reports. The involved individuals have a substantial privacy interest in the personally identifying information described above. The deceased person's family members also have personal privacy interests that must be protected. There is no cognizable, countervailing public interest in the disclosure of this information.

     d.    **Internal Affairs Division's Final Investigative Report Concerning the Use of Force.** Internal Affairs Division (IAD) conducted an investigation into the events on May 24, 2021. These investigations start as a criminal investigation into an MPD officer's use of force until the determination is made by the U.S. Attorney's Office to not pursue a criminal case, after which point it is an administrative investigation. Officer Rathbun has significant privacy interests in the content and outcome of this investigative report, including the specific details of the event, IAD findings, personally identifiable information, and other data points related to Officer Rathbun. Other involved individuals also have a substantial privacy interest in personally identifying information, such as his/her/their name, e-mail address, images, or date of birth. The deceased person's family members also have personal privacy interests that must be

6

protected, as the investigative report necessarily includes significant information about the circumstances surrounding the shooting and details about the decedent. There is no cognizable, countervailing public interest in the disclosure of this information.

        e.      **PD Form 120 Death Report.** Autopsy reports are maintained by the D.C. Office of the Chief Medical Examiner, and are not in MPD's custody, but a PD Form 120 Death Report contains similar information based on OCME's autopsy. The Death Report includes identifying information of investigators, next of kin, and narratives with data points about the decedent. The deceased person's family members therefore have personal privacy interests that must be protected. The involved individuals also have a substantial privacy interest in personally identifying information. There is no cognizable, countervailing public interest in the disclosure of this information.

        f.      **OUC Event Chronology.** The Office of Unified Communications (OUC) maintains all radio transmission information. OUC develops event chronologies, which include time-stamped data on radio transmissions and identifying information such as badge numbers or names. The contents of radio transmissions also may include data points about involved individuals, including location information and descriptions. The involved individuals have a substantial privacy interest in personally identifying information, such as his/her/their name, e-mail address, images, or date of birth. The deceased person's family members also have personal privacy interests that must be protected. There is no cognizable, countervailing public interest in the disclosure of this information.

    20.    All documents deemed responsive to the Plaintiff's June 16, 2023 request, including the more specific requests Plaintiff makes in the Complaint that arguably fall within the scope of the original request, are exempt from disclosure and listed in the Vaughn Index

attached to this Declaration.  Also included in the Vaughn Index are the PD-251s, which have been redacted to protect the names and addresses of victim(s) and reporting parties.  I have reviewed the Vaughn Index and the records in MPD's possession described therein.  The Vaughn Index is a true and accurate index and description of the documents that were withheld.

21.    Based on my review, the Vaughn Index: (1) adequately describes the documents in question; (2) details whether the document has been redacted or withheld; (3) if information was redacted, the Vaughn Index specifically identifies the type of information that was redacted; (4) states the statutory basis for the redactions or withholdings; and (5) explains why the exemption applies.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  October 22, 2024.

*Brandynn Reaves*
BRANDYNN REAVES
FOIA Officer
Freedom of Information Act Office
Metropolitan Police Department
300 Indiana Avenue, NW, Room 4153
Washington, D.C. 20001
(202) 727-3721

A T T A C H M E N T     15

Use of Force Overview

# Metropolitan Police Academy



# 5.1 Use of Force Overview

- Firearm discharge (excluding negligent discharges determined to be misconduct by IAD)
- Deadly force
- Serious use of force
- Use of force indicating potential criminal conduct
- Use of force resulting in visible injury
- Use of force resulting in complaint of injury or pain

**Exception:** When control holds are used and there is no injury or complaint of pain or injury.

When completing a FIR, a member should articulate the events as accurately and coherently as possible. Members should also articulate when they used de-escalation tactics and why they didn't do something to help keep the situation calm (e.g., that a particular force option was not feasible at the time). Members need to document as much detail as possible in their narratives to help officials understand what was happening on scene.

## Body Worn Cameras (BWC)

The body worn camera is one of the department's most important tools to help document a member's patrol activities. This tool is particularly useful in use of force investigations. After a use of force, one of the first questions asked by the department, the media, and activist groups is, "Was the officer wearing a body camera?"

A body camera program helps to promote and ensure department transparency. When an officer activates his or her body camera, he or she is less likely to be perceived as concealing his or her actions. However, if that same officer is equipped with a camera and does not activate it, he or she will likely be viewed as having something to hide. That officer could even be accused of deliberately trying to cover up his or her actions.

Body cameras are a powerful tool and are here to stay. While interacting with the public, it is especially important to always remember to activate your camera immediately when you receive a call for service or whenever you self-initiate any field activities. This will protect you and your fellow officers as well as provide a valuable resource if your actions are called in to question.

Members *may not review* their BWC recordings or BWC recordings that have been shared with them to assist in initial report writing. However, after an initial report is completed, members may view their BWC or another member's BWC thereafter, including, but not limited to when doing the following:

- Papering a case
- Preparing an affidavit for a warrant
- Providing a statement
- Completing any supplemental report

**EO 20-044** provides that **initial reports** are those reports completed by members in response to calls for service or self-initiated police action that are submitted prior to the end of their shift to document their response to an event. Initial reports include, but are not limited to, reports completed in Mark43 (e.g., Incident/Offense Report, Arrest Report, Traffic Crash Report, Missing Person Report), NOI, Arrestee's Illness/Injury Report, FD-12s, and Force Incident Reports.

<u>**NOTE**</u>: The above is the information that General Counsel provides to officials during legal training.